**No. 18-17274**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

EAST BAY SANCTUARY COVENANT, et al.
Plaintiffs-Appellees,

v.

DONALD J. TRUMP, President of the United States, et al.
Defendants-Appellants.

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA

**EMERGENCY MOTION UNDER CIRCUIT RULE
27-3 FOR ADMINISTRATIVE STAY AND
MOTION FOR STAY PENDING APPEAL**

JOSEPH H. HUNT
*Assistant Attorney General*
SCOTT G. STEWART
*Deputy Assistant Attorney General*
AUGUST E. FLENTJE
*Special Counsel*
WILLIAM C. PEACHEY
*Director*
EREZ REUVENI
*Assistant Director*
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
PATRICK GLEN
*Senior Litigation Counsel*
JOSEPH A. DARROW
FRANCESCA GENOVA
CHRISTINA GREER
*Trial Attorneys*

## CIRCUIT RULE 27-3 CERTIFICATE

The undersigned counsel certifies that the following is the information required by Circuit Rule 27-3:

**(1) Telephone numbers and addresses of the attorneys for the parties**

*Counsel for Appellants Donald J. Trump, et al.*
Joseph H. Hunt (jody.hunt@usdoj.gov)
Scott G. Stewart (scott.g.stewart@usdoj.gov)
August E. Flentje (august.flentje@usdoj.gov)
William C. Peachey (william.peachey@usdoj.gov)
Erez Reuveni (erez.r.reuveni@usdoj.gov)
Patrick Glen (patrick.glen@usdoj.gov)
Joseph A. Darrow (joseph.a.darrow@usdoj.gov)
Francesca Genova (francesca.m.genova@usdoj.gov)
Christina Greer (christina.p.greer@usdoj.gov)
Office of Immigration Litigation
U.S. Department of Justice, Civil Division
P.O. Box 868, Ben Franklin Station
Washington, DC 20044
202-307-4293

*Counsel for Appellees*
Lee Gelernt (lgelernt@aclu.org)
Judy Rabinovitz (jrabinovitz@aclu.org)
Omar C. Jadwat (ojadwat@aclu.org)
Anand Balakrishnan (abalakrishnan@aclu.org)
Celso Perez (cperez@aclu.org)
ACLU Foundation
Immigrants' Rights Project
125 Broad Street, 18th Floor
New York, NY 10004
(212) 549-2660

Jennifer Chang Newell (jnewell@aclu.org)
Cody Wofsy (cwofsy@aclu.org)
Julie Veroff (jveroff@aclu.org)
ACLU Foundation
Immigrants' Rights Project
39 Drumm Street
San Francisco, CA 94111
(415) 343-0770

Melissa Crow (melissa.crow@splcenter.org)
Southern Poverty Law Center
1666 Connecticut Avenue NW, Suite 100
Washington, D.C. 20009
(202) 355-4471
F: (404) 221-5857

Mary Bauer (mary.bauer@splcenter.org)
Southern Poverty Law Center
1000 Preston Avenue
Charlottesville, VA 22903
(470) 606-9307

Baher Azmy (bazmy@ccrjustice.org)
Angelo Guisado (aguisado@ccrjustice.org)
Ghita Schwarz (gschwarz@ccrjustice.org)
Center for Constitutional Rights
666 Broadway, 7th Floor
New York, NY 10012
(212) 614-6464

Christine P. Sun (csun@aclu.org)
Vasudha Talla (vtalla@aclu.org)
ACLU Foundation of Northern California
39 Drumm Street
San Francisco, CA 94111
(415) 621-2493

**(2) Facts showing the existence and nature of the emergency**

As set forth more fully in the motion, the district court has entered a nationwide injunction barring enforcement of an important Executive Branch policy issued pursuant to delegated statutory authority rendering aliens ineligible for asylum when they unlawfully enter the United States at the southern border in violation of a Presidential proclamation that suspends those aliens' entry in the national interest. That injunction is imposing irreparable harm on Defendants and the public. The injunction contravenes the constitutional separation of powers; harms the public by thwarting enforcement of a rule implementing the Attorney General's and Secretary of Homeland Security's statutory authority over the border and the process through which aliens apply for and receive asylum in this country; and second-guesses the Executive Branch's considered foreign-policy judgments concerning efforts to negotiate with Mexico and Central American countries a diplomatic solution to the crisis at the southern border.

**(3) When and how counsel notified**

The undersigned counsel notified counsel for Plaintiffs by email on November 27, 2018 that it would be filing this a motion to stay in district court and then this motion. Counsel notified Plaintiffs by email again on November 30, 2018, of Defendants' intent to file this motion should the district court deny its stay motion that day. Service will be effected by electronic service through the CM/ECF system.

**(4) Submissions to the district court**

On November 27, 2018, Defendants requested a stay of the district court's order from the district court. The district court denied the request on November 30, 2018.

_Counsel to Defendants_

JOSEPH H. HUNT
 _Assistant Attorney General_
SCOTT G. STEWART
 _Deputy Assistant Attorney General_
AUGUST E. FLENTJE
 _Special Counsel_
WILLIAM C. PEACHEY
 _Director_
By: _/s/ Erez Reuveni_
 EREZ REUVENI
 _Assistant Director_
 Office of Immigration Litigation
 U.S. Department of Justice, Civil Division
 P.O. Box 868, Ben Franklin Station
 Washington, DC 20044
 Tel: (202) 307-4293
 Email: Erez.R.Reuveni@usdoj.gov
PATRICK GLEN
 _Senior Litigation Counsel_
JOSEPH DARROW
FRANCESCA GENOVA
CHRISTINA GREER
 _Trial Attorneys_

## INTRODUCTION

This Court should expedite this appeal and stay, pending resolution of the appeal, the district court's extraordinary and legally flawed nationwide injunction of a critical regulation designed to deter illegal migration and secure the southern border. That regulation is urgently needed to stem a crisis resulting from the increase in mass illegal migration at the southern border by aliens lacking meritorious asylum claims, who nevertheless enter unlawfully at heightened risk to themselves and federal officers. The government requests an immediate administrative stay and a decision by Friday, December 7, 2018.

The President, relying on his "broad discretion to suspend the entry of aliens into the United States," *Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018), determined that entry must be suspended temporarily for the many aliens who, rather than presenting themselves at a port of entry, violate our criminal law and endanger themselves, any children accompanying them, and U.S. law-enforcement officers by crossing illegally into the United States. *See Proclamation No. 9822, Addressing Mass Migration Through the Southern Border of the United States*, 83 Fed. Reg. 57661 (Nov. 9, 2018) (Exhibit A). The Attorney General and Secretary of Homeland Security, exercising their broad statutory authority, issued a regulation providing that those who enter the country in contravention of such a proclamation will not be eligible for the discretionary benefit of asylum. *See* Aliens Subject to a Bar on Entry

1

Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934 (Nov. 9, 2018) (Exhibit B). Such aliens can still seek protection from removal—so they will not be sent back to countries where they are more likely than not to face persecution or torture. Those actions address an ongoing crisis of illegal mass migration that threatens to overwhelm our asylum system as large numbers of migrants are now approaching or have arrived at the southern border. Together, these actions discourage illegal entry and the misuse and distortion of our asylum system, channel aliens seeking to enter to apply for asylum to ports of entry so that their asylum claims may be processed in an orderly way, encourage aliens to apply for protection in Mexico or other countries they enter before proceeding to the United States, and aid ongoing negotiations with Mexico and other countries on deterring mass migration to the United States.

Despite the Executive Branch's established authority and sound policy aims, the district court issued a nationwide injunction barring implementation of the rule precisely when it is needed most. That injunction should be stayed pending appeal.

The injunction is legally flawed at every turn. The district court entered the injunction at the behest of organizational Plaintiffs that are not themselves subject to the rule and that lack Article III standing or any right to challenge asylum-eligibility standards that affect third-party aliens. The injunction flouts Congress's considered judgment that the Executive Branch has broad discretion to deny asylum

(even to aliens who otherwise satisfy the statutory requirements for asylum) and broad authority to "establish additional limitations and conditions, consistent with [the asylum statute], under which an alien shall be ineligible for asylum." 8 U.S.C. § 1158(b)(1)(A), (b)(2)(C). And the injunction is vastly overbroad: it is untethered from Plaintiffs' claims and from any existing or even future clients of Plaintiffs, and it applies nationwide, effectively preventing other courts, including those exclusively vested with such authority by Congress, from reviewing the rule.

The balance of harms strongly favors a stay pending appeal, an immediate administrative stay pending consideration of the request for that stay, and expedited consideration of this appeal. The injunction harms the public by thwarting enforcement of a rule aimed at encouraging the large number of aliens transiting Mexico and Central America to follow our laws, as well as the Executive Branch's diplomatic efforts to negotiate with Mexico and Central American countries to solve a problem that is putting thousands at risk as they take dangerous journeys across Mexico—overwhelming our asylum system and placing federal officers in danger. Plaintiffs have identified only speculative harms that they might suffer from the rule's implementation—harms that all derive from illegal conduct and that could be minimized by expediting proceedings.

The district court declined to stay its injunction pending this appeal. Defendants seek a stay in this Court because the very emergency the rule seeks to confront will continue to unfold absent such a stay.

## BACKGROUND

Legal Background.  Congress has recognized the need for the President to regulate the flow of aliens into the United States, and has empowered the President to suspend or limit the entry of aliens in the national interest.  8 U.S.C. §§ 1182(f), 1185(a).

Under 8 U.S.C. § 1158(a)(1), "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C. § 1225(b)]."  But Congress made a *grant* of asylum purely *discretionary*: asylum "*may* [be] grant[ed] to an alien who has applied."  8 U.S.C. § 1158(b)(1)(A).  As part of this discretion, "[t]he Attorney General may by regulation establish additional limitations and conditions, consistent with this section, under which an alien shall be ineligible for asylum."  *Id.* § 1158(b)(2)(C).  The Executive Branch has several times exercised its authority to exclude categories of aliens from asylum eligibility.  *See* 83 Fed. Reg. at 55937-38.  Besides the discretionary authority to grant asylum, the United States has a mandatory duty to provide two forms of protection from removal: withholding

4

of removal (when an alien faces a probability of persecution if returned) and protection under the Convention Against Torture (CAT) (when an alien faces a probability of torture if returned). *See* 8 U.S.C. § 1231(b)(3)(A) (withholding); *id.* § 1208.16(c) (CAT).

Rule/Proclamation. On November 9, 2018, the Attorney General and Secretary issued an interim final rule rendering ineligible for asylum aliens who enter the United States in contravention of a presidential proclamation that suspends the entry of aliens into the United States through the southern border with Mexico. 83 Fed. Reg. 55934. The Attorney General and Secretary invoked their authority to establish "additional limitations and conditions consistent with [§ 1158] under which an alien shall be ineligible for asylum" (8 U.S.C. § 1158(b)(2)(C)) and to "provide by regulation for any other conditions or limitations on the consideration of an application for asylum" (*id.* § 1158(d)(5)(B)). *See* 83 Fed. Reg. at 55934-38.

Later that day, the President issued a proclamation that "suspend[s] and limit[s]" "[t]he entry of any alien into the United States across the international boundary between the United States and Mexico," except at a port of entry. Proclamation § 1. The proclamation lasts for 90 days after November 9 or until a safe-third-country agreement with Mexico can be implemented, whichever is earlier. *Id.* §§ 2(a), (b). The proclamation does not limit any alien from seeking withholding of removal or CAT protection. *Id.* § 2(c).

<u>This Lawsuit.</u>  On November 9, 2018, four organizations that provide legal and social services to immigrants and refugees filed this suit and sought immediate injunctive relief.  The district court granted a nationwide injunction—which it denominated a "temporary restraining order"—on November 19, barring implementation of the rule at least until a hearing on December 19, 2018.  The court concluded that this case is justiciable, that the rule likely conflicts with the Immigration and Nationality Act (INA), and that other considerations favored injunctive relief.  *See* Order, Dkt. 43 (Exhibits C, D).  The court denied the government's stay motion on November 30.  Order, Dkt. 61 (Exhibit E).

## ARGUMENT

An immediate stay pending appeal is warranted because the government can establish (1) a strong likelihood of success on appeal; (2) a likelihood that it will be irreparably harmed absent a stay; (3) that Plaintiffs will not be substantially harmed by a stay; and (4) public interest in a stay.  *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987).  This case also warrants expedited appellate consideration.

This Court has jurisdiction under 28 U.S.C. § 1292(a)(1).  Although temporary restraining orders are ordinarily not appealable, this Court has jurisdiction over appeals from "interlocutory orders of the district courts pertaining to injunctions"; "the essence of the order, not its moniker," determines appealability. *Service Employees v. Nat'l Union of Healthcare*, 598 F.3d 1061, 1067 (9th Cir.

2010). An order is appealable where, as here, it "was strongly challenged in adversarial proceedings before the district court and . . . will remain in force for longer than the fourteen-day period identified in Federal Rule of Civil Procedure 65(b)," *Washington v. Trump*, 847 F.3d 1151, 1158 (9th Cir. 2017). Here the district court's extensive written order has no clear end date, will be in effect for at least thirty days, and was vigorously contested after notice. It is therefore appealable. *Id*.

## I.  Defendants Are Likely to Succeed on Appeal

### A. Plaintiffs Lack Standing and Are Outside the Statute's Zone of Interests

The district court erred in concluding that Plaintiffs' claims are justiciable. *First*, the Plaintiff organizations have not themselves suffered a cognizable injury necessary to establish Article III standing. The court concluded that the rule had frustrated Plaintiffs' mission, Order 11-12, but that is wrong. Neither the rule nor the proclamation thwarts Plaintiffs' stated mission of "provid[ing] assistance to asylum seekers." Compl. ¶ 78. Plaintiffs do not allege, and the court did not find, that they cannot continue to assist asylum seekers, whether or not they enter lawfully through a port of entry. Moreover, although the court pointed to certain practices of border officials and policies that may make it harder for individuals to seek asylum, Order 11-12, those actions are not part of the rule or proclamation that Plaintiffs challenge. And Plaintiffs point to nothing to suggest that they could not maintain

funding (their other claimed injury in fact) by representing individuals, who, as the court acknowledged, present at ports of entry in significant numbers. Order 11.

*Second*, Plaintiffs are not within the INA's zone of interests. "[O]n any given claim the injury that supplies constitutional standing must be the same as the injury within the requisite 'zone of interests.'" *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996). The district court's zone-of-interest analysis, however, rested on the rights of Plaintiffs' asylum-seeker clients under the INA. Order 16. The court did not conclude that Plaintiffs' *own* alleged injuries fall within the INA's zone of interests, and it is well-established that such injuries cannot satisfy that test. *See Immigrant Assistance Project. v. INS*, 306 F.3d 842, 867 (9th Cir. 2002); *NWIRP v. USCIS*, 325 F.R.D. 671, 688 (W.D. Wash. 2016).

*Third*, the district court erred in ruling that Plaintiffs have third-party standing to assert the rights of asylum-seekers who allegedly are their clients, particularly where Plaintiffs identify no such clients. Order 13-15. The court's order relies on alleged obstacles to asylum-seekers in "begin[ning] the asylum process" or "applying at ports of entry." Order 14. But such a theory disregards the fact that the relevant issue is whether "there is a 'hindrance' to the [third parties] advancing their own . . . rights against the [challenged] scheme." *Kowalski v. Tesmer*, 543 U.S. 125, 131 (2004). If Plaintiffs have "an existing attorney-client relationship" with aliens covered by the rule, there is no meaningful hindrance to those clients, represented

8

by Plaintiff organizations, seeking relief. And with respect to aliens with whom they lack an attorney-client relationship, there is no basis for third-party standing at all. In any event, Plaintiffs did not assert third-party injury in their complaint or TRO motion, and the court therefore erred in manufacturing standing to save Plaintiffs from dismissal. Finally, third-party standing is inappropriate because it would amount to an end-run around the immigration statutes, which presuppose that only aliens may challenge certain asylum-related decisions and limit when and where aliens may seek judicial review of asylum claims. *See* 8 U.S.C. §§ 1225(b)(1)(C), (D), 1252(a)(1), (2)(B).

## B. The Rule Is a Valid Exercise of Asylum Authority

The rule is consistent with the INA. It lawfully renders ineligible for asylum aliens who contravene the proclamation, which is itself based on an urgent effort by the President to secure the southern border. Section 1158(b)(1) makes a grant of asylum a matter of agency discretion. As an aspect of that discretion, § 1158(b)(2)(C) authorizes the agency heads to "establish *additional* limitations and conditions . . . under which an alien shall be ineligible for asylum" in addition to the six statutory bars on asylum eligibility. 8 U.S.C § 1158(b)(2)(C) (emphasis added). That broad vesting of discretionary authority requires that new regulatory asylum-eligibility bars be "consistent with" § 1158. *Id.* That describes this rule: Nothing in § 1158 confers *a right* to receive asylum for aliens who enter in violation of a

specific Presidential proclamation governing a specific border for a limited time in response to a specific crisis, and thus the rule is "consistent with" the broad discretion conferred by that section to impose an asylum-eligibility bar tailored to these circumstances.

The district court nevertheless held that the rule conflicts with § 1158(a) because that provision states that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival . . . ), irrespective of such alien's status, may apply for asylum in accordance with this section." 8 U.S.C. § 1158(a)(1). But the instruction that aliens "may apply" for asylum regardless of whether they entered at a port of arrival does not, as the district court thought, mean that the rule "render[s] the right to apply a dead letter." Order 21. Rather, § 1158 distinguishes between an alien's *ability to apply* for asylum and the Executive's *authority to deny* asylum in its discretion—using categorical grounds of ineligibility or otherwise—and imposes different sets of requirements for each stage of the process.

Section 1158(a), which governs *applications*, bars an alien from even applying for asylum unless he filed within a year after his arrival, 8 U.S.C. § 1158(a)(2)(B); requires that he has not "previously applied for asylum and had such application denied," *id.* § 1158(a)(2)(C); and provides that he may be removed under a safe-third-country agreement, *id.* § 1158(a)(2)(A). After clearing these

hurdles, an alien "may apply for asylum" under § 1158(a)(1) "whether or not" he arrived "at a designated port of arrival." But even when § 1158(a) does not bar an alien from applying for asylum, he still may be subject to one of the six categorical statutory bars to the granting of asylum, *id.* § 1158(b)(2)(A), or any "additional limitations" the agency heads, in their discretionary administration of the statute, adopt, *id.* § 1158(b)(2)(C). And even if an alien does not fall within such a bar, the ultimate "decision whether asylum should be granted to an eligible alien is committed to the Attorney General's [or Secretary's] discretion." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999); *see* 8 U.S.C. § 1158(b)(1)(A).

It is therefore not true that an alien's manner of entry—here in contravention of a presidential proclamation—cannot be a determinative "factor by which the alien is rendered ineligible" for asylum. Order 21. Rather, holding as the district court did—that the Executive Branch may "not impose any limitations on asylum eligibility because any regulation that 'limits' eligibility necessarily undermines the statutory guarantee that 'any alien . . . irrespective of such alien's status' may apply for asylum"—would render § 1158(b)(2)(C) "meaningless, disabling the Attorney General from adopting further limitations while the statute clearly empowers him to do so." *R-S-C- v. Sessions*, 869 F.3d 1176, 1187 n.9 (10th Cir. 2017). Thus, the district court's conclusion that "Congress has clearly commanded that immigrants be eligible for asylum regardless of where they enter," Order 19, is without merit.

11

The fact that § 1158(a) allows an alien to *apply* for asylum regardless of manner of entry does not mean that this consideration can have no bearing on *eligibility* for asylum under § 1158(b) or on the ultimate discretionary determination whether to grant asylum even if the alien is statutorily eligible.

The district court acknowledged that the Executive Branch has, for decades, denied asylum in individual cases as a matter of discretion based in part on the alien's manner of entry, *see Matter of Pula*, 19 I. & N. Dec. 467 (BIA 1987), but suggested that it cannot do so as a categorical matter. Order 20-21. But if § 1158(a) does not prohibit the agency from considering manner of entry on a case-by-case basis when determining whether to grant asylum under § 1158(b), there is no textual basis to conclude that it somehow prohibits the agency from considering manner of entry categorically. *See, e.g.*, *Lopez v. Davis*, 531 U.S. 230 (2001). The district court acknowledged as much, Order 21, but suggested that this rule does not apply when "Congress has not spoken to the precise issue and the statute contains a gap." Order 22. But as this Court has explained, in a case the district court did not acknowledge, "Congress did not expressly declare such an intent in 8 U.S.C. § 1158(a)." *Komarenko v. INS*, 35 F.3d 432, 436 (9th Cir. 1994). Rather, "[t]he statute merely states that 'the alien may be granted asylum in the discretion of the Attorney General,'" *id.* (quoting 8 U.S.C. § 1158(a)(1) (1993)), and thus nothing in the statute "preclude[s] the Attorney General from exercising this discretion by promulgating

12

reasonable regulations applicable to . . . undesirable classes of aliens." *Id*. Although the statute has since been amended, the relevant discretionary features remain undiminished, *see* 8 U.S.C. § 1158(a)(1), (b)(1)(A), and nothing in the current statute requires the Executive Branch to rely only on case-by-case adjudication when applying its discretion to deny asylum based on an alien's manner of entry. Rather, the statute confers express discretionary authority to adopt additional categorical bars on asylum eligibility. *Id.* § 1158(b)(2)(C).

The district court was also wrong to think that the rule broadly precludes asylum eligibility whenever someone illegally crosses the border. The only category of aliens who are ineligible are those who are "subject" to a proclamation concerning the southern border and "nonetheless enter[] the United States after [that] proclamation [went] into effect," and thus have necessarily "engaged in actions that undermine a particularized determination in a proclamation that the President judged as being required by the national interest." 83 Fed. Reg. at 55940. The President's proclamation responds to a particular and "immediate" "crisis"; it is "tailor[ed] . . . to channel" particular aliens "to ports of entry" to ensure that any entry will occur in "an orderly and controlled manner"; and it is a "foreign affairs" measure to "facilitate ongoing negotiations with Mexico and other countries regarding appropriate cooperative arrangements to prevent unlawful mass migration to the United States through the southern border." Proclamation (preamble). The rule thus will "not

preclude an alien physically present in the United States from being granted asylum if the alien arrives in the United States through any border other than the southern land border with Mexico or at any time other than during the pendency of a proclamation suspending or limiting entry." 83 Fed. Reg. at 55941. Nothing in § 1158 bars an asylum-ineligibility rule that turns on the contravention of this proclamation. After all, "[a]liens who contravene such a measure have not merely violated the immigration laws, but have also undercut the efficacy of a measure adopted by the President based upon his determination of the national interest in matters that could have significant implications for the foreign affairs of the United States." *Id.* at 55940. In disregarding this limitation, Order 23, the district court failed to give due regard to the President's determination relating to the specific crisis that required immediate action, *see Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 187 (1993), and Plaintiffs waived any contrary argument by conceding below that they do not challenge the proclamation. Order 17-18.

The district court relied on Article 31 of 1967 United Nations Protocol Relating to the Status of Refugees, which states that signatories "shall not impose penalties [on refugees], on account of their illegal entry or presence," as authority for reading § 1158(a) as not authorizing the rule. Order 20-21. But the rule is consistent with that provision of the Protocol—which, in any event, "does not have the force of law in American courts," *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir.

2009)—because the bar is predicated upon contravention of a presidential proclamation, not illegal entry *per se*, and aliens subject to the bar may still seek withholding of removal and CAT protection, consistent with the treaty obligations that the United States has implemented in domestic law. *Cazun v. Attorney General*, 856 F.3d 249, 257 n.16 (3d Cir. 2017). Regardless, the government does not penalize an alien by denying asylum as a matter of discretion or limiting aliens to withholding and CAT protection: neither measure "imprison[s] or fine[s] aliens" as "the sort of criminal 'penalty' forbidden" by Article 31(1). *Id.*

## C. The Rule Was Properly Promulgated as an Interim Final Rule

This district court did not resolve the merits of Defendants' good-cause and foreign-affairs arguments for issuing the rule without advanced notice-and-comment procedures, Order 24, but did conclude that Plaintiffs had demonstrated serious questions going to the merits of both arguments. Order 28, 29. The injunction cannot remain in effect on this basis.

First, Defendants properly invoked the foreign-affairs exception, which exempts from notice-and-comment rulemaking agency actions "linked intimately with the Government's overall political agenda concerning relations with another country." *Am. Ass'n of Exporters v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985). As the Departments explained, "[t]he flow of aliens across the southern border, unlawfully or without appropriate travel documents, directly implicates the

foreign policy interests of the United States." 83 Fed. Reg. at 55950. The rule and proclamation directly relate to "ongoing negotiations with Mexico about how to manage our shared border," and how to consider asylum claims from nationals of Northern Triangle countries, and with the Northern Triangle countries to control the flow of their nationals. *Id.* Importantly, "the United States and Mexico have been engaged in ongoing discussions of a safe-third-country agreement"—whereby aliens normally must seek asylum in the first country they enter, rather than transiting one country to seek asylum in another. *Id.* By discouraging illegal entry during this crisis and requiring orderly processing, the rule and proclamation will help "develop a process to provide this influx with the opportunity to seek protection at the safest and earliest point of transit possible" and "establish compliance and enforcement mechanisms for those who seek to enter the United States illegally, including for those who do not avail themselves of earlier offers of protection." *Id.* These interlocking goals are all "linked intimately with the Government's overall political agenda concerning relations with another country." *Am. Ass'n of Exporters*, 751 F.2d at 1249.

The district court erred in suggesting that these foreign-affairs consequences are insufficient and second-guessing them. Order 26-27. Notice-and-comment rulemaking would slow and limit the ability to negotiate with Mexico and Northern Triangle governments, and a "prompt response" is needed to address the crisis at our

southern border. *Yassini*, 618 F.2d at 1360. The Executive Branch's choice here—to require aliens seeking asylum to undergo orderly processing at ports of entry while safely in Mexico where they could also request asylum—is a "[d]ecision[] involving the relationships between the United States and its alien visitors" that "implicate[s] our relations with foreign powers" and "implement[s] the President's foreign policy." *Id.* at 1361.

Second, the district court's good-cause analysis was flawed. The good-cause exception applies when "the very announcement of a proposed rule itself can be expected to precipitate activity by affected parties that would harm the public welfare." *Mobil Oil Corp. v. DOE*, 728 F.2d 1477, 1492 (TECA 1983). Significant "threat[s] to public safety" provide good cause to make rules without pre-promulgation notice and comment. *Hawaii Helicopter Operators Ass'n v. FAA,* 51 F.3d 212, 214 (9th Cir. 1995). The Departments recognized that pre-promulgation notice and comment or a delayed effective date "would result in serious damage to important interests" by encouraging a surge of aliens to enter between ports of entry before the rule took effect and that such crossings risk the safety of aliens and Border Patrol agents. 83 Fed. Reg. at 55949-50.

The district court accepted that the rule's purpose of encouraging aliens to present at ports of entry "makes some intuitive sense." Order 28. Yet it concluded that it must "assess[] the reasonableness of the Rule's linchpin assumption" through

17

further proceedings. Order 29. But under the good-cause exception, the government need only state its reasons for invoking the exception. *See* 5 U.S.C. § 553(b)(B), (d)(3). That is because this exception often involves predicting future actions and risks, where courts are ill-equipped to second-guess the Executive Branch's prospective judgment. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 34 (2010). The court thus does not conduct an evidentiary hearing to assess the government's stated reasons *ex post*; rather, it evaluates the reasons set forth to determine whether they are arbitrary and capricious. *See United States v. Valverde*, 628 F.3d 1159, 1165 (9th Cir. 2010) (rule need only provide a "rational justification"). Those reasons are plainly not arbitrary and capricious given the district court's acknowledgement that the government's concern "makes . . . intuitive sense" and given that rules governing border crossing are often issued under this exception to avoid the same harms. *See* 82 Fed. Reg. at 4770; 69 Fed. Reg. 48877.

## II. The Balance of Harms Weighs Strongly in Favor of a Stay

The balance of harms also clearly favors a stay.

The injunction undermines the Executive Branch's constitutional and statutory authority to secure the Nation's borders, and it invites the very harms to the public that the Executive Branch sought to address in the rule and proclamation. The Departments explained that the rule is urgently needed to discourage aliens from

18

crossing the border illegally, raising non-meritorious asylum claims, and securing release into the country. In FY2018, 396,579 aliens were apprehended entering unlawfully between ports of entry along the southern border. 83 Fed. Reg. at 55948. That is over 1,000 aliens every day—many with families and children—who are making a dangerous and illegal border crossing rather than presenting at a port of entry. And the rate of aliens asserting a "credible fear" has gone up by over 1900% since 2008, from "5,000 a year in [FY] 2008 to about 97,000 in FY 2018," while a large majority of these asylum claims are not meritorious. *Id.* at 55935, 55946 (of 34,158 case completions in FY2018 that began with a credible-fear claim, 71% resulted in a removal order, and asylum was granted in only 17%). The Departments acted to address the "urgent need to deter foreign nationals from undertaking dangerous border crossings," especially the "thousands of aliens traveling in groups . . . expected to attempt entry at the southern border in the coming weeks." *Id*. at 55950. The rule explained that immediate action was warranted for the swift protection of the United States' southern border, immigration officers, and the hundreds of aliens who die each year crossing the border. *See id*. The problem is all the greater given the district court's improper extension of its order not only to the aliens with whom these Plaintiff organizations allege they have an attorney-client relationship, but to *all aliens worldwide* who now or will seek to break our laws by

crossing our southern border illegally and then apply for asylum only *after* being caught.

The injunction constitutes a major and "unwarranted judicial interference in the conduct of foreign policy." *Kiobel v. Royal Dutch Petroleum*, 569 U.S. 108, 116 (2013). The Executive Branch—tasked with foreign relations—decided to "encourage . . . aliens to first avail themselves of offers of asylum from Mexico" and is engaging in international negotiations accordingly. 83 Fed. Reg. at 55950. The district court second-guessed that decision based on conclusory declarations submitted by Plaintiffs that "asylum seekers experience high rates of violence and harassment while waiting to enter, as well as the threat of deportation to the countries from which they have escaped." Order 30. The court lacked authority to engage in such second-guessing premised on risks that any alien whether or not subject to the rule risks by migrating through Mexico. Indeed, the rule seeks to prevent "needless deaths and crimes associated with human trafficking and alien smuggling operations" (83 Fed. Reg. 55950) and ensures that aliens in the United States who are ineligible for asylum will not be returned to countries where they face a clear possibility of persecution or torture. The injunction undermines the separation of powers by blocking the Executive Branch's lawful use of its authority to serve these goals and prevents the Executive from relying on the rule to aid diplomatic

negotiations for at least 30 days, a significant portion of the time the President determined exigent measures at the southern border were needed.

In contrast to these harms, Plaintiffs have not shown that they themselves face irreparable harm cognizable under the INA or tied to the rule. They allege abstract goals or injuries "in terms of money, time and energy"—and neither is an irreparable injury that can outweigh the harms caused by the injunction. *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Even if Plaintiffs could invoke harms to third parties, those harms carry little weight because they rest on conduct that violates our criminal and immigration laws, and because those aliens may continue to apply for asylum at a port of entry and may seek withholding or CAT protection even if they were subject to the rule. And those aliens would be able to adjudicate any legal claims they have through the appropriate review channels Congress has made available either in the U.S. District Court for the District of Columbia or through a petition for review. *See* 8 U.S.C. § 1252(a)(5), (b)(9), (e)(3).

In any event, Defendants' appeal could be expedited to minimize any prejudice. Given the harms to the government posed by the injunction, Defendants respectfully request that this Court enter an immediate administrative stay pending consideration of the merits of this motion and expedite this appeal.

## III.    The District Court Improperly Issued a Nationwide Injunction

The district court's nationwide injunction imposes particularly sweeping harm because it defies the rule that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."  *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).  An injunction based on asserted harm to third-party clients of Plaintiffs must be so limited—and to Plaintiffs' actual clients.  *See Log Cabin Republicans v. United States*, 658 F.3d 1162, 1168 (9th Cir. 2011) (assuming that plaintiff "had standing to seek . . . an injunction barring the United States from applying [the law] to Log Cabin's members").  The injunction here is grossly overbroad and should be rejected on that ground alone.

## CONCLUSION

The Court should stay the district court's order and expedite this appeal.

//

//

22

Respectfully submitted,

JOSEPH H. HUNT
 *Assistant Attorney General*
SCOTT G. STEWART
 *Deputy Assistant Attorney General*
AUGUST E. FLENTJE
 *Special Counsel*
WILLIAM C. PEACHEY
 *Director*
By: /s/ *Erez Reuveni*
 EREZ REUVENI
 *Assistant Director*
 Office of Immigration Litigation
 U.S. Department of Justice, Civil Division
 P.O. Box 868, Ben Franklin Station
 Washington, DC 20044
 Tel: (202) 307-4293
 Email: Erez.R.Reuveni@usdoj.gov
PATRICK GLEN
 *Senior Litigation Counsel*
JOSEPH DARROW
FRANCESCA GENOVA
CHRISTINA GREER
 *Trial Attorneys*

Dated: December 1, 2018        *Attorneys for Defendants-Appellants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2018, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. Counsel in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

By: */s/ Erez Reuveni*
EREZ REUVENI
Assistant Director
United States Department of Justice
Civil Division

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the type-volume limitation of Fed. R. App. P. 27 because it contains 5,195 words. This motion complies with the typeface and the type style requirements of Fed. R. App. P. 27 because this brief has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

**EXHIBIT A**

**Proclamation 9822, Addressing Mass Migration Through the Southern Border of the United States (Nov. 9, 2018)**

Federal Register

Vol. 83, No. 221

Thursday, November 15, 2018

# Presidential Documents

Title 3—

The President

Proclamation 9822 of November 9, 2018

## Addressing Mass Migration Through the Southern Border of the United States

### By the President of the United States of America

### A Proclamation

The United States expects the arrival at the border between the United States and Mexico (southern border) of a substantial number of aliens primarily from Central America who appear to have no lawful basis for admission into our country. They are traveling in large, organized groups through Mexico and reportedly intend to enter the United States unlawfully or without proper documentation and to seek asylum, despite the fact that, based on past experience, a significant majority will not be eligible for or be granted that benefit. Many entered Mexico unlawfully—some with violence—and have rejected opportunities to apply for asylum and benefits in Mexico. The arrival of large numbers of aliens will contribute to the overloading of our immigration and asylum system and to the release of thousands of aliens into the interior of the United States. The continuing and threatened mass migration of aliens with no basis for admission into the United States through our southern border has precipitated a crisis and undermines the integrity of our borders. I therefore must take immediate action to protect the national interest, and to maintain the effectiveness of the asylum system for legitimate asylum seekers who demonstrate that they have fled persecution and warrant the many special benefits associated with asylum.

In recent weeks, an average of approximately 2,000 inadmissible aliens have entered each day at our southern border. In Fiscal Year 2018 overall, 124,511 aliens were found inadmissible at ports of entry on the southern border, while 396,579 aliens were apprehended entering the United States unlawfully between such ports of entry. The great number of aliens who cross unlawfully into the United States through the southern border consumes tremendous resources as the Government seeks to surveil, apprehend, screen, process, and detain them.

Aliens who enter the United States unlawfully or without proper documentation and are subject to expedited removal may avoid being promptly removed by demonstrating, during an initial screening process, a credible fear of persecution or torture. Approximately 2 decades ago, most aliens deemed inadmissible at a port of entry or apprehended after unlawfully entering the United States through the southern border were single adults who were promptly returned to Mexico, and very few asserted a fear of return. Since then, however, there has been a massive increase in fear-of-persecution or torture claims by aliens who enter the United States through the southern border. The vast majority of such aliens are found to satisfy the credible-fear threshold, although only a fraction of the claimants whose claims are adjudicated ultimately qualify for asylum or other protection. Aliens found to have a credible fear are often released into the interior of the United States, as a result of a lack of detention space and a variety of other legal and practical difficulties, pending adjudication of their claims in a full removal proceeding in immigration court. The immigration adjudication process often takes years to complete because of the growing volume of claims and because of the need to expedite proceedings for detained aliens. During that time, many released aliens fail to appear for hearings, do not

comply with subsequent orders of removal, or are difficult to locate and remove.

Members of family units pose particular challenges. The Federal Government lacks sufficient facilities to house families together. Virtually all members of family units who enter the United States through the southern border, unlawfully or without proper documentation, and that are found to have a credible fear of persecution, are thus released into the United States. Against this backdrop of near-assurance of release, the number of such aliens traveling as family units who enter through the southern border and claim a credible fear of persecution has greatly increased. And large numbers of family units decide to make the dangerous and unlawful border crossing with their children.

The United States has a long and proud history of offering protection to aliens who are fleeing persecution and torture and who qualify under the standards articulated in our immigration laws, including through our asylum system and the Refugee Admissions Program. But our system is being overwhelmed by migration through our southern border. Crossing the border to avoid detection and then, if apprehended, claiming a fear of persecution is in too many instances an avenue to near-automatic release into the interior of the United States. Once released, such aliens are very difficult to remove. An additional influx of large groups of aliens arriving at once through the southern border would add tremendous strain to an already taxed system, especially if they avoid orderly processing by unlawfully crossing the southern border.

The entry of large numbers of aliens into the United States unlawfully between ports of entry on the southern border is contrary to the national interest, and our law has long recognized that aliens who seek to lawfully enter the United States must do so at ports of entry. Unlawful entry puts lives of both law enforcement and aliens at risk. By contrast, entry at ports of entry at the southern border allows for orderly processing, which enables the efficient deployment of law enforcement resources across our vast southern border.

Failing to take immediate action to stem the mass migration the United States is currently experiencing and anticipating would only encourage additional mass unlawful migration and further overwhelming of the system.

Other presidents have taken strong action to prevent mass migration. In Proclamation 4865 of September 29, 1981 (High Seas Interdiction of Illegal Aliens), in response to an influx of Haitian nationals traveling to the United States by sea, President Reagan suspended the entry of undocumented aliens from the high seas and ordered the Coast Guard to intercept such aliens before they reached United States shores and to return them to their point of origin. In Executive Order 12807 of May 24, 1992 (Interdiction of Illegal Aliens), in response to a dramatic increase in the unlawful mass migration of Haitian nationals to the United States, President Bush ordered additional measures to interdict such Haitian nationals and return them to their home country. The Supreme Court upheld the legality of those measures in *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155 (1993).

I am similarly acting to suspend, for a limited period, the entry of certain aliens in order to address the problem of large numbers of aliens traveling through Mexico to enter our country unlawfully or without proper documentation. I am tailoring the suspension to channel these aliens to ports of entry, so that, if they enter the United States, they do so in an orderly and controlled manner instead of unlawfully. Under this suspension, aliens entering through the southern border, even those without proper documentation, may, consistent with this proclamation, avail themselves of our asylum system, provided that they properly present themselves for inspection at a port of entry. In anticipation of a large group of aliens arriving in the coming weeks, I am directing the Secretary of Homeland Security to commit additional resources to support our ports of entry at the southern border

to assist in processing those aliens—and all others arriving at our ports of entry—as efficiently as possible.

But aliens who enter the United States unlawfully through the southern border in contravention of this proclamation will be ineligible to be granted asylum under the regulation promulgated by the Attorney General and the Secretary of Homeland Security that became effective earlier today. Those aliens may, however, still seek other forms of protection from persecution or torture. In addition, this limited suspension will facilitate ongoing negotiations with Mexico and other countries regarding appropriate cooperative arrangements to prevent unlawful mass migration to the United States through the southern border. Thus, this proclamation is also necessary to manage and conduct the foreign affairs of the United States effectively.

NOW, THEREFORE, I, DONALD J. TRUMP, by the authority vested in me by the Constitution and the laws of the United States of America, including sections 212(f) and 215(a) of the Immigration and Nationality Act (INA) (8 U.S.C. 1182(f) and 1185(a), respectively) hereby find that, absent the measures set forth in this proclamation, the entry into the United States of persons described in section 1 of this proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions. I therefore hereby proclaim the following:

**Section 1**. *Suspension and Limitation on Entry*. The entry of any alien into the United States across the international boundary between the United States and Mexico is hereby suspended and limited, subject to section 2 of this proclamation. That suspension and limitation shall expire 90 days after the date of this proclamation or the date on which an agreement permits the United States to remove aliens to Mexico in compliance with the terms of section 208(a)(2)(A) of the INA (8 U.S.C. 1158(a)(2)(A)), whichever is earlier.

**Sec. 2**. *Scope and Implementation of Suspension and Limitation on Entry*. (a) The suspension and limitation on entry pursuant to section 1 of this proclamation shall apply only to aliens who enter the United States after the date of this proclamation.

(b) The suspension and limitation on entry pursuant to section 1 of this proclamation shall not apply to any alien who enters the United States at a port of entry and properly presents for inspection, or to any lawful permanent resident of the United States.

(c) Nothing in this proclamation shall limit an alien entering the United States from being considered for withholding of removal under section 241(b)(3) of the INA (8 U.S.C. 1231(b)(3)) or protection pursuant to the regulations promulgated under the authority of the implementing legislation regarding the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, or limit the statutory processes afforded to unaccompanied alien children upon entering the United States under section 279 of title 6, United States Code, and section 1232 of title 8, United States Code.

(d) No later than 90 days after the date of this proclamation, the Secretary of State, the Attorney General, and the Secretary of Homeland Security shall jointly submit to the President, through the Assistant to the President for National Security Affairs, a recommendation on whether an extension or renewal of the suspension or limitation on entry in section 1 of this proclamation is in the interests of the United States.

**Sec. 3**. *Interdiction*. The Secretary of State and the Secretary of Homeland Security shall consult with the Government of Mexico regarding appropriate steps—consistent with applicable law and the foreign policy, national security, and public-safety interests of the United States—to address the approach of large groups of aliens traveling through Mexico with the intent of entering the United States unlawfully, including efforts to deter, dissuade, and return

such aliens before they physically enter United States territory through the southern border.

**Sec. 4.** *Severability.* It is the policy of the United States to enforce this proclamation to the maximum extent possible to advance the interests of the United States. Accordingly:

(a) if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid, the remainder of this proclamation and the application of its other provisions to any other persons or circumstances shall not be affected thereby; and

(b) if any provision of this proclamation, or the application of any provision to any person or circumstance, is held to be invalid because of the failure to follow certain procedures, the relevant executive branch officials shall implement those procedural requirements to conform with existing law and with any applicable court orders.

**Sec. 5.** *General Provisions.* (a) Nothing in this proclamation shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This proclamation shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This proclamation is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

IN WITNESS WHEREOF, I have hereunto set my hand this ninth day of November, in the year of our Lord two thousand eighteen, and of the Independence of the United States of America the two hundred and forty-third.

[FR Doc. 2018–25117

Filed 11–14–18; 11:15 am]

Billing code 3295–F9–P

**EXHIBIT B**

**Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55934 (Nov. 9, 2018)**



**DEPARTMENT OF HOMELAND SECURITY**

**8 CFR Part 208**

**RIN 1615–AC34**

**DEPARTMENT OF JUSTICE**

**Executive Office for Immigration Review**

**8 CFR Parts 1003 and 1208**

**[EOIR Docket No. 18–0501; A.G. Order No. 4327–2018]**

**RIN 1125–AA89**

**Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims**

**AGENCY:** U.S. Citizenship and Immigration Services, Department of Homeland Security; Executive Office for Immigration Review, Department of Justice.

**ACTION:** Interim final rule; request for comment.

**SUMMARY:** The Department of Justice and the Department of Homeland Security ("DOJ," "DHS," or, collectively, "the Departments") are adopting an interim final rule governing asylum claims in the context of aliens who are subject to, but contravene, a suspension or limitation on entry into the United States through the southern border with Mexico that is imposed by a presidential proclamation or other presidential order ("a proclamation") under section 212(f) or 215(a)(1) of the Immigration and Nationality Act ("INA"). Pursuant to statutory authority, the Departments are amending their respective existing regulations to provide that aliens subject to such a proclamation concerning the southern border, but who contravene such a proclamation by entering the United States after the effective date of such a proclamation, are ineligible for asylum. The interim rule, if applied to a proclamation suspending the entry of aliens who cross the southern border unlawfully, would bar such aliens from eligibility for asylum and thereby channel inadmissible aliens to ports of entry, where they would be processed in a controlled, orderly, and lawful manner. This rule would apply only prospectively to a proclamation issued after the effective date of this rule. It would not apply to a proclamation that specifically includes an exception for aliens applying for asylum, nor would it apply to aliens subject to a waiver or exception provided by the proclamation. DHS is amending its regulations to specify a screening process for aliens who are subject to this specific bar to asylum eligibility. DOJ is amending its regulations with respect to such aliens. The regulations would ensure that aliens in this category who establish a reasonable fear of persecution or torture could seek withholding of removal under the INA or protection from removal under regulations implementing U.S. obligations under Article 3 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment ("CAT").

**DATES:**

*Effective date:* This rule is effective November 9, 2018.

*Submission of public comments:* Written or electronic comments must be submitted on or before January 8, 2019. Written comments postmarked on or before that date will be considered timely. The electronic Federal Docket Management System will accept comments prior to midnight eastern standard time at the end of that day.

**ADDRESSES:** You may submit comments, identified by EOIR Docket No. 18–0501, by one of the following methods:

• *Federal eRulemaking Portal: http://www.regulations.gov.* Follow the instructions for submitting comments.

• *Mail:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041. To ensure proper handling, please reference EOIR Docket No. 18–0501 on your correspondence. This mailing address may be used for paper, disk, or CD–ROM submissions.

• *Hand Delivery/Courier:* Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041, Contact Telephone Number (703) 305–0289 (not a toll-free call).

**FOR FURTHER INFORMATION CONTACT:** Lauren Alder Reid, Assistant Director, Office of Policy, Executive Office for Immigration Review, 5107 Leesburg Pike, Suite 2616, Falls Church, VA 22041, Contact Telephone Number (703) 305–0289 (not a toll-free call).

**SUPPLEMENTARY INFORMATION:**

**I. Public Participation**

Interested persons are invited to participate in this rulemaking by submitting written data, views, or arguments on all aspects of this rule. The Departments also invite comments that relate to the economic or federalism effects that might result from this rule. To provide the most assistance to the Departments, comments should reference a specific portion of the rule; explain the reason for any recommended change; and include data, information, or authority that supports the recommended change.

All comments submitted for this rulemaking should include the agency name and EOIR Docket No. 18–0501. Please note that all comments received are considered part of the public record and made available for public inspection at *www.regulations.gov.* Such information includes personally identifiable information (such as a person's name, address, or any other data that might personally identify that individual) that the commenter voluntarily submits.

If you want to submit personally identifiable information as part of your comment, but do not want it to be posted online, you must include the phrase "PERSONALLY IDENTIFIABLE INFORMATION" in the first paragraph of your comment and precisely and prominently identify the information of which you seek redaction.

If you want to submit confidential business information as part of your comment, but do not want it to be posted online, you must include the phrase "CONFIDENTIAL BUSINESS INFORMATION" in the first paragraph of your comment and precisely and prominently identify the confidential business information of which you seek redaction. If a comment has so much confidential business information that it cannot be effectively redacted, all or part of that comment may not be posted on *www.regulations.gov.* Personally identifiable information and confidential business information provided as set forth above will be placed in the public docket file of DOJ's Executive Office of Immigration Review ("EOIR"), but not posted online. To inspect the public docket file in person, you must make an appointment with EOIR. Please see the **FOR FURTHER INFORMATION CONTACT** paragraph above for the contact information specific to this rule.

**II. Purpose of This Interim Final Rule**

This interim final rule ("interim rule" or "rule") governs eligibility for asylum and screening procedures for aliens subject to a presidential proclamation or order restricting entry issued pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), or section 215(a)(1) of the INA, 8 U.S.C. 1185(a)(1), that concerns entry to the United States along the southern border with Mexico and is issued on or after the effective date of this rule. Pursuant to statutory authority, the interim rule renders such aliens ineligible for asylum if they enter the United States after the effective date of

such a proclamation, become subject to the proclamation, and enter the United States in violation of the suspension or limitation of entry established by the proclamation. The interim rule, if applied to a proclamation suspending the entry of aliens who cross the southern border unlawfully, would bar such aliens from eligibility for asylum and thereby channel inadmissible aliens to ports of entry, where such aliens could seek to enter and would be processed in an orderly and controlled manner. Aliens who enter prior to the effective date of an applicable proclamation will not be subject to this asylum eligibility bar unless they depart and reenter while the proclamation remains in effect. Aliens also will not be subject to this eligibility bar if they fall within an exception or waiver within the proclamation that makes the suspension or limitation of entry in the proclamation inapplicable to them, or if the proclamation provides that it does not affect eligibility for asylum.

As discussed further below, asylum is a discretionary immigration benefit. In general, aliens may apply for asylum if they are physically present or arrive in the United States, irrespective of their status and irrespective of whether or not they arrive at a port of entry, as provided in section 208(a) of the INA, 8 U.S.C. 1158(a). Congress, however, provided that certain categories of aliens could not receive asylum and further delegated to the Attorney General and the Secretary of Homeland Security (''Secretary'') the authority to promulgate regulations establishing additional bars on eligibility that are consistent with the asylum statute and ''any other conditions or limitations on the consideration of an application for asylum'' that are consistent with the INA. *See* INA 208(b)(2)(C), (d)(5)(B), 8 U.S.C. 1158(b)(2)(C), (d)(5)(B).

In the Illegal Immigration Reform and Immigration Responsibility Act of 1996 (''IIRIRA''), Public Law 104–208, Congress, concerned with rampant delays in proceedings to remove illegal aliens, created expedited procedures for removing inadmissible aliens, and authorized the extension of such procedures to aliens who entered illegally and were apprehended within two years of their entry. *See generally* INA 235(b), 8 U.S.C. 1225(b). Those procedures were aimed at facilitating the swift removal of inadmissible aliens, including those who had entered illegally, while also expeditiously resolving any asylum claims. For instance, Congress provided that any alien who asserted a fear of persecution would appear before an asylum officer, and that any alien who is determined to

have established a ''credible fear''— meaning a ''significant possibility . . . that the alien could establish eligibility for asylum'' under the asylum statute— would be detained for further consideration of an asylum claim. *See* INA 235(b)(1), (b)(1)(B)(v), 8 U.S.C. 1225(b)(1), (b)(1)(B)(v).

When the expedited procedures were first implemented approximately two decades ago, relatively few aliens within those proceedings asserted an intent to apply for asylum or a fear of persecution. Rather, most aliens found inadmissible at the southern border were single adults who were immediately repatriated to Mexico. Thus, while the overall number of illegal aliens apprehended was far higher than it is today (around 1.6 million in 2000), aliens could be processed and removed more quickly, without requiring detention or lengthy court proceedings.

In recent years, the United States has seen a large increase in the number and proportion of inadmissible aliens subject to expedited removal who assert an intent to apply for asylum or a fear of persecution during that process and are subsequently placed into removal proceedings in immigration court. Most of those aliens unlawfully enter the country between ports of entry along the southern border. Over the past decade, the overall percentage of aliens subject to expedited removal and referred, as part of the initial screening process, for a credible-fear interview jumped from approximately 5% to above 40%, and the total number of credible-fear referrals for interviews increased from about 5,000 a year in Fiscal Year (''FY'') 2008 to about 97,000 in FY 2018. Furthermore, the percentage of cases in which asylum officers found that the alien had established a credible fear— leading to the alien's placement in full immigration proceedings under section 240 of the INA, 8 U.S.C. 1229a—has also increased in recent years. In FY 2008, when asylum officers resolved a referred case with a credible-fear determination, they made a positive finding about 77% of the time. That percentage rose to 80% by FY 2014. In FY 2018, that percentage of positive credible-fear determinations has climbed to about 89% of all cases. After this initial screening process, however, significant proportions of aliens who receive a positive credible-fear determination never file an application for asylum or are ordered removed in absentia. In FY 2018, a total of about 6,000 aliens who passed through credible-fear screening (17% of all completed cases, 27% of all completed cases in which an asylum application was filed, and about 36% of

cases where the asylum claim was adjudicated on the merits) established that they should be granted asylum.

Apprehending and processing this growing number of aliens who cross illegally into the United States and invoke asylum procedures thus consumes an ever increasing amount of resources of DHS, which must surveil, apprehend, and process the aliens who enter the country. Congress has also required DHS to detain all aliens during the pendency of their credible-fear proceedings, which can take days or weeks. And DOJ must also dedicate substantial resources: Its immigration judges adjudicate aliens' claims, and its officials are responsible for prosecuting and maintaining custody over those who violate the criminal law. The strains on the Departments are particularly acute with respect to the rising numbers of family units, who generally cannot be detained if they are found to have a credible fear, due to a combination of resource constraints and the manner in which the terms of the Settlement Agreement in *Flores* v. *Reno* have been interpreted by courts. *See* Stipulated Settlement Agreement, *Flores* v. *Reno,* No. 85–cv–4544 (N.D. Cal. Jan. 17, 1997).

In recent weeks, United States officials have each day encountered an average of approximately 2,000 inadmissible aliens at the southern border. At the same time, large caravans of thousands of aliens, primarily from Central America, are attempting to make their way to the United States, with the apparent intent of seeking asylum after entering the United States unlawfully or without proper documentation. Central American nationals represent a majority of aliens who enter the United States unlawfully, and are also disproportionately likely to choose to enter illegally between ports of entry rather than presenting themselves at a port of entry. As discussed below, aliens who enter unlawfully between ports of entry along the southern border, as opposed to at a port of entry, pose a greater strain on DHS's already stretched detention and processing resources and also engage in conduct that seriously endangers themselves, any children traveling with them, and the U.S. Customs and Border Protection (''CBP'') agents who seek to apprehend them.

The United States has been engaged in sustained diplomatic negotiations with Mexico and the Northern Triangle countries (Honduras, El Salvador, and Guatemala) regarding the situation on the southern border, but those negotiations have, to date, proved

**55936** **Federal Register** / Vol. 83, No. 218 / Friday, November 9, 2018 / Rules and Regulations

unable to meaningfully improve the situation.

The purpose of this rule is to limit aliens' eligibility for asylum if they enter in contravention of a proclamation suspending or restricting their entry along the southern border. Such aliens would contravene a measure that the President has determined to be in the national interest. For instance, a proclamation restricting the entry of inadmissible aliens who enter unlawfully between ports of entry would reflect a determination that this particular category of aliens necessitates a response that would supplement existing prohibitions on entry for all inadmissible aliens. Such a proclamation would encourage such aliens to seek admission and indicate an intention to apply for asylum at ports of entry. Aliens who enter in violation of that proclamation would not be eligible for asylum. They would, however, remain eligible for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), or for protections under the regulations issued under the authority of the implementing legislation regarding Article 3 of the CAT.

The Departments anticipate that a large number of aliens who would be subject to a proclamation-based ineligibility for asylum would be subject to expedited-removal proceedings. Accordingly, this rule ensures that asylum officers and immigration judges account for such aliens' ineligibility for asylum within the expedited-removal process, so that aliens subject to such a bar will be processed swiftly. Furthermore, the rule continues to afford protection from removal for individuals who establish that they are more likely than not to be persecuted or tortured in the country of removal. Aliens rendered ineligible for asylum by this interim rule and who are referred for an interview in the expedited-removal process are still eligible to seek withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3), or protections under the regulations issued under the authority of the implementing legislation regarding Article 3 of the CAT. Such aliens could pursue such claims in proceedings before an immigration judge under section 240 of the INA, 8 U.S.C. 1229a, if they establish a reasonable fear of persecution or torture.

### III. Background

#### A. Joint Interim Rule

The Attorney General and the Secretary of Homeland Security publish this joint interim rule pursuant to their respective authorities concerning asylum determinations.

The Homeland Security Act of 2002, Public Law 107–296, as amended, transferred many functions related to the execution of federal immigration law to the newly created Department of Homeland Security. The Homeland Security Act of 2002 charges the Secretary "with the administration and enforcement of this chapter and all other laws relating to the immigration and naturalization of aliens," 8 U.S.C. 1103(a)(1), and grants the Secretary the power to take all actions "necessary for carrying out" the provisions of the INA, *id.* 1103(a)(3). The Homeland Security Act of 2002 also transferred to DHS some responsibility for affirmative asylum applications, *i.e.*, applications for asylum made outside the removal context. *See* 6 U.S.C. 271(b)(3). Those authorities have been delegated to U.S. Citizenship and Immigration Services ("USCIS"). USCIS asylum officers determine in the first instance whether an alien's affirmative asylum application should be granted. *See* 8 CFR 208.9.

But the Homeland Security Act of 2002 retained authority over certain individual immigration adjudications (including those related to defensive asylum applications) in DOJ, under the Executive Office for Immigration Review ("EOIR") and subject to the direction and regulation of the Attorney General. *See* 6 U.S.C. 521; 8 U.S.C. 1103(g). Thus, immigration judges within DOJ continue to adjudicate all asylum applications made by aliens during the removal process (defensive asylum applications), and they also review affirmative asylum applications referred by USCIS to the immigration court. *See* INA 101(b)(4), 8 U.S.C. 1101(b)(4); 8 CFR 1208.2; *Dhakal* v. *Sessions,* 895 F.3d 532, 536–37 (7th Cir. 2018) (describing affirmative and defensive asylum processes). The Board of Immigration Appeals ("BIA" or "Board"), also within DOJ, in turn hears appeals from immigration judges' decisions. 8 CFR 1003.1. In addition, the INA provides "[t]hat determination and ruling by the Attorney General with respect to all questions of law shall be controlling," INA 103(a)(1), 8 U.S.C. 1103(a)(1). This broad division of functions and authorities informs the background of this interim rule.

#### B. Legal Framework for Asylum

Asylum is a form of discretionary relief under section 208 of the INA, 8 U.S.C. 1158, that precludes an alien from being subject to removal, creates a path to lawful permanent resident status and citizenship, and affords a variety of other benefits, such as allowing certain alien family members to obtain lawful immigration status derivatively. *See R–S–C* v. *Sessions,* 869 F.3d 1176, 1180 (10th Cir. 2017); *see also, e.g.,* INA 208(c)(1)(A), (C), 8 U.S.C. 1158(c)(1)(A), (C) (asylees cannot be removed and can travel abroad with prior consent); INA 208(b)(3), 8 U.S.C. 1158(b)(3) (allowing derivative asylum for asylee's spouse and unmarried children); INA 209(b), 8 U.S.C. 1159(b) (allowing the Attorney General or Secretary to adjust the status of an asylee to that of a lawful permanent resident); INA 316(a), 8 U.S.C. 1427(a) (describing requirements for naturalization of lawful permanent residents). Aliens who are granted asylum are authorized to work in the United States and may receive certain financial assistance from the federal government. *See* INA 208(c)(1)(B), (d)(2), 8 U.S.C. 1158(c)(1)(B), (d)(2); 8 U.S.C. 1612(a)(2)(A), (b)(2)(A); 8 U.S.C. 1613(b)(1); 8 CFR 274a.12(a)(5); *see also* 8 CFR 274a.12(c)(8) (providing that asylum applicants may seek employment authorization 150 days after filing a complete application for asylum).

Aliens applying for asylum must establish that they meet the definition of a "refugee," that they are not subject to a bar to the granting of asylum, and that they merit a favorable exercise of discretion. INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 1229a(c)(4)(A); *see Moncrieffe* v. *Holder,* 569 U.S. 184, 187 (2013) (describing asylum as a form of "discretionary relief from removal"); *Delgado* v. *Mukasey,* 508 F.3d 702, 705 (2d Cir. 2007) ("Asylum is a discretionary form of relief . . . . Once an applicant has established eligibility . . . it remains within the Attorney General's discretion to deny asylum."). Because asylum is a discretionary form of relief from removal, the alien bears the burden of showing both eligibility for asylum and why the Attorney General or Secretary should exercise discretion to grant relief. *See* INA 208(b)(1), 240(c)(4)(A), 8 U.S.C. 1158(b)(1), 1229a(c)(4)(A); *Romilus* v. *Ashcroft,* 385 F.3d 1, 8 (1st Cir. 2004).

Section 208 of the INA provides that, in order to apply for asylum, an applicant must be "physically present" or "arrive[e]" in the United States, "whether or not at a designated port of arrival" and "irrespective of such alien's status"—but the applicant must also "apply for asylum in accordance with" the rest of section 208 or with the expedited-removal process in section 235 of the INA. INA 208(a)(1), 8 U.S.C. 1158(a)(1). Furthermore, to be granted asylum, the alien must demonstrate that he or she meets the statutory definition

of a "refugee," INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A), and is not subject to an exception or bar, INA 208(b)(2), 8 U.S.C. 1158(b)(2). The alien bears the burden of proof to establish that he or she meets these criteria. INA 208(b)(1)(B)(i), 8 U.S.C. 1158(b)(1)(B)(i); 8 CFR 1240.8(d).

For an alien to establish that he or she is a "refugee," the alien generally must be someone who is outside of his or her country of nationality and "is unable or unwilling to return to . . . that country because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion." INA 101(a)(42)(A), 8 U.S.C. 1101(a)(42)(A).

In addition, if evidence indicates that one or more of the grounds for mandatory denial may apply, an alien must show that he or she does not fit within one of the statutory bars to granting asylum and is not subject to any "additional limitations and conditions . . . under which an alien shall be ineligible for asylum" established by a regulation that is "consistent with" section 208 of the INA. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C); *see* 8 CFR 1240.8(d). The INA currently bars a grant of asylum to any alien: (1) Who "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of" a protected ground; (2) who, "having been convicted by a final judgment of a particularly serious crime, constitutes a danger to the community of the United States"; (3) for whom there are serious reasons to believe the alien "has committed a serious nonpolitical crime outside the United States" prior to arrival in the United States; (4) for whom "there are reasonable grounds for regarding the alien as a danger to the security of the United States"; (5) who is described in the terrorism-related inadmissibility grounds, with limited exceptions; or (6) who "was firmly resettled in another country prior to arriving in the United States." INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi).

An alien who falls within any of those bars is subject to mandatory denial of asylum. Where there is evidence that "one or more of the grounds for mandatory denial of the application for relief may apply," the applicant in immigration court proceedings bears the burden of establishing that the bar at issue does not apply. 8 CFR 1240.8(d); *see also, e.g., Rendon* v. *Mukasey,* 520 F.3d 967, 973 (9th Cir. 2008) (applying 8 CFR 1240.8(d) in the context of the aggravated felony bar to asylum); *Gao* v. *U.S. Att'y Gen.,* 500 F.3d 93, 98 (2d Cir.

2007) (applying 8 CFR 1240.8(d) in the context of the persecutor bar); *Chen* v. *U.S. Att'y Gen.,* 513 F.3d 1255, 1257 (11th Cir. 2008) (same).

Because asylum is a discretionary benefit, aliens who are eligible for asylum are not automatically entitled to it. After demonstrating eligibility, aliens must further meet their burden of showing that the Attorney General or Secretary should exercise his or her discretion to grant asylum. *See* INA 208(b)(1)(A), 8 U.S.C. 1158(b)(1)(A) (the "Secretary of Homeland Security or the Attorney General may grant asylum to an alien" who applies in accordance with the required procedures and meets the definition of a "refugee"). The asylum statute's grant of discretion "is a broad delegation of power, which restricts the Attorney General's discretion to grant asylum only by requiring the Attorney General to first determine that the asylum applicant is a 'refugee.'" *Komarenko* v. *INS,* 35 F.3d 432, 436 (9th Cir. 1994), *overruled on other grounds by Abebe* v. *Mukasey,* 554 F.3d 1203 (9th Cir. 2009) (en banc) (per curiam). Immigration judges and asylum officers exercise that delegated discretion on a case-by-case basis. Under the Board's decision in *Matter of Pula,* 19 I&N Dec. 467 (BIA 1987), and its progeny, "an alien's manner of entry or attempted entry is a proper and relevant discretionary factor" and "circumvention of orderly refugee procedures" can be a "serious adverse factor" against exercising discretion to grant asylum, *id.* at 473, but "[t]he danger of persecution will outweigh all but the most egregious adverse factors," *Matter of Kasinga,* 21 I&N Dec. 357, 367 (BIA 1996).

*C. Establishing Bars to Asylum*

The availability of asylum has long been qualified both by statutory bars and by administrative discretion to create additional bars. Those bars have developed over time in a back-and-forth process between Congress and the Attorney General. The original asylum provisions, as set out in the Refugee Act of 1980, Public Law 96–212, simply directed the Attorney General to "establish a procedure for an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status, to apply for asylum, and the alien may be granted asylum in the discretion of the Attorney General if the Attorney General determines that such alien is a refugee" within the meaning of the INA. *See* 8 U.S.C. 1158(a) (1982); *see also INS* v. *Cardoza-Fonseca,* 480 U.S. 421, 427–29 (1987) (describing the 1980 provisions).

In the 1980 implementing regulations, the Attorney General, in his discretion, established several mandatory bars to granting asylum that were modeled on the mandatory bars to eligibility for withholding of deportation under the existing section 243(h) of the INA. *See* Refugee and Asylum Procedures, 45 FR 37392, 37392 (June 2, 1980) ("The application will be denied if the alien does not come within the definition of refugee under the Act, is firmly resettled in a third country, or is within one of the undesirable groups described in section 243(h) of the Act, *e.g.,* having been convicted of a serious crime, constitutes a danger to the United States."). Those regulations required denial of an asylum application if it was determined that (1) the alien was "not a refugee within the meaning of section 101(a)(42)" of the INA, 8 U.S.C. 1101(a)(42); (2) the alien had been "firmly resettled in a foreign country" before arriving in the United States; (3) the alien "ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular group, or political opinion"; (4) the alien had "been convicted by a final judgment of a particularly serious crime" and therefore constituted "a danger to the community of the United States"; (5) there were "serious reasons for considering that the alien ha[d] committed a serious non-political crime outside the United States prior to the arrival of the alien in the United States"; or (6) there were "reasonable grounds for regarding the alien as a danger to the security of the United States." *See id.* at 37394–95.

In 1990, the Attorney General substantially amended the asylum regulations while retaining the mandatory bars for aliens who persecuted others on account of a protected ground, were convicted of a particularly serious crime in the United States, firmly resettled in another country, or presented reasonable grounds to be regarded as a danger to the security of the United States. *See* Asylum and Withholding of Deportation Procedures, 55 FR 30674, 30683 (July 27, 1990); *see also Yang* v. *INS,* 79 F.3d 932, 936–39 (9th Cir. 1996) (upholding firm-resettlement bar); *Komarenko,* 35 F.3d at 436 (upholding particularly-serious-crime bar). In the Immigration Act of 1990, Public Law 101–649, Congress added an additional mandatory bar to applying for or being granted asylum for "[a]n[y] alien who has been convicted of an aggravated felony." Public Law 101–649, sec. 515.

In IIRIRA and the Antiterrorism and Effective Death Penalty Act of 1996, Public Law 104–132, Congress amended the asylum provisions in section 208 of the INA, 8 U.S.C. 1158. Among other amendments, Congress created three exceptions to section 208(a)(1)'s provision that an alien may apply for asylum, for (1) aliens who can be removed to a safe third country pursuant to bilateral or multilateral agreement; (2) aliens who failed to apply for asylum within one year of arriving in the United States; and (3) aliens who have previously applied for asylum and had the application denied. Public Law 104–208, div. C, sec. 604(a); *see* INA 208(a)(2)(A)–(C), 8 U.S.C. 1158(a)(2)(A)–(C).

Congress also adopted six mandatory exceptions to the authority of the Attorney General or Secretary to grant asylum that largely reflect pre-existing bars set forth in the Attorney General's asylum regulations. These exceptions cover (1) aliens who "ordered, incited, or otherwise participated" in the persecution of others on account of a protected ground; (2) aliens convicted of a "particularly serious crime"; (3) aliens who committed a "serious nonpolitical crime outside the United States" before arriving in the United States; (4) aliens who are a "danger to the security of the United States"; (5) aliens who are inadmissible or removable under a set of specified grounds relating to terrorist activity; and (6) aliens who have "firmly resettled in another country prior to arriving in the United States." Public Law 104–208, div. C, sec. 604(a); *see* INA 208(b)(2)(A)(i)–(vi), 8 U.S.C. 1158(b)(2)(A)(i)–(vi). Congress further added that aggravated felonies, defined in 8 U.S.C. 1101(a)(43), would be considered "particularly serious crime[s]." Public Law 104–208, div. C, sec. 604(a); *see* INA 201(a)(43), 8 U.S.C. 1101(a)(43).

Although Congress enacted specific exceptions, that statutory list is not exhaustive. Congress, in IIRIRA, expressly authorized the Attorney General to expand upon two of those exceptions—the bars for "particularly serious crimes" and "serious nonpolitical crimes." While Congress prescribed that all aggravated felonies constitute particularly serious crimes, Congress further provided that the Attorney General may "designate by regulation offenses that will be considered" a "particularly serious crime" that "constitutes a danger to the community of the United States." INA 208(b)(2)(A)(ii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(ii), (B)(ii). Courts and the Board have long held that this grant of authority also authorizes the Board to

identify additional particularly serious crimes (beyond aggravated felonies) through case-by-case adjudication. *See, e.g., Ali* v. *Achim,* 468 F.3d 462, 468– 69 (7th Cir. 2006); *Delgado* v. *Holder,* 648 F.3d 1095, 1106 (9th Cir. 2011) (en banc). Congress likewise authorized the Attorney General to designate by regulation offenses that constitute "a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States." INA 208(b)(2)(A)(iii), (B)(ii), 8 U.S.C. 1158(b)(2)(A)(iii), (B)(ii). Although these provisions continue to refer only to the Attorney General, the Departments interpret these provisions to also apply to the Secretary of Homeland Security by operation of the Homeland Security Act of 2002. *See* 6 U.S.C. 552; 8 U.S.C. 1103(a)(1).

Congress further provided the Attorney General with the authority, by regulation, to "establish additional limitations and conditions, consistent with [section 208 of the INA], under which an alien shall be ineligible for asylum under paragraph (1)." INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C). As the Tenth Circuit has recognized, "the statute clearly empowers" the Attorney General to "adopt[] further limitations" on asylum eligibility. *R–S–C,* 869 F.3d at 1187 & n.9. By allowing the imposition by regulation of "additional limitations and conditions," the statute gives the Attorney General and the Secretary broad authority in determining what the "limitations and conditions" should be. The additional limitations on eligibility must be established "by regulation," and must be "consistent with" the rest of section 208 of the INA. INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C).

Thus, the Attorney General in the past has invoked section 208(b)(2)(C) of the INA to limit eligibility for asylum based on a "fundamental change in circumstances" and on the ability of an applicant to safely relocate internally within the alien's country of nationality or of last habitual residence. *See* Asylum Procedures, 65 FR 76121, 76126 (Dec. 6, 2000). The courts have also viewed section 208(b)(2)(C) as conferring broad discretion, including to render aliens ineligible for asylum based on fraud. *See R–S–C,* 869 F.3d at 1187; *Nijjar* v. *Holder,* 689 F.3d 1077, 1082 (9th Cir. 2012) (noting that fraud can be "one of the 'additional limitations . . . under which an alien shall be ineligible for asylum' that the Attorney General is authorized to establish by regulation").

Section 208(d)(5) of the INA, 8 U.S.C. 1158(d)(5), also establishes certain procedures for consideration of asylum applications. But Congress specified that the Attorney General "may provide

by regulation for any other conditions or limitations on the consideration of an application for asylum," so long as those limitations are "not inconsistent with this chapter." INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B).

In sum, the current statutory framework leaves the Attorney General (and, after the Homeland Security Act, the Secretary) significant discretion to adopt additional bars to asylum eligibility. Beyond providing discretion to further define particularly serious crimes and serious nonpolitical offenses, Congress has provided the Attorney General and Secretary with discretion to establish by regulation any additional limitations or conditions on eligibility for asylum or on the consideration of applications for asylum, so long as these limitations are consistent with the asylum statute.

### D. Other Forms of Protection

Aliens who are not eligible to apply for or be granted asylum, or who are denied asylum on the basis of the Attorney General's or the Secretary's discretion, may nonetheless qualify for protection from removal under other provisions of the immigration laws. A defensive application for asylum that is submitted by an alien in removal proceedings is also deemed an application for statutory withholding of removal under section 241(b)(3) of the INA, 8 U.S.C. 1231(b)(3). *See* 8 CFR 208.30(e)(2)–(4), 1208.3(b), 1208.16(a). An immigration judge may also consider an alien's eligibility for withholding and deferral of removal under regulations issued pursuant to the authority of the implementing legislation regarding Article 3 of the CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, div. G, sec. 2242(b); 8 CFR 1208.3(b); *see also* 8 CFR 1208.16–1208.17.

These forms of protection bar an alien's removal to any country where the alien would "more likely than not" face persecution or torture, meaning that the alien would face a clear probability that his or her life or freedom would be threatened on account of a protected ground or a clear probability of torture. 8 CFR 1208.16(b)(2), (c)(2); *see Kouljinski* v. *Keisler,* 505 F.3d 534, 544– 45 (6th Cir. 2007); *Sulaiman* v. *Gonzales,* 429 F.3d 347, 351 (1st Cir. 2005). Thus, if an alien proves that it is more likely than not that the alien's life or freedom would be threatened on account of a protected ground, but is denied asylum for some other reason— for instance, because of a statutory exception, an eligibility bar adopted by regulation, or a discretionary denial of asylum—the alien may be entitled to

statutory withholding of removal if not otherwise barred for that form of protection. INA 241(b)(3), 8 U.S.C. 1231(b)(3); 8 CFR 208.16, 1208.16; *see also Garcia* v. *Sessions,* 856 F.3d 27, 40 (1st Cir. 2017) ("[W]ithholding of removal has long been understood to be a mandatory protection that must be given to certain qualifying aliens, while asylum has never been so understood."). Likewise, an alien who establishes that he or she will more likely than not face torture in the country of removal will qualify for CAT protection. *See* 8 CFR 208.16(c), 1208.16(c). But, unlike asylum, statutory withholding and CAT protection do not: (1) Prohibit the Government from removing the alien to a third country where the alien would not face the requisite probability of persecution or torture; (2) create a path to lawful permanent resident status and citizenship; or (3) afford the same ancillary benefits (such as protection for derivative family members). *See R–S–C,* 869 F.3d at 1180.

*E. Implementation of Treaty Obligations*

The framework described above is consistent with certain U.S. obligations under the 1967 Protocol Relating to the Status of Refugees ("Refugee Protocol"), which incorporates Articles 2 to 34 of the 1951 Convention Relating to the Status of Refugees ("Refugee Convention"), as well as U.S. obligations under Article 3 of the CAT. Neither the Refugee Protocol nor the CAT is self-executing in the United States. *See Khan* v. *Holder,* 584 F.3d 773, 783 (9th Cir. 2009) ('[T]he [Refugee] Protocol is not self-executing."); *Auguste* v. *Ridge,* 395 F.3d 123, 132 (3d Cir. 2005) (the CAT "was not self-executing"). These treaties are not directly enforceable in U.S. law, but some of the obligations they contain have been implemented through domestic implementing legislation. For example, the United States has implemented the non-refoulement provisions of these treaties—*i.e.,* provisions prohibiting the return of an individual to a country where he or she would face persecution or torture— through the withholding of removal provisions at section 241(b)(3) of the INA and the CAT regulations, not through the asylum provisions at section 208 of the INA. *See Cardoza-Fonseca,* 480 U.S. at 440–41; Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, Div. G, sec. 2242(b); 8 CFR 208.16(c), 208.17– 208.18; 1208.16(c), 1208.17–1208.18. Limitations on the availability of asylum that do not affect the statutory withholding of removal or protection under the CAT regulations are

consistent with these provisions. *See R– S–C,* 869 F.3d at 1188 & n.11; *Cazun* v. *Att'y Gen.,* 856 F.3d 249, 257 & n.16 (3d Cir. 2017); *Ramirez-Mejia* v. *Lynch,* 813 F.3d 240, 241 (5th Cir. 2016).

Limitations on eligibility for asylum are also consistent with Article 34 of the Refugee Convention, concerning assimilation of refugees, as implemented by section 208 of the INA, 8 U.S.C. 1158. Section 208 of the INA reflects that Article 34 is precatory and not mandatory, and accordingly does not provide that all refugees shall receive asylum. *See Cardoza-Fonseca,* 480 U.S. at 441; *Garcia,* 856 F.3d at 42; *Cazun,* 856 F.3d at 257 & n. 16; *Mejia* v. *Sessions,* 866 F.3d 573, 588 (4th Cir. 2017); *R–S–C,* 869 F.3d at 1188; *Ramirez-Mejia,* 813 F.3d at 241. As noted above, Congress has long recognized the precatory nature of Article 34 by imposing various statutory exceptions and by authorizing the creation of new bars to asylum eligibility through regulation.

Courts have likewise rejected arguments that other provisions of the Refugee Convention require every refugee to receive asylum. Courts have held, in the context of upholding the bar on eligibility for asylum in reinstatement proceedings under section 241(a)(5) of the INA, 8 U.S.C. 1231(a)(5), that limiting the ability to apply for asylum does not constitute a prohibited "penalty" under Article 31(1) of the Refugee Convention. *Cazun,* 856 F.3d at 257 & n.16; *Mejia,* 866 F.3d at 588. Courts have also rejected the argument that Article 28 of the Refugee Convention, governing the issuance of international travel documents for refugees "lawfully staying" in a country's territory, mandates that every person who might qualify for statutory withholding must also be granted asylum. *Garcia,* 856 F.3d at 42; *R–S–C,* 869 F.3d at 1188.

## IV. Regulatory Changes

*A. Limitation on Eligibility for Asylum for Aliens Who Contravene a Presidential Proclamation Under Section 212(f) or 215(a)(1) of the INA Concerning the Southern Border*

Pursuant to section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C), the Departments are revising 8 CFR 208.13(c) and 8 CFR 1208.13(c) to add a new mandatory bar on eligibility for asylum for certain aliens who are subject to a presidential proclamation suspending or imposing limitations on their entry into the United States pursuant to section 212(f) of the INA, 8 U.S.C. 1182(f), or section 215(a)(1) of the INA, 8 U.S.C. 1185(a)(1), and who enter

the United States in contravention of such a proclamation after the effective date of this rule. The bar would be subject to several further limitations: (1) The bar would apply only prospectively, to aliens who enter the United States after the effective date of such a proclamation; (2) the proclamation must concern entry at the southern border; and (3) the bar on asylum eligibility would not apply if the proclamation expressly disclaims affecting asylum eligibility for aliens within its scope, or expressly provides for a waiver or exception that entitles the alien to relief from the limitation on entry imposed by the proclamation.

The President has both statutory and inherent constitutional authority to suspend the entry of aliens into the United States when it is in the national interest. *See United States ex rel. Knauff* v. *Shaughnessy,* 338 U.S. 537, 542 (1950) ("The exclusion of aliens is a fundamental act of sovereignty" that derives from "legislative power" and also "is inherent in the executive power to control the foreign affairs of the nation."); *see also Proposed Interdiction of Haitian Flag Vessels,* 5 Op. O.L.C. 242, 244–45 (1981) ("[T]he sovereignty of the Nation, which is the basis of our ability to exclude all aliens, is lodged in both political branches of the government," and even without congressional action, the President may "act[ ] to protect the United States from massive illegal immigration.").

Congress, in the INA, has expressly vested the President with broad authority to restrict the ability of aliens to enter the United States. Section 212(f) states: "Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." 8 U.S.C. 1182(f). "By its plain language, [8 U.S.C.] § 1182(f) grants the President broad discretion to suspend the entry of aliens into the United States," including the authority "to impose additional limitations on entry beyond the grounds for exclusion set forth in the INA." *Trump* v. *Hawaii,* 138 S. Ct. 2392, 2408 – 12 (2018). For instance, the Supreme Court considered it "perfectly clear that 8 U.S.C. 1182(f) . . . grants the President ample power to establish a naval blockade that would simply deny illegal Haitian immigrants the ability to disembark on our shores," thereby preventing them from entering

**55940** **Federal Register** / Vol. 83, No. 218 / Friday, November 9, 2018 / Rules and Regulations

the United States and applying for asylum. *Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 187 (1993).

The President's broad authority under section 212(f) is buttressed by section 215(a)(1), which states it shall be unlawful "for any alien to depart from or enter or attempt to depart from or enter the United States except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." 8 U.S.C. 1185(a)(1). The presidential orders that the Supreme Court upheld in *Sale* were promulgated pursuant to both sections 212(f) and 215(a)(1)—*see* 509 U.S. at 172 & n.27; *see also* Exec. Order 12807 (May 24, 1992) ("Interdiction of Illegal Aliens"); Exec. Order 12324 (Sept. 29, 1981) ("Interdiction of Illegal Aliens") (revoked and replaced by Exec. Order 12807)—as was the proclamation upheld in *Trump* v. *Hawaii, see* 138 S. Ct. at 2405. Other presidential orders have solely cited section 215(a)(1) as authority. *See, e.g.,* Exec. Order 12172 (Nov. 26, 1979) ("Delegation of Authority With Respect to Entry of Certain Aliens Into the United States") (invoking section 215(a)(1) with respect to certain Iranian visa holders).

An alien whose entry is suspended or limited by a proclamation is one whom the President has determined should not enter the United States, or only should do so under certain conditions. Such an order authorizes measures designed to prevent such aliens from arriving in the United States as a result of the President's determination that it would be against the national interest for them to do so. For example, the proclamation and order that the Supreme Court upheld in *Sale,* Proc. 4865 (Sept. 29, 1981) ("High Seas Interdiction of Illegal Aliens"); Exec. Order 12324, directed the Coast Guard to interdict the boats of tens of thousands of migrants fleeing Haiti to prevent them from reaching U.S. shores, where they could make claims for asylum. The order further authorized the Coast Guard to intercept any vessel believed to be transporting undocumented aliens to the United States, "[t]o make inquiries of those on board, examine documents, and take such actions as are necessary to carry out this order," and "[t]o return the vessel and its passengers to the country from which it came, or to another country, when there is reason to believe that an offense is being committed against the United States immigration laws." Exec. Order 12807, sec. 2(c).

An alien whose entry is suspended or restricted under such a proclamation, but who nonetheless reaches U.S. soil contrary to the President's

determination that the alien should not be in the United States, would remain subject to various procedures under immigration laws. For instance, an alien subject to a proclamation who nevertheless entered the country in contravention of its terms generally would be placed in expedited-removal proceedings under section 235 of the INA, 8 U.S.C. 1225, and those proceedings would allow the alien to raise any claims for protection before being removed from the United States, if appropriate. Furthermore, the asylum statute provides that "[a]ny alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival)," and "irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, [8 U.S.C.] 1225(b)." INA 208(a)(1), 8 U.S.C. 1158(a)(1). Some past proclamations have accordingly made clear that aliens subject to an entry bar may still apply for asylum if they have nonetheless entered the United States. *See, e.g.,* Proc. 9645, sec. 6(e) (Sept. 24, 2017) ("Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats") ("Nothing in this proclamation shall be construed to limit the ability of an individual to seek asylum, refugee status, withholding of removal, or protection under the Convention Against Torture, consistent with the laws of the United States.").

As noted above, however, the asylum statute also authorizes the Attorney General and Secretary "by regulation" to "establish additional limitations and conditions, consistent with [section 208 of the INA], under which an alien shall be ineligible for asylum," INA 208(b)(2)(C), 8 U.S.C. 1158(b)(2)(C), and to set conditions or limitations on the consideration of an application for asylum, INA 208(d)(5)(B), 8 U.S.C. 1158(d)(5)(B). The Attorney General and the Secretary have determined that this authority should be exercised to render ineligible for a grant of asylum any alien who is subject to a proclamation suspending or restricting entry along the southern border with Mexico, but who nonetheless enters the United States after such a proclamation goes into effect. Such an alien would have engaged in actions that undermine a particularized determination in a proclamation that the President judged as being required by the national interest: That the alien should not enter the United States.

The basis for ineligibility in these circumstances would be the Departments' conclusion that aliens

who contravene such proclamations should not be eligible for asylum. Such proclamations generally reflect sensitive determinations regarding foreign relations and national security that Congress recognized should be entrusted to the President. *See Trump* v. *Hawaii,* 138 S. Ct. at 2411. Aliens who contravene such a measure have not merely violated the immigration laws, but have also undercut the efficacy of a measure adopted by the President based upon his determination of the national interest in matters that could have significant implications for the foreign affairs of the United States. For instance, previous proclamations were directed solely at Haitian migrants, nearly all of whom were already inadmissible by virtue of other provisions of the INA, but the proclamation suspended entry and authorized further measures to ensure that such migrants did not enter the United States contrary to the President's determination. *See, e.g.,* Proc. 4865; Exec. Order 12807.

In the case of the southern border, a proclamation that suspended the entry of aliens who crossed between the ports of entry would address a pressing national problem concerning the immigration system and our foreign relations with neighboring countries. Even if most of those aliens would already be inadmissible under our laws, the proclamation would impose limitations on entry for the period of the suspension against a particular class of aliens defined by the President. That judgment would reflect a determination that certain illegal entrants—namely, those crossing between the ports of entry on the southern border during the duration of the proclamation—were a source of particular concern to the national interest. Furthermore, such a proclamation could authorize additional measures to prevent the entry of such inadmissible aliens, again reflecting the national concern with this subset of inadmissible aliens. The interim final rule reflects the Departments' judgment that, under the extraordinary circumstances presented here, aliens crossing the southern border in contravention of such a proclamation should not be eligible for a grant of asylum during the period of suspension or limitation on entry. The result would be to channel to ports of entry aliens who seek to enter the United States and assert an intention to apply for asylum or a fear of persecution, and to provide for consideration of those statements there.

Significantly, this bar to eligibility for a grant of asylum would be limited in scope. This bar would apply only prospectively. This bar would further

apply only to a proclamation concerning entry along the southern border, because this interim rule reflects the need to facilitate urgent action to address current conditions at that border. This bar would not apply to any proclamation that expressly disclaimed an effect on eligibility for asylum. And this bar would not affect an applicant who is granted a waiver or is excepted from the suspension under the relevant proclamation, or an alien who did not at any time enter the United States after the effective date of such proclamation.

Aliens who enter in contravention of a proclamation will not, however, overcome the eligibility bar merely because a proclamation has subsequently ceased to have effect. The alien still would have entered notwithstanding a proclamation at the time the alien entered the United States, which would result in ineligibility for asylum (but not for statutory withholding or for CAT protection). Retaining eligibility for asylum for aliens who entered the United States in contravention of the proclamation, but evaded detection until it had ceased, could encourage aliens to take riskier measures to evade detection between ports of entry, and would continue to stretch government resources dedicated to apprehension efforts.

This restriction on eligibility to asylum is consistent with section 208(a)(1) of the INA, 8 U.S.C. 1158(a)(1). The regulation establishes a condition on asylum eligibility, not on the ability to apply for asylum. *Compare* INA 208(a), 8 U.S.C. 1158(a) (describing conditions for applying for asylum), *with* INA 208(b), 8 U.S.C. 1158(b) (identifying exceptions and bars to granting asylum). And, as applied to a proclamation that suspends the entry of aliens who crossed between the ports of entry at the southern border, the restriction would not preclude an alien physically present in the United States from being granted asylum if the alien arrives in the United States through any border other than the southern land border with Mexico or at any time other than during the pendency of a proclamation suspending or limiting entry.

*B. Screening Procedures in Expedited Removal for Aliens Subject to Proclamations*

The rule would also modify certain aspects of the process for screening claims for protection asserted by aliens who have entered in contravention of a proclamation and who are subject to expedited removal under INA 235(b)(1), 8 U.S.C. 1225(b)(1). Under current procedures, aliens who unlawfully enter the United States may avoid being removed on an expedited basis by making a threshold showing of a credible fear of persecution at a initial screening interview. At present, those aliens are often released into the interior of the United States pending adjudication of such claims by an immigration court in section 240 proceedings especially if those aliens travel as family units. Once an alien is released, adjudications can take months or years to complete because of the increasing volume of claims and the need to expedite cases in which aliens have been detained. The Departments expect that a substantial proportion of aliens subject to an entry proclamation concerning the southern border would be subject to expedited removal, since approximately 234,534 aliens in FY 2018 who presented at a port of entry or were apprehended at the border were referred to expedited-removal proceedings.[1] The procedural changes within expedited removal would be confined to aliens who are ineligible for asylum because they are subject to a regulatory bar for contravening an entry proclamation.

1. Under existing law, expedited-removal procedures—streamlined procedures for expeditiously reviewing claims and removing certain aliens—apply to those individuals who arrive at a port of entry or those who have entered illegally and are encountered by an immigration officer within 100 miles of the border and within 14 days of entering. *See* INA 235(b), 8 U.S.C. 1225(b); Designating Aliens For Expedited Removal, 69 FR 48877, 48880 (Aug. 11, 2004). To be subject to expedited removal, an alien must also be inadmissible under INA 212(a)(6)(C) or (a)(7), 8 U.S.C. 1182(a)(6)(C) or (a)(7), meaning that the alien has either tried to procure documentation through misrepresentation or lacks such documentation altogether. Thus, an alien encountered in the interior of the United States who entered in contravention of a proclamation and who is not otherwise amenable to expedited removal would be placed in proceedings under section 240 of the INA. The interim rule does not invite comment on existing regulations implementing the present scope of expedited removal.

Section 235(b)(1) of the INA, 8 U.S.C. 1225(b)(1), prescribes procedures in the expedited-removal context for screening an alien's eligibility for asylum. When these provisions were being debated in 1996, legislators expressed particular concern that "[e]xisting procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative," and that "[t]he asylum system has been abused by those who seek to use it as a means of 'backdoor' immigration." *See* H.R. Rep. No. 104–469, pt. 1, at 107 (1996). Members of Congress accordingly described the purpose of expedited removal and related procedures as "streamlin[ing] rules and procedures in the Immigration and Nationality Act to make it easier to deny admission to inadmissible aliens and easier to remove deportable aliens from the United States." *Id.* at 157; *see Am. Immigration Lawyers Ass'n* v. *Reno,* 18 F. Supp. 2d 38, 41 (D.D.C. 1998), *aff'd,* 199 F.3d 1352 (DC Cir. 2000) (rejecting several constitutional challenges to IIRIRA and describing the expedited-removal process as a "summary removal process for adjudicating the claims of aliens who arrive in the United States without proper documentation").

Congress thus provided that aliens "inadmissible under [8 U.S.C.] 1182(a)(6)(C) or 1182(a)(7)" shall be "removed from the United States without further hearing or review unless the alien indicates either an intention to apply for asylum under [8 U.S.C. 1158] or a fear of persecution." INA 235(b)(1)(A)(i), 8 U.S.C. 1225(b)(1)(A)(i); *see* INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii) (such aliens shall be referred "for an interview by an asylum officer"). On its face, the statute refers only to proceedings to establish eligibility for an affirmative grant of asylum and its attendant benefits, not to statutory withholding of removal or CAT protection against removal to a particular country.

An alien referred for a credible-fear interview must demonstrate a "credible fear," defined as a "significant possibility, taking into account the credibility of the statements made by the alien in support of the alien's claim and such other facts as are known to the officer, that the alien could establish eligibility for asylum under [8 U.S.C. 1158]." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). According to the House report, "[t]he credible-fear standard [wa]s designed to weed out non-meritorious cases so that only applicants with a likelihood of success will proceed to the regular asylum process." H.R. Rep. No. 104–69, at 158.

---

[1] As noted below, in FY 2018, approximately 171,511 aliens entered illegally between ports of entry, were apprehended by CBP, and were placed in expedited removal. Approximately 59,921 inadmissible aliens arrived at ports of entry and were placed in expedited removal. Furthermore, ICE arrested some 3,102 aliens and placed them in expedited removal.

If the asylum officer determines that the alien lacks a credible fear, then the alien may request review by an immigration judge. INA 235(b)(1)(B)(iii)(III), 8 U.S.C. 1225(b)(1)(B)(iii)(III). If the immigration judge concurs with the asylum officer's negative credible-fear determination, then the alien shall be removed from the United States without further review by either the Board or the courts. INA 235(b)(1)(B)(iii)(I), (b)(1)(C), 8 U.S.C. 1225(b)(1)(B)(iii)(I), (b)(1)(C); INA 242(a)(2)(A)(iii), (e)(5), 8 U.S.C. 1252(a)(2)(A)(iii), (e)(5); *Pena* v. *Lynch*, 815 F.3d 452, 457 (9th Cir. 2016). By contrast, if the asylum officer or immigration judge determines that the alien has a credible fear—*i.e.*, "a significant possibility . . . that the alien could establish eligibility for asylum," INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v)—then the alien, under current regulations, is placed in section 240 proceedings for a full hearing before an immigration judge, with appeal available to the Board and review in the federal courts of appeals. *See* INA 235(b)(1)(B)(ii), (b)(2)(A), 8 U.S.C. 1225(b)(1)(B)(ii), (b)(2)(A); INA 242(a), 8 U.S.C. 1252(a); 8 CFR 208.30(e)(5), 1003.1. The interim rule does not invite comment on existing regulations implementing this framework.

By contrast, section 235 of the INA is silent regarding procedures for the granting of statutory withholding of removal and CAT protection; indeed, section 235 predates the legislation directing implementation of U.S. obligations under Article 3 of the CAT. *See* Foreign Affairs Reform and Restructuring Act of 1998, Public Law 105–277, sec. 2242(b) (requiring implementation of CAT); IIRIRA, Public Law 104–208, sec. 302 (revising section 235 of the INA to include procedures for dealing with inadmissible aliens who intend to apply for asylum). The legal standards for ultimately granting asylum on the merits versus statutory withholding or CAT protection are also different. Asylum requires an applicant to ultimately establish a "well-founded fear" of persecution, which has been interpreted to mean a "reasonable possibility" of persecution—a "more generous" standard than the "clear probability" of persecution or torture standard that applies to statutory withholding or CAT protection. *See INS* v. *Stevic*, 467 U.S. 407, 425, 429–30 (1984); *Santosa* v. *Mukasey*, 528 F.3d 88, 92 & n.1 (1st Cir. 2008); *compare* 8 CFR 1208.13(b)(2)(i)(B) *with* 8 CFR 1208.16(b)(2), (c)(2). As a result, applicants who establish eligibility for asylum are not necessarily eligible for statutory withholding or CAT protection.

Current regulations instruct USCIS adjudicators and immigration judges to treat an alien's request for asylum in expedited-removal proceedings under section 1225(b) as a request for statutory withholding and CAT protection as well. *See* 8 CFR 208.3(b), 208.30(e)(2)–(4), 1208.3(b), 1208.16(a). In the context of expedited-removal proceedings, "credible fear of persecution" is defined to mean a "significant possibility" that the alien "could establish eligibility for asylum under section 1158," not CAT or statutory withholding. INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). Regulations nevertheless have generally provided that aliens in expedited removal should be subject to the same process for considering statutory withholding of removal claims under INA 241(b)(3), 8 U.S.C. 1231(b)(3), and claims for protection under the CAT, as they are for asylum claims. *See* 8 CFR 208.30(e)(2)–(4).

Thus, when the Immigration and Naturalization Service provided for claims for statutory withholding of removal and CAT protection to be considered in the same expedited-removal proceedings as asylum, the result was that if an alien showed that there was a significant possibility of establishing eligibility for asylum and was therefore referred for removal proceedings under section 240 of the INA, any potential statutory withholding and CAT claims the alien might have were referred as well. This was done on the assumption that that it would not "disrupt[ ] the streamlined process established by Congress to circumvent meritless claims." Regulations Concerning the Convention Against Torture, 64 FR 8478, 8485 (Feb. 19, 1999). But while the INA authorizes the Attorney General and Secretary to provide for consideration of statutory withholding and CAT claims together with asylum claims or other matters that may be considered in removal proceedings, the INA does not require that approach, *see Foti* v. *INS*, 375 U.S. 217, 229–30 & n.16 (1963), or that they be considered in the same way.

Since 1999, regulations also have provided for a distinct "reasonable fear" screening process for certain aliens who are categorically ineligible for asylum and can thus make claims only for statutory withholding or CAT protections. *See* 8 CFR 208.31. Specifically, if an alien is subject to having a previous order of removal reinstated or is a non-permanent resident alien subject to an administrative order of removal resulting from an aggravated felony conviction, then he is categorically ineligible for asylum. *See id.* § 208.31(a), (e). Such an alien can be placed in withholding-only proceedings to adjudicate his statutory withholding or CAT claims, but only if he first establishes a "reasonable fear" of persecution or torture through a screening process that tracks the credible-fear process. *See id.* § 208.31(c), (e). Reasonable fear is defined by regulation to mean a "reasonable possibility that [the alien] would be persecuted on account of his or her race, religion, nationality, membership in a particular social group or political opinion, or a reasonable possibility that he or she would be tortured in the country of removal." *Id.* § 208.31(c). "This . . . screening process is modeled on the credible-fear screening process, but requires the alien to meet a higher screening standard." Regulations Concerning the Convention Against Torture, 64 FR at 8485; *see also Garcia* v. *Johnson*, No. 14–CV–01775, 2014 WL 6657591, at *2 (N.D. Cal. Nov. 21, 2014) (describing the aim of the regulations as providing "fair and efficient procedures" in reasonable-fear screening that would comport with U.S. international obligations).

Significantly, when establishing the reasonable-fear screening process, DOJ explained that the two affected categories of aliens should be screened based on the higher reasonable-fear standard because, "[u]nlike the broad class of arriving aliens who are subject to expedited removal, these two classes of aliens are ineligible for asylum," and may be entitled only to statutory withholding of removal or CAT protection. Regulations Concerning the Convention Against Torture, 64 FR at 8485. "Because the standard for showing entitlement to these forms of protection (a probability of persecution or torture) is significantly higher than the standard for asylum (a well-founded fear of persecution), the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher." *Id.*

2. Drawing on the established framework for considering whether to grant withholding of removal or CAT protection in the reasonable-fear context, this interim rule establishes a bifurcated screening process for aliens subject to expedited removal who are ineligible for asylum by virtue of entering in contravention of a proclamation, but who express a fear of return or seek statutory withholding or CAT protection. The Attorney General and Secretary have broad authority to

implement the immigration laws, *see* INA 103, 8 U.S.C. 1103, including by establishing regulations, *see* INA 103, 8 U.S.C. 1103(a)(3), and to regulate "conditions or limitations on the consideration of an application for asylum," *id.* 1158(d)(5)(B). Furthermore, the Secretary has the authority—in her "sole and unreviewable discretion," the exercise of which may be "modified at any time"—to designate additional categories of aliens that will be subject to expedited-removal procedures, so long as the designated aliens have not been admitted or paroled nor continuously present in the United States for two years. INA 235(b)(1)(A)(iii), 8 U.S.C. 1225(b)(1)(A)(iii). The Departments have frequently invoked these authorities to establish or modify procedures affecting aliens in expedited-removal proceedings, as well as to adjust the categories of aliens subject to particular procedures within the expedited-removal framework.[2]

This rule does not change the credible-fear standard for asylum claims, although the regulation would expand the scope of the inquiry in the process. An alien who is subject to a relevant proclamation and nonetheless has entered the United States after the effective date of such a proclamation in contravention of that proclamation would be ineligible for asylum and would thus not be able to establish a "significant possibility . . . [of] eligibility for asylum under section 1158." INA 235(b)(1)(B)(v), 8 U.S.C. 1225(b)(1)(B)(v). As current USCIS guidance explains, under the credible-fear standard, "[a] claim that has no possibility, or only a minimal or mere possibility, of success, would not meet the 'significant possibility' standard." USCIS, Office of Refugee, Asylum, & Int'l Operations, Asylum Div., *Asylum Officer Basic Training Course, Lesson Plan on Credible Fear* at 15 (Feb. 13, 2017). Consistent with section 235(b)(1)(B)(iii)(III) of the INA, the alien could still obtain review from an immigration judge regarding whether the asylum officer correctly determined that the alien was subject to a limitation

or suspension on entry imposed by a proclamation. Further, consistent with section 235(b)(1)(B) of the INA, if the immigration judge reversed the asylum officer's determination, the alien could assert the asylum claim in section 240 proceedings.

Aliens determined to be ineligible for asylum by virtue of contravening a proclamation, however, would still be screened, but in a manner that reflects that their only viable claims would be for statutory withholding or CAT protection pursuant to 8 CFR 208.30(e)(2)–(4) and 1208.16(a). After determining the alien's ineligibility for asylum under the credible-fear standard, the asylum officer would apply the long-established reasonable-fear standard to assess whether further proceedings on a possible statutory withholding or CAT protection claim are warranted. If the asylum officer determined that the alien had not established the requisite reasonable fear, the alien then could seek review of that decision from an immigration judge (just as the alien may under existing 8 CFR 208.30 and 208.31), and would be subject to removal only if the immigration judge agreed with the negative reasonable-fear finding. Conversely, if either the asylum officer or the immigration judge determined that the alien cleared the reasonable-fear threshold, the alien would be put in section 240 proceedings, just like aliens who receive a positive credible-fear determination for asylum. Employing a reasonable-fear standard in this context, for this category of ineligible aliens, would be consistent with the Department of Justice's longstanding rationale that "aliens ineligible for asylum," who could only be granted statutory withholding of removal or CAT protection, should be subject to a different screening standard that would correspond to the higher bar for actually obtaining these forms of protection. *See* Regulations Concerning the Convention Against Torture, 64 FR at 8485 ("Because the standard for showing entitlement to these forms of protection . . . is significantly higher than the standard for asylum . . . the screening standard adopted for initial consideration of withholding and deferral requests in these contexts is also higher.").

The screening process established by the interim rule will accordingly proceed as follows. For an alien subject to expedited removal, DHS will ascertain whether the alien seeks protection, consistent with INA 235(b)(1)(A)(ii), 8 U.S.C. 1225(b)(1)(A)(ii). All aliens seeking asylum, statutory withholding of

removal, or CAT protection will continue to go before an asylum officer for screening, consistent with INA 235(b)(1)(B), 8 U.S.C. 1225(b)(1)(B). The asylum officer will ask threshold questions to elicit whether an alien is ineligible for a grant of asylum pursuant to a proclamation entry bar. If there is a significant possibility that the alien is not subject to the eligibility bar (and the alien otherwise demonstrates sufficient facts pertaining to asylum eligibility), then the alien will have established a credible fear.

If, however, an alien lacks a significant possibility of eligibility for asylum because of the proclamation bar, then the asylum officer will make a negative credible-fear finding. The asylum officer will then apply the reasonable-fear standard to assess the alien's claims for statutory withholding of removal or CAT protection.

An alien subject to the proclamation-based asylum bar who clears the reasonable-fear screening standard will be placed in section 240 proceedings, just as an alien who clears the credible-fear standard will be. In those proceedings, the alien will also have an opportunity to raise whether the alien was correctly identified as subject to the proclamation ineligibility bar to asylum, as well as other claims. If an immigration judge determines that the alien was incorrectly identified as subject to the proclamation, the alien will be able to apply for asylum. Such aliens can appeal the immigration judge's decision in these proceedings to the BIA and then seek review from a federal court of appeals.

Conversely, an alien who is found to be subject to the proclamation asylum bar and who does not clear the reasonable-fear screening standard can obtain review of both of those determinations before an immigration judge, just as immigration judges currently review negative credible-fear and reasonable-fear determinations. If the immigration judge finds that either determination was incorrect, then the alien will be placed into section 240 proceedings. In reviewing the determinations, the immigration judge will decide de novo whether the alien is subject to the proclamation asylum bar. If, however, the immigration judge affirms both determinations, then the alien will be subject to removal without further appeal, consistent with the existing process under section 235 of the INA. In short, aliens subject to the proclamation eligibility bar to asylum will be processed through existing procedures by DHS and EOIR in accordance with 8 CFR 208.30 and 1208.30, but will be subject to the

---

[2] *See, e.g.,* Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR 4769 (Jan. 17, 2017); Designating Aliens For Expedited Removal, 69 FR 48877; Implementation of the Agreement Between the Government of the United States of America and the Government of Canada Regarding Asylum Claims Made in Transit and at Land Border Ports-of-Entry, 69 FR 10620 (March 8, 2004); New Rules Regarding Procedures for Asylum and Withholding of Removal, 63 FR 31945 (June 11, 1998); Asylum Procedures, 65 FR 76121; Regulations Concerning the Convention Against Torture, 64 FR 8478 (Feb. 19, 1999).

reasonable-fear standard as part of those procedures with respect to their statutory withholding and CAT protection claims.[3]

2. The above process will not affect the process in 8 CFR 208.30(e)(5) for certain existing statutory bars to asylum eligibility. Under that regulatory provision, many aliens who appear to fall within an existing statutory bar, and thus appear to be ineligible for asylum, can nonetheless be placed in section 240 proceedings if they are otherwise eligible for asylum and obtain immigration judge review of their asylum claims, followed by further review before the BIA and the courts of appeals. Specifically, with the exceptions of stowaways and aliens entering from Canada at a port of entry (who are generally ineligible to apply for asylum by virtue of a safe-third-country agreement), 8 CFR 208.30(e)(5) provides that "if an alien is able to establish a credible fear of persecution or torture but appears to be subject to one or more of the mandatory bars to applying for, or being granted, asylum contained in section 208(a)(2) and 208(b)(2) of the [INA] . . . [DHS] shall nonetheless place the alien in proceedings under section 240 of the [INA] for full consideration of the alien's claim."

The language providing that the agency "shall nonetheless place the alien in proceedings under section 240 of the [INA]" was promulgated in 2000 in a final rule implementing asylum procedures after the 1996 enactment of IIRIRA. *See* Asylum Procedures, 65 FR at 76137. The explanation for this change was that some commenters suggested that aliens should be referred to section 240 proceedings "regardless of any apparent statutory ineligibility under section 208(a)(2) or 208(b)(2)(A) of the [INA]. The Department has adopted that suggestion and has so amended the regulation." *Id.* at 76129.

This rule will avoid a textual ambiguity in 8 CFR 208.30(e)(5), which is unclear regarding its scope, by adding a new sentence clarifying the process

applicable to an alien barred under a covered proclamation. *See* 8 CFR 208.30(e)(5) (referring to an alien who "appears to be subject to one or more of the mandatory bars to . . . asylum contained in section 208(a)(2) and 208(b)(2) of the [INA]"). By using a definite article ("the mandatory bars to . . . asylum") and the phrase "contained in," 8 CFR 208.30(e)(5) may refer only to aliens who are subject to the defined mandatory bars "contained in" specific parts of section 208 of the INA, such as the bar for aggravated felons, INA 208(b)(2)(B)(i), 8 U.S.C. 1158(b)(2)(B)(i), or the bar for aliens reasonably believed to be a danger to U.S. security, INA 208(b)(2)(A)(iv), 8 U.S.C. 1158(b)(2)(A)(iv). It is thus not clear whether an alien subject to a further limitation or condition on asylum eligibility adopted pursuant to section 208(b)(2)(C) of the INA would also be subject to the procedures set forth in 8 CFR 208.30(e)(5). Notably, the preamble to the final rule adopting 8 CFR 208.30(e)(5) indicated that it was intended to apply to "any apparent statutory ineligibility under section 208(a)(2) or 208(b)(2)(A) of the [INA]," and did not address future regulatory ineligibility under section 208(b)(2)(C) of the INA, 8 U.S.C. 1158(b)(2)(C). Asylum Procedures, 65 FR at 76129. This rule does not resolve that question, however, but instead establishes an express regulatory provision dealing specifically with aliens subject to a limitation under section 212(f) or 215(a)(1) of the INA.

## C. Anticipated Effects of the Rule

1. The interim rule aims to address an urgent situation at the southern border. In recent years, there has been a significant increase in the number and percentage of aliens who seek admission or unlawfully enter the United States and then assert an intent to apply for asylum or a fear of persecution. The vast majority of such assertions for protection occur in the expedited-removal context, and the rates at which such aliens receive a positive credible-fear determination has increased in the last five years. Having passed through the credible-fear screening process, many of these aliens are released into the interior to await further section 240 removal proceedings. But many aliens who pass through the credible-fear screening thereafter do not pursue their claims for asylum. Moreover, a substantial number fail to appear for a section 240 proceeding. And even aliens who passed through credible-fear screening and apply for asylum are granted it at a low rate.

Recent numbers illustrate the scope and scale of the problems caused by the disconnect between the number of aliens asserting a credible fear and the number of aliens who ultimately are deemed eligible for, and granted, asylum. In FY 2018, DHS identified some 612,183 inadmissible aliens who entered the United States, of whom 404,142 entered unlawfully between ports of entry and were apprehended by CBP, and 208,041 presented themselves at ports of entry. Those numbers exclude the inadmissible aliens who crossed but evaded detection, and interior enforcement operations conducted by U.S. Immigration and Customs Enforcement ("ICE"). The vast majority of those inadmissible aliens— 521,090—crossed the southern border. Approximately 98% (396,579) of all aliens apprehended after illegally crossing between ports of entry made their crossings at the southern border, and 76% of all encounters at the southern border reflect such apprehensions. By contrast, 124,511 inadmissible aliens presented themselves at ports of entry along the southern border, representing 60% of all port traffic for inadmissible aliens and 24% of encounters with inadmissible aliens at the southern border.

Nationwide, DHS has preliminarily calculated that throughout FY 2018, approximately 234,534 aliens who presented at a port of entry or were apprehended at the border were referred to expedited-removal proceedings. Of that total, approximately 171,511 aliens were apprehended crossing between ports of entry; approximately 59,921 were inadmissible aliens who presented at ports of entry; and approximately 3,102 were arrested by ICE and referred to expedited removal.[4] The total number of aliens of all nationalities referred to expedited-removal proceedings has significantly increased over the last decade, from 161,516 aliens in 2008 to approximately 234,534 in FY 2018 (an overall increase of about 45%). Of those totals, the number of aliens from the Northern Triangle referred to expedited-removal proceedings has increased from 29,206 in FY 2008 (18% of the total

---

[3] Nothing about this screening process or in this interim rule would alter the existing procedures for processing alien stowaways under the INA and associated regulations. An alien stowaway is unlikely to be subject to 8 CFR 208.13(c)(3) and 1208.13(c)(3) unless a proclamation specifically applies to stowaways or to entry by vessels or aircraft. INA 101(a)(49), 8 U.S.C. 1101(a)(49). Moreover, an alien stowaway is barred from being placed into section 240 proceedings regardless of whether a credible fear is established. INA 235(a)(2), 8 U.S.C. 1225(a)(2). Similarly, despite the incorporation of a reasonable-fear standard into the evaluation of certain cases under credible-fear procedures, nothing about this screening process or in this interim rule implicates existing reasonable-fear procedures in 8 CFR 208.31 and 1208.31.

[4] All references to the number of aliens subject to expedited removal in FY 2018 reflect data for the first three quarters of the year and projections for the fourth quarter of FY 2018. It is unclear whether the ICE arrests reflect additional numbers of aliens processed at ports of entry. Another approximately 130,211 aliens were subject to reinstatement, meaning that the alien had previously been removed and then unlawfully entered the United States again. The vast majority of reinstatements involved Mexican nationals. Aliens subject to reinstatement who express a fear of persecution or torture receive reasonable-fear determinations under 8 CFR 208.31.

**Federal Register** / Vol. 83, No. 218 / Friday, November 9, 2018 / Rules and Regulations **55945**

161,516 aliens referred) to approximately 103,752 in FY 2018 (44% of the total approximately 234,534 aliens referred, an increase of over 300%). In FY 2018, nationals of the Northern Triangle represented approximately 103,752 (44%) of the aliens referred to expedited-removal proceedings; approximately 91,235 (39%) were Mexican; and nationals from other countries made up the remaining balance (17%). As of the date of this rule, final expedited-removal statistics for FY 2018 specific to the southern border are not available. But the Departments' experience with immigration enforcement has demonstrated that the vast majority of expedited-removal actions have also occurred along the southern border.

Once in expedited removal, some 97,192 (approximately 41% of all aliens in expedited removal) were referred for a credible-fear interview with an asylum officer, either because they expressed a fear of persecution or torture or an intent to apply for protection. Of that number, 6,867 (7%) were Mexican nationals, 25,673 (26%) were Honduran, 13,433 (14%) were Salvadoran, 24,456 (25%) were Guatemalan, and other nationalities made up the remaining 28% (the largest proportion of which were 7,761 Indian nationals).

In other words: Approximately 61% of aliens from Northern Triangle countries placed in expedited removal expressed the intent to apply for asylum or a fear of persecution and triggered credible-fear proceedings in FY 2018 (approximately 69% of Hondurans, 79% of Salvadorans, and 49% of Guatemalans). These aliens represented 65% of all credible-fear referrals in FY 2018. By contrast, only 8% of aliens from Mexico trigger credible-fear proceedings when they are placed in expedited removal, and Mexicans represented 7% of all credible-fear referrals. Other nationalities compose the remaining 26,763 (28%) referred for credible-fear interviews.

Once these 97,192 aliens were interviewed by an asylum officer, 83,862 cases were decided on the merits (asylum officers closed the others).[5]

Those asylum officers found a credible fear in 89% (74,574) of decided cases—meaning that almost all of those aliens' cases were referred on for further immigration proceedings under section 240, and many of the aliens were released into the interior while awaiting those proceedings.[6] As noted, nationals of Northern Triangle countries represent the bulk of credible-fear referrals (65%, or 63,562 cases where the alien expressed an intent to apply for asylum or asserted a fear). In cases where asylum officers decided whether nationals of these countries had a credible fear, they received a positive credible-fear finding 88% of the time.[7] Moreover, when aliens from those countries sought review of negative findings by an immigration judge, they obtained reversals approximately 18% of the time, resulting in some 47,507 cases in which nationals of Northern Triangle countries received positive credible-fear determinations.[8] In other words: Aliens from Northern Triangle countries ultimately received a positive credible-fear determination 89% of the time. Some 6,867 Mexican nationals were interviewed; asylum officers gave them a positive credible-fear determination in 81% of decided cases (4,261), and immigration judges

reversed an additional 91 negative credible-fear determinations, resulting in some 4,352 cases (83% of cases decided on the merits) in which Mexican nationals were referred to section 240 proceedings after receiving a positive credible-fear determination.

These figures have enormous consequences for the asylum system writ large. Asylum officers and immigration judges devote significant resources to these screening interviews, which the INA requires to happen within a fixed statutory timeframe. These aliens must also be detained during the pendency of expedited-removal proceedings. *See* INA 235(b), 8 U.S.C. 1225(b); *Jennings* v. *Rodriguez,* 138 S. Ct. 830, 834 (2018). And assertions of credible fear in expedited removal have rapidly grown in the last decade—especially in the last five years. In FY 2008, for example, fewer than 5,000 aliens were in expedited removal (5%) and were thus referred for a credible-fear interview. In FY 2014, 51,001 referrals occurred (representing 21% of aliens in expedited removal). The credible-fear referral numbers today reflect a 190% increase from FY 2014 and a nearly 2000% increase from FY 2008. Furthermore, the percentage of cases in which asylum officers found that aliens had established a credible fear—leading to the aliens being placed in section 240 removal proceedings—has also increased in recent years. In FY 2008, asylum officers found a credible fear in about 3,200 (or 77%) of all cases. In FY 2014, asylum officers found a credible fear in about 35,000 (or 80%) of all cases in which they made a determination. And in FY 2018, asylum officers found a credible fear in nearly 89% of all such cases.

Once aliens are referred for section 240 proceedings, their cases may take months or years to adjudicate due to backlogs in the system. As of November 2, 2018, there were approximately 203,569 total cases pending in the immigration courts that originated with a credible-fear referral—or 26% of the total backlog of 791,821 removal cases. Of that number, 136,554 involved nationals of Northern Triangle countries (39,940 cases involving Hondurans; 59,702 involving Salvadoran nationals; 36,912 involving Guatemalan nationals). Another 10,736 cases involved Mexican nationals.

In FY 2018, immigration judges completed 34,158 total cases that originated with a credible-fear referral.[9]

---

[5] DHS sometimes calculates credible-fear grant rates as a proportion of all cases (positive, negative, and closed cases). Because this rule concerns the merits of the screening process and closed cases are not affected by that process, this preamble discusses the proportions of determinations on the merits when describing the credible-fear screening process. This preamble does, however, account for the fact that some proportion of closed cases are also sent to section 240 proceedings when discussing the number of cases that immigration judges completed involving aliens referred for a credible-fear interview while in expedited-removal proceedings.

[6] Stowaways are the only category of aliens who would receive a positive credible-fear determination and go to asylum-only proceedings, as opposed to section 240 proceedings, but the number of stowaways is very small. Between FY 2013 and FY 2017, an average of roughly 300 aliens per year were placed in asylum-only proceedings, and that number includes not only stowaways but all classes of aliens subject to asylum-only proceedings. 8 CFR 1208.2(c)(1) (describing 10 categories of aliens, including stowaways found to have a credible fear, who are subject to asylum-only proceedings).

[7] Asylum officers decided 53,205 of these cases on the merits and closed the remaining 10,357 (but sent many of the latter to section 240 proceedings). Specifically, 25,673 Honduran nationals were interviewed; 21,476 of those resulted in a positive screening on the merits, 2,436 received a negative finding, and 1,761 were closed—meaning that 90% of all Honduran cases involving a merits determination resulted in a positive finding, and 10% were denied. Some 13,433 Salvadoran nationals were interviewed; 11,034 of those resulted in a positive screening on the merits, 1,717 were denied, and 682 were closed—meaning that 86% of all Salvadoran cases involving a merits determination resulted in a positive finding, and 14% were denied. Some 24,456 Guatemalan nationals were interviewed; 14,183 of those resulted in a positive screening on the merits, 2,359 were denied, and 7,914 were closed—meaning that 86% of all Guatemalan cases involving a merits determination resulted in a positive finding, and 14% were denied. Again, the percentages exclude closed cases so as to describe how asylum officers make decisions on the merits.

[8] Immigration judges in 2018 reversed 18% (288) of negative credible-fear determinations involving Hondurans, 19% (241) of negative credible-fear determinations involving Salvadorans, and 17% (285) of negative credible-fear determinations involving Guatemalans.

[9] All descriptions of case outcomes before immigration judges reflect initial case completions by an immigration judge during the fiscal year

Continued

Those aliens were likely referred for credible-fear screening between 2015 and 2018; the vast majority of these cases arose from positive credible-fear determinations as opposed to the subset of cases that were closed in expedited removal and referred for section 240 proceedings. In a significant proportion of these cases, the aliens did not appear for section 240 proceedings or did not file an application for asylum in connection with those proceedings. In FY 2018, of the 34,158 completions that originated with a credible-fear referral, 24,361 (71%) were completed by an immigration judge with the issuance of an order of removal. Of those completed cases, 10,534 involved in absentia removal orders, meaning that in approximately 31% of all initial completions in FY 2018 that originated from a credible-fear referral, the alien failed to appear at a hearing. Moreover, of those 10,534 cases, there were 1,981 cases where an asylum application was filed, meaning 8,553 did not file an asylum application and failed to appear at a hearing. Further, 40% of all initial completions originating with a credible-fear referral (or 13,595 cases, including the 8,553 aliens just discussed) were completed in FY 2018 without an alien filing an application for asylum. In short, in nearly half of the cases completed by an immigration judge in FY 2018 involving aliens who passed through a credible-fear referral, the alien failed to appear at a hearing or failed to file an asylum application.

Those figures are consistent with trends from FY 2008 through FY 2018, during which time DHS pursued some 354,356 cases in the immigration courts that involved aliens who had gone through a credible-fear review (*i.e.,* the aliens received a positive credible-fear determination or their closed case was referred for further proceedings). During this period, however, only about 53% (189,127) of those aliens filed an asylum application, despite the fact that they were placed into further immigration proceedings under section 240 because they alleged a fear during expedited-removal proceedings.

Even among those aliens who received a credible-fear interview, filed for asylum, and appeared in section 240 proceedings to resolve their asylum claims—a category that would logically include the aliens with the greatest confidence in the merits of their claims—only a very small percentage received asylum. In FY 2018 immigration judges completed 34,158 cases that originated with a credible-fear referral; only 20,563 of those cases involved an application for asylum, and immigration judges granted only 5,639 aliens asylum. In other words, in FY 2018, less than 6,000 aliens who passed through credible-fear screening (17% of all completed cases, 27% of all completed cases in which an asylum application was filed, and about 36% of cases where the asylum claim was adjudicated on the merits) established that they should be granted asylum. (An additional 322 aliens received either statutory withholding or CAT protection.) Because there may be multiple bases for denying an asylum application and immigration judges often make alternative findings for consideration of issues on appeal, EOIR does not track reasons for asylum denials by immigration judges at a granular level. Nevertheless, experience indicates that the vast majority of those asylum denials reflect a conclusion that the alien failed to establish a significant possibility of persecution, rather than the effect of a bar to asylum eligibility or a discretionary decision by an immigration judge to deny asylum to an alien who qualifies as a refugee.

The statistics for nationals of Northern Triangle countries are particularly illuminating. In FY 2018, immigration judges in section 240 proceedings adjudicated 20,784 cases involving nationals of Northern Triangle countries who were referred for credible-fear interviews and then referred to section 240 proceedings (*i.e.,* they expressed a fear and either received a positive credible-fear determination or had their case closed and referred to section 240 proceedings for an unspecified reason). Given that those aliens asserted a fear of persecution and progressed through credible-fear screening, those aliens presumably would have had the greatest reason to then pursue an asylum application. Yet in only about 54% of those cases did the alien file an asylum application. Furthermore, about 38% of aliens from Northern Triangle countries who were referred for credible-fear interviews and passed to section 240 proceedings did not appear, and were ordered removed in absentia. Put

differently: Only a little over half of aliens from Northern Triangle countries who claimed a fear of persecution and passed threshold screening submitted an application for asylum, and over a third did not appear at section 240 proceedings.[10] And only 1,889 aliens from Northern Triangle countries were granted asylum, or approximately 9% of completed cases for aliens from Northern Triangle countries who received a credible-fear referral, 17% of the cases where such aliens filed asylum applications in their removal proceedings, and about 23% of cases where such aliens' asylum claims were adjudicated on the merits. Specifically, in FY 2018, 536 Hondurans, 408 Guatemalans, and 945 Salvadorans who initially were referred for a credible-fear interview (whether in FY 2018 or earlier) and progressed to section 240 proceedings were granted asylum.

The Departments thus believe that these numbers underscore the major costs and inefficiencies of the current asylum system. Again, numbers for Northern Triangle nationals—who represent the vast majority of aliens who claim a credible fear—illuminate the scale of the problem. Out of the 63,562 Northern Triangle nationals who expressed an intent to apply for asylum or a fear of persecution and received credible-fear screening interviews in FY 2018, 47,507 received a positive credible-fear finding from the asylum officer or immigration judge. (Another 10,357 cases were administratively closed, some of which also may have been referred to section 240 proceedings.) Those aliens will remain in the United States to await section 240 proceedings while immigration judges work through the current backlog of nearly 800,000 cases—136,554 of which involve nationals of Northern Triangle countries who passed through credible-

unless otherwise noted. All references to applications for asylum generally involve applications for asylum, as opposed to some other form of protection, but EOIR statistics do not distinguish between, for instance, the filing of an application for asylum or the filing of an application for statutory withholding. As noted, an application for asylum is also deemed an application for other forms of protection, and whether an application will be for asylum or only for some other form of protection is often a post-filing determination made by the immigration judge (for instance, because the one-year filing bar for asylum applies).

[10] These percentages are even higher for particular nationalities. In FY 2018, immigration judges adjudicated 7,151 cases involving Hondurans whose cases originated with a credible-fear referral in expedited-removal proceedings. Of that 7,151, only 49% (3,509) filed an application for asylum, and 44% (3,167) had their cases completed with an in absentia removal order because they failed to appear. Similarly, immigration judges adjudicated 5,382 cases involving Guatemalans whose cases originated with a credible-fear referral; only 46% (2,457) filed an application, and 41% (2,218) received in absentia removal orders. The 8,251 Salvadoran cases had the highest rate of asylum applications (filed in 65% of cases, or 5,341), and 31% of the total cases (2,534) involved in absentia removal orders. Numbers for Mexican nationals reflected similar trends. In FY 2018, immigration judges adjudicated 3,307 cases involving Mexican nationals who progressed to section 240 proceedings after being referred for a credible-fear interview; 49% of them filed applications for asylum in these proceedings, and 25% of the total cases resulted in an in absentia removal order.

**Federal Register** / Vol. 83, No. 218 / Friday, November 9, 2018 / Rules and Regulations **55947**

fear screening interviews. Immigration judges adjudicated 20,784 cases involving such nationals of Northern Triangle countries in FY 2018; slightly under half of those aliens did not file an application for asylum, and over a third were screened through expedited removal but did not appear for a section 240 proceeding. Even when nationals of Northern Triangle countries who passed through credible-fear screening applied for asylum (as 11,307 did in cases completed in FY 2018), immigration judges granted asylum to only 1,889, or 17% of the cases where such aliens filed asylum applications in their removal proceedings. Immigration judges found in the overwhelming majority of cases that the aliens had no significant possibility of persecution.

These existing burdens suggest an unsustainably inefficient process, and those pressures are now coupled with the prospect that large caravans of thousands of aliens, primarily from Central America, will seek to enter the United States unlawfully or without proper documentation and thereafter trigger credible-fear screening procedures and obtain release into the interior. The United States has been engaged in ongoing diplomatic negotiations with Mexico and the Northern Triangle countries (Guatemala, El Salvador, and Honduras) about the problems on the southern border, but those negotiations have, to date, proved unable to meaningfully improve the situation.

2. In combination with a presidential proclamation directed at the crisis on the southern border, the rule would help ameliorate the pressures on the present system. Aliens who could not establish a credible fear for asylum purposes due to the proclamation-based eligibility bar could nonetheless seek statutory withholding of removal or CAT protection, but would receive a positive finding only by establishing a reasonable fear of persecution or torture. In FY 2018, USCIS issued nearly 7,000 reasonable-fear determinations (*i.e.,* made a positive or negative determination)—a smaller number because the current determinations are limited to the narrow categories of aliens described above. Of those determinations, USCIS found a reasonable fear in 45% of cases in 2018, and 48% of cases in 2017. Negative reasonable-fear determinations were then subject to further review, and immigration judges reversed approximately 18%.

Even if rates of positive reasonable-fear findings increased when a more general population of aliens became subject to the reasonable-fear screening

process, this process would better filter those aliens eligible for that form of protection. Even assuming that grant rates for statutory withholding in the reasonable-fear screening process (a higher standard) would be the same as grant rates for asylum, this screening mechanism would likely still allow through a significantly higher percentage of cases than would likely be granted. And the reasonable-fear screening rates would also still allow a far greater percentage of claimants through than would ultimately receive CAT protection. Fewer than 1,000 aliens per year, of any nationality, receive CAT protection.

To the extent that aliens continued to enter the United States in violation of a relevant proclamation, the application of the rule's bar to eligibility for asylum in the credible-fear screening process (combined with the application of the reasonable-fear standard to statutory withholding and CAT claims) would reduce the number of cases referred to section 240 proceedings. Finally, the Departments emphasize that this rule would not prevent aliens with claims for statutory withholding or CAT protection from having their claims adjudicated in section 240 proceedings after satisfying the reasonable-fear standard.

Further, determining whether an alien is subject to a suspension of entry proclamation would ordinarily be straightforward, because such orders specify the class of aliens whose entry is restricted. Likewise, adding questions designed to elicit whether an alien is subject to an entry proclamation, and employing a bifurcated credible-fear analysis for the asylum claim and reasonable-fear review of the statutory withholding and CAT claims, will likely not be unduly burdensome. Although DHS has generally not applied existing mandatory bars to asylum in credible-fear determinations, asylum officers currently probe for this information and note in the record where the possibility exists that a mandatory bar may apply. Though screening for proclamation-based ineligibility for asylum may in some cases entail some additional work, USCIS will account for it under the Paperwork Reduction Act, 44 U.S.C. 3501 *et seq.,* as needed, following issuance of a covered proclamation. USCIS asylum officers and EOIR immigration judges have almost two decades of experience applying the reasonable-fear standard to statutory withholding and CAT claims, and do so in thousands of cases per year already (13,732 in FY 2018 for both EOIR and USCIS). *See, e.g.,* Memorandum for All Immigration Judges, et al., from The

Office of the Chief Immigration Judge, Executive Office for Immigration Review at 6 (May 14, 1999) (explaining similarities between credible-fear and reasonable-fear proceedings for immigration judges).

That said, USCIS estimates that asylum officers have historically averaged four to five credible-fear interviews and completions per day, but only two to three reasonable-fear case completions per day. Comparing this against current case processing targets, and depending on the number of aliens who contravene a presidential proclamation, such a change might result in the need to increase the number of officers required to conduct credible-fear or reasonable-fear screenings to maintain current case completion goals. However, current reasonable-fear interviews are for types of aliens (aggravated felons and aliens subject to reinstatement) for whom relevant criminal and immigration records take time to obtain, and for whom additional interviewing and administrative processing time is typically required. The population of aliens who would be subject to this rule would generally not have the same type of criminal and immigration records in the United States, but additional interviewing time might be necessary. Therefore, it is unclear whether these averages would hold once the rule is implemented.

If an asylum officer determines that credible fear has been established but for the existence of the proclamation bar, and the alien seeks review of such determination before an immigration judge, DHS may need to shift additional resources towards facilitating such review in immigration court in order to provide records of the negative credible-fear determination to the immigration court. However, ICE attorneys, while sometimes present, generally do not advocate for DHS in negative credible-fear or reasonable-fear reviews before an immigration judge.

DHS would, however, also expend additional resources detaining aliens who would have previously received a positive credible-fear determination and who now receive, and challenge, a negative credible-fear and reasonable-fear determination. Aliens are generally detained during the credible-fear screening, but may be eligible for parole or release on bond if they establish a credible fear. To the extent that the rule may result in lengthier interviews for each case, aliens' length of stay in detention would increase. Furthermore, DHS anticipates that more negative determinations would increase the number of aliens who would be

detained and the length of time they would be detained, since fewer aliens would be eligible for parole or release on bond. Also, to the extent this rule would increase the number of aliens who receive both negative credible-fear and reasonable-fear determinations, and would thus be subject to immediate removal, DHS will incur increased and more immediate costs for enforcement and removal of these aliens. That cost would be counterbalanced by the fact that it would be considerably more costly and resource-intensive to ultimately remove such an alien after the end of section 240 proceedings, and the desirability of promoting greater enforcement of the immigration laws.

Attorneys from ICE represent DHS in full immigration proceedings, and immigration judges (who are part of DOJ) adjudicate those proceedings. If fewer aliens are found to have credible fear or reasonable fear and referred to full immigration proceedings, such a development will allow DOJ and ICE attorney resources to be reallocated to other immigration proceedings. The additional bars to asylum are unlikely to result in immigration judges spending much additional time on each case where the nature of the proclamation bar is straightforward to apply. Further, there will likely be a decrease in the number of asylum hearings before immigration judges because certain respondents will no longer be eligible for asylum and DHS will likely refer fewer cases to full immigration proceedings. If DHS officers identify the proclamation-based bar to asylum (before EOIR has acquired jurisdiction over the case), EOIR anticipates a reduction in both in-court and out-of-court time for immigration judges.

A decrease in the number of credible-fear findings and, thus, asylum grants would also decrease the number of employment authorization documents processed by DHS. Aliens are generally eligible to apply for and receive employment authorization and an Employment Authorization Document (Form I–766) after their asylum claim has been pending for more than 180 days. *See* INA 208(d)(5)(A)(iii), 8 U.S.C. 1158(d)(5)(A)(iii); 8 CFR 1208.7(a)(1)(2). This rule and any associated future presidential proclamations would also be expected to have a deterrent effect that could lessen future flows of illegal immigration.

3. The Departments are not in a position to determine how all entry proclamations involving the southern border could affect the decision calculus for various categories of aliens planning to enter the United States through the southern border in the near future. The

focus of this rule is on the tens of thousands of aliens each year (97,192 in FY 2018) who assert a credible fear in expedited-removal proceedings and may thereby be placed on a path to release into the interior of the United States. The President has announced his intention to take executive action to suspend the entry of aliens between ports of entry and instead to channel such aliens to ports of entry, where they may seek to enter and assert an intent to apply for asylum in a controlled, orderly, and lawful manner. The Departments have accordingly assessed the anticipated effects of such a presidential action so as to illuminate how the rule would be applied in those circumstances.

a. *Effects on Aliens.* Such a proclamation, coupled with this rule, would have the most direct effect on the more than approximately 70,000 aliens a year (as of FY 2018) estimated to enter between the ports of entry and then assert a credible fear in expedited-removal proceedings.[11] If such aliens contravened a proclamation suspending their entry unless they entered at a port of entry, they would become ineligible for asylum, but would remain eligible for statutory withholding or CAT protection. And for the reasons discussed above, their claims would be processed more expeditiously. Conversely, if such aliens decided to instead arrive at ports of entry, they would remain eligible for asylum and would proceed through the existing credible-fear screening process.

Such an application of this rule could also affect the decision calculus for the estimated 24,000 or so aliens a year (as of FY 2018) who arrive at ports of entry along the southern border and assert a credible fear in expedited-removal proceedings.[12] Such aliens would likely face increased wait times at a U.S. port of entry, meaning that they would spend

more time in Mexico. Third-country nationals in this category would have added incentives to take advantage of Mexican asylum procedures and to make decisions about travel to a U.S. port of entry based on information about which ports were most capable of swift processing.

Such an application of this rule could also affect aliens who apply for asylum affirmatively or in removal proceedings after entering through the southern border. Some of those asylum grants would become denials for aliens who became ineligible for asylum because they crossed illegally in contravention of a proclamation effective before they entered. Such aliens could, however, still obtain statutory withholding of removal or CAT protection in section 240 proceedings.

Finally, such a proclamation could also affect the thousands of aliens who are granted asylum each year. Those aliens' cases are equally subject to existing backlogs in immigration courts, and could be adjudicated more swiftly if the number of non-meritorious cases declined. Aliens with meritorious claims could thus more expeditiously receive the benefits associated with asylum.

b. *Effects on the Departments' Operations.* Applying this rule in conjunction with a proclamation that channeled aliens seeking asylum to ports of entry would likely create significant overall efficiencies in the Departments' operations beyond the general efficiencies discussed above. Channeling even some proportion of aliens who currently enter illegally and assert a credible fear to ports of entry would, on balance, be expected to help the Departments more effectively leverage their resources to promote orderly and efficient processing of inadmissible aliens.

At present, CBP dedicates enormous resources to attempting to apprehend aliens who cross the southern border illegally. As noted, CBP apprehended 396,579 such aliens in FY 2018. Such crossings often occur in remote locations, and over 16,000 CBP officers are responsible for patrolling hundreds of thousands of square miles of territory, ranging from deserts to mountainous terrain to cities. When a United States Border Patrol ("Border Patrol" or "USBP") agent apprehends an alien who enters unlawfully, the USBP agent takes the alien into custody and transports the alien to a Border Patrol station for processing—which could be hours away. Family units apprehended after crossing illegally present additional logistical challenges, and may require additional agents to assist

[11] The Departments estimated this number by using the approximately 171,511 aliens in FY 2018 who were referred to expedited removal after crossing illegally between ports of entry and being apprehended by CBP. That number excludes the approximately 3,102 additional aliens who were arrested by ICE, because it is not clear at this time whether such aliens were ultimately processed at a port of entry. The Departments also relied on the fact that approximately 41% of aliens in expedited removal in FY 2018 triggered credible-fear screening.

[12] The Departments estimated this number by using the approximately 59,921 aliens in FY 2018 who were referred to expedited removal after presenting at a port of entry. That number excludes the approximately 3,102 additional aliens who were arrested by ICE, because it is not clear at this time whether such aliens were ultimately processed at a port of entry. The Departments also relied on the fact that approximately 41% of aliens in expedited removal in FY 2018 triggered credible-fear screening.

with the transport of the illegal aliens from the point of apprehension to the station for processing. And apprehending one alien or group of aliens may come at the expense of apprehending others while agents are dedicating resources to transportation instead of patrolling.

At the Border Patrol station, a CBP agent obtains an alien's fingerprints, photographs, and biometric data, and begins asking background questions about the alien's nationality and purpose in crossing. At the same time, agents must make swift decisions, in coordination with DOJ, as to whether to charge the alien with an immigration-related criminal offense. Further, agents must decide whether to apply expedited-removal procedures, to pursue reinstatement proceedings if the alien already has a removal order in effect, to authorize voluntary return, or to pursue some other lawful course of action. Once the processing of the alien is completed, the USBP temporarily detains any alien who is referred for removal proceedings. Once the USBP determines that an alien should be placed in expedited-removal proceedings, the alien is expeditiously transferred to ICE custody in compliance with federal law. The distance between ICE detention facilities and USBP stations, however, varies. Asylum officers and immigration judges review requisite credible-fear findings during expedited-removal proceedings while the alien is in ICE custody.

By contrast, CBP officers are able to employ a more orderly and streamlined process for inadmissible aliens who present at one of the ports of entry along the southern border—even if they claim a credible fear. Because such aliens have typically sought admission without violating the law, CBP generally does not need to dedicate resources to apprehending or considering whether to charge such aliens. And while aliens who present at a port of entry undergo threshold screening to determine their admissibility, see INA 235(b)(2), 8 U.S.C. 1225(b)(2), that process takes approximately the same amount of time as CBP's process for obtaining details from aliens apprehended between ports of entry. Just as for illegal entrants, CBP officers at ports of entry must decide whether inadmissible aliens at ports of entry are subject to expedited removal. Aliens subject to such proceedings are then generally transferred to ICE custody so that DHS can implement Congress's statutory mandate to detain such aliens during the pendency of expedited-removal proceedings. As with

stations, ports of entry vary in their proximity to ICE detention facilities.

The Departments acknowledge that in the event all of the approximately 70,000 aliens per year who cross illegally and assert a credible fear instead decide to present at a port of entry, processing times at ports of entry would be slower in the absence of additional resources or policies that would encourage aliens to enter at less busy ports. Using FY 2018 figures, the number of aliens presenting at a port of entry would rise from about 124,511 to about 200,000 aliens if all illegal aliens who assert a credible fear went to ports of entry. That would likely create longer lines at U.S. ports of entry, although the Departments note that such ports have variable capacities and that wait times vary considerably between them. The Departments nonetheless believe such a policy would be preferable to the status quo. Nearly 40% of inadmissible aliens who present at ports of entry today are Mexican nationals, who rarely claim a credible fear and who accordingly can be processed and admitted or removed quickly.

Furthermore, the overwhelming number of aliens who would have an incentive under the rule and a proclamation to arrive at a port of entry rather than to cross illegally are from third countries, not from Mexico. In FY 2018, CBP apprehended and referred to expedited removal an estimated 87,544 Northern Triangle nationals and an estimated 66,826 Mexican nationals, but Northern Triangle nationals assert a credible fear over 60% of the time, whereas Mexican nationals assert a credible fear less than 10% of the time. The Departments believe that it is reasonable for third-country aliens, who appear highly unlikely to be persecuted on account of a protected ground or tortured in Mexico, to be subject to orderly processing at ports of entry that takes into account resource constraints at ports of entry and in U.S. detention facilities. Such orderly processing would be impossible if large proportions of third-country nationals continue to cross the southern border illegally.

To be sure, some Mexican nationals who would assert a credible fear may also have to spend more time waiting for processing in Mexico. Such nationals, however, could still obtain statutory withholding of removal or CAT protection if they crossed illegally, which would allow them a safeguard against persecution. Moreover, only 178 Mexican nationals received asylum in FY 2018 after initially asserting a credible fear of persecution in expedited-removal proceedings, indicating that the category of Mexican

nationals most likely to be affected by the rule and a proclamation would also be highly unlikely to establish eligibility for asylum.

## Regulatory Requirements

### A. Administrative Procedure Act

While the Administrative Procedure Act ("APA") generally requires agencies to publish notice of a proposed rulemaking in the **Federal Register** for a period of public comment, it provides an exception "when the agency for good cause finds . . . that notice and public procedure thereon are impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(b)(B). This exception relieves agencies of the notice-and-comment requirement in emergency situations, or in circumstances where "the delay created by the notice and comment requirements would result in serious damage to important interests." *Woods Psychiatric Inst.* v. *United States*, 20 Cl. Ct. 324, 333 (1990), *aff'd*, 925 F.2d 1454 (Fed. Cir. 1991); *see also Nat'l Fed'n of Federal Emps.* v. *Nat'l Treasury Emps. Union*, 671 F.2d 607, 611 (D.C. Cir. 1982); *United States* v. *Dean*, 604 F.3d 1275, 1279 (11th Cir. 2010). Agencies have previously relied on this exception in promulgating a host of immigration-related interim rules.[13] Furthermore, DHS has invoked this exception in promulgating rules related to expedited removal—a context in which Congress recognized the need for dispatch in addressing large volumes of aliens by giving the Secretary significant discretion to "modify at any time" the classes of aliens who would be subject to such procedures. *See* INA 235(b)(1)(A)(iii)(I), 8 U.S.C. 1225(b)(1)(A)(iii)(I).[14]

---

[13] *See, e.g.,* Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR 5906, 5907 (Feb. 4, 2016) (interim rule citing good cause to immediately require additional documentation from certain Caribbean agricultural workers to avoid "an increase in applications for admission in bad faith by persons who would otherwise have been denied visas and are seeking to avoid the visa requirement and consular screening process during the period between the publication of a proposed and a final rule"); Suspending the 30-Day and Annual Interview Requirements From the Special Registration Process for Certain Nonimmigrants, 68 FR 67578, 67581 (Dec. 2, 2003) (interim rule claiming good cause exception for suspending certain automatic registration requirements for nonimmigrants because "without [the] regulation approximately 82,532 aliens would be subject to 30-day or annual re-registration interviews" over six months).

[14] *See, e.g.,* Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR at 4770 (claiming good cause exception because the ability to detain certain Cuban nationals "while admissibility and identity are
Continued

**55950** **Federal Register** / Vol. 83, No. 218 / Friday, November 9, 2018 / Rules and Regulations

The Departments have concluded that the good-cause exceptions in 5 U.S.C. 553(b)(B) and (d)(3) apply to this rule. Notice and comment on this rule, along with a 30-day delay in its effective date, would be impracticable and contrary to the public interest. The Departments have determined that immediate implementation of this rule is essential to avoid creating an incentive for aliens to seek to cross the border during pre-promulgation notice and comment under 5 U.S.C. 553(b) or during the 30-day delay in the effective date under 5 U.S.C. 553(d).

DHS concluded in January 2017 that it was imperative to give immediate effect to a rule designating Cuban nationals arriving by air as eligible for expedited removal because "pre-promulgation notice and comment would . . . endanger[] human life and hav[e] a potential destabilizing effect in the region." Eliminating Exception to Expedited Removal Authority for Cuban Nationals Arriving by Air, 82 FR at 4770. DHS in particular cited the prospect that "publication of the rule as a proposed rule, which would signal a significant change in policy while permitting continuation of the exception for Cuban nationals, could lead to a surge in migration of Cuban nationals seeking to travel to and enter the United States during the period between the publication of a proposed and a final rule." *Id.* DHS found that "[s]uch a surge would threaten national security and public safety by diverting valuable Government resources from counterterrorism and homeland security responsibilities. A surge could also have a destabilizing effect on the region, thus weakening the security of the United States and threatening its international relations." *Id.* DHS concluded: "[A] surge could result in significant loss of human life." *Id.; accord, e.g.,* Designating Aliens For Expedited Removal, 69 FR 48877 (noting similar destabilizing incentives for a surge during a delay in the effective date); Visas: Documentation of Nonimmigrants Under the Immigration and Nationality Act, as Amended, 81 FR at 5907 (finding the good-cause exception applicable

determined and protection claims are adjudicated, as well as to quickly remove those without protection claims or claims to lawful status, is a necessity for national security and public safety"); Designating Aliens For Expedited Removal, 69 FR at 48880 (claiming good cause exception for expansion of expedited-removal program due to "[t]he large volume of illegal entries, and attempted illegal entries, and the attendant risks to national security presented by these illegal entries," as well as "the need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations").

because of similar short-run incentive concerns).

These same concerns would apply here as well. Pre-promulgation notice and comment, or a delay in the effective date, could lead to an increase in migration to the southern border to enter the United States before the rule took effect. For instance, the thousands of aliens who presently enter illegally and make claims of credible fear if and when they are apprehended would have an added incentive to cross illegally during the comment period. They have an incentive to cross illegally in the hopes of evading detection entirely. Even once apprehended, at present, they are able to take advantage of a second opportunity to remain in the United States by making credible-fear claims in expedited-removal proceedings. Even if their statements are ultimately not found to be genuine, they are likely to be released into the interior pending section 240 proceedings that may not occur for months or years. Based on the available statistics, the Departments believe that a large proportion of aliens who enter illegally and assert a fear could be released while awaiting section 240 proceedings. There continues to be an "urgent need to deter foreign nationals from undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes associated with human trafficking and alien smuggling operations." Designating Aliens For Expedited Removal, 69 FR at 48878.

Furthermore, there are already large numbers of migrants—including thousands of aliens traveling in groups, primarily from Central America—expected to attempt entry at the southern border in the coming weeks. Some are traveling in large, organized groups through Mexico and, by reports, intend to come to the United States unlawfully or without proper documentation and to express an intent to seek asylum. Creating an incentive for members of those groups to attempt to enter the United States unlawfully before this rule took effect would make more dangerous their already perilous journeys, and would further strain CBP's apprehension operations. This interim rule is thus a practical means to address these developments and avoid creating an even larger short-term influx; an extended notice-and-comment rulemaking process would be impracticable.

Alternatively, the Departments may forgo notice-and-comment procedures and a delay in the effective date because this rule involves a "foreign affairs function of the United States." 5 U.S.C. 553(a)(1). The flow of aliens across the

southern border, unlawfully or without appropriate travel documents, directly implicates the foreign policy interests of the United States. *See, e.g.,* Exec. Order 13767 (Jan. 25, 2017). Presidential proclamations invoking section 212(f) or 215(a)(1) of the INA at the southern border necessarily implicate our relations with Mexico and the President's foreign policy, including sensitive and ongoing negotiations with Mexico about how to manage our shared border.[15] A proclamation under section 212(f) of the INA would reflect a presidential determination that some or all entries along the border "would [be] detrimental to the interests of the United States." And the structure of the rule, under which the Attorney General and the Secretary are exercising their statutory authority to establish a mandatory bar to asylum eligibility resting squarely on a proclamation issued by the President, confirms the direct relationship between the President's foreign policy decisions in this area and the rule.

For instance, a proclamation aimed at channeling aliens who wish to make a claim for asylum to ports of entry at the southern border would be inextricably related to any negotiations over a safe-third-country agreement (as defined in INA 208(a)(2)(A), 8 U.S.C. 1158(a)(2)(A)), or any similar arrangements. As noted, the vast majority of aliens who enter illegally today come from the Northern Triangle countries, and large portions of those aliens assert a credible fear. Channeling those aliens to ports of entry would encourage these aliens to first avail themselves of offers of asylum from Mexico.

Moreover, this rule would be an integral part of ongoing negotiations with Mexico and Northern Triangle countries over how to address the influx of tens of thousands of migrants from Central America through Mexico and into the United States. For instance, over the past few weeks, the United States has consistently engaged with the Security and Foreign Ministries of El Salvador, Guatemala, and Honduras, as well as the Ministries of Governance and Foreign Affairs of Mexico, to

[15] For instance, since 2004, the United States and Mexico have been operating under a memorandum of understanding concerning the repatriation of Mexican nationals. Memorandum of Understanding Between the Department of Homeland Security of the United States of America and the Secretariat of Governance and the Secretariat of Foreign Affairs of the United Mexican States, on the Safe, Orderly, Dignified and Humane Repatriation of Mexican Nationals (Feb. 20, 2004). Article 6 of that memorandum reserves the movement of third-country nationals through Mexico and the United States for further bilateral negotiations.

**Federal Register** / Vol. 83, No. 218 / Friday, November 9, 2018 / Rules and Regulations **55951**

discuss how to address the mass influx of aliens traveling together from Central America who plan to seek to enter at the southern border. Those ongoing discussions involve negotiations over issues such as how these other countries will develop a process to provide this influx with the opportunity to seek protection at the safest and earliest point of transit possible, and how to establish compliance and enforcement mechanisms for those who seek to enter the United States illegally, including for those who do not avail themselves of earlier offers of protection. Furthermore, the United States and Mexico have been engaged in ongoing discussions of a safe-third-country agreement, and this rule will strengthen the ability of the United States to address the crisis at the southern border and therefore facilitate the likelihood of success in future negotiations.

This rule thus supports the President's foreign policy with respect to Mexico and the Northern Triangle countries in this area and is exempt from the notice-and-comment and delayed-effective-date requirements in 5 U.S.C. 553. *See Am. Ass'n of Exporters & Importers-Textile & Apparel Grp.* v. *United States,* 751 F.2d 1239, 1249 (Fed. Cir. 1985) (noting that foreign affairs exception covers agency actions "linked intimately with the Government's overall political agenda concerning relations with another country"); *Yassini* v. *Crosland,* 618 F.2d 1356, 1361 (9th Cir. 1980) (because an immigration directive "was implementing the President's foreign policy," the action "fell within the foreign affairs function and good cause exceptions to the notice and comment requirements of the APA").

Invoking the APA's foreign affairs exception is also consistent with past rulemakings. In 2016, for example, in response to diplomatic developments between the United States and Cuba, DHS changed its regulations concerning flights to and from the island via an immediately effective interim final rule. This rulemaking explained that it was covered by the foreign affairs exception because it was "consistent with U.S. foreign policy goals"—specifically, the "continued effort to normalize relations between the two countries." Flights to and From Cuba, 81 FR 14948, 14952 (Mar. 21, 2016). In a similar vein, DHS and the State Department recently provided notice that they were eliminating an exception to expedited removal for certain Cuban nationals. The notice explained that the change in policy was subject to the foreign affairs exception because it was "part of a major foreign policy initiative

announced by the President, and is central to ongoing diplomatic discussions between the United States and Cuba with respect to travel and migration between the two countries." Eliminating Exception To Expedited Removal Authority for Cuban Nationals Encountered in the United States or Arriving by Sea, 82 FR at 4904–05.

For the foregoing reasons, taken together, the Departments have concluded that the foreign affairs exemption to notice-and-comment rulemaking applies.

*B. Regulatory Flexibility Act*

The Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.,* as amended by the Small Business Regulatory Enforcement Fairness Act of 1996, requires an agency to prepare and make available to the public a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small governmental jurisdictions). A regulatory flexibility analysis is not required when a rule is exempt from notice-and-comment rulemaking.

*C. Unfunded Mandates Reform Act of 1995*

This interim final rule will not result in the expenditure by state, local, and tribal governments, in the aggregate, or by the private sector, of $100 million or more in any one year, and it will not significantly or uniquely affect small governments. Therefore, no actions were deemed necessary under the provisions of the Unfunded Mandates Reform Act of 1995.

*D. Congressional Review Act*

This interim final rule is not a major rule as defined by section 804 of the Congressional Review Act. 5 U.S.C. 804. This rule will not result in an annual effect on the economy of $100 million or more; a major increase in costs or prices; or significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets.

*E. Executive Order 12866, Executive Order 13563, and Executive Order 13771 (Regulatory Planning and Review)*

This interim final rule is not a "significant regulatory action" under section 3(f) of Executive Order 12866 because the rule is exempt under the foreign-affairs exemption in section 3(d)(2) as part of the actual exercise of diplomacy. The rule is consequently also exempt from Executive Order

13771 because it is not a significant regulatory action under Executive Order 12866. Though the potential costs, benefits, and transfers associated with some proclamations may have any of a range of economic impacts, this rule itself does not have an impact aside from enabling future action. The Departments have discussed what some of the potential impacts associated with a proclamation may be, but these impacts do not stem directly from this rule and, as such, they do not consider them to be costs, benefits, or transfers of this rule.

This rule amends existing regulations to provide that aliens subject to restrictions on entry under certain proclamations are ineligible for asylum. The expected effects of this rule for aliens and on the Departments' operations are discussed above. As noted, this rule will result in the application of an additional mandatory bar to asylum, but the scope of that bar will depend on the substance of relevant triggering proclamations. In addition, this rule requires DHS to consider and apply the proclamation bar in the credible-fear screening analysis, which DHS does not currently do. Application of the new bar to asylum will likely decrease the number of asylum grants. By applying the bar earlier in the process, it will lessen the time that aliens who are ineligible for asylum and who lack a reasonable fear of persecution or torture will be present in the United States. Finally, DOJ is amending its regulations with respect to aliens who are subject to the proclamation bar to asylum eligibility to ensure that aliens who establish a reasonable fear of persecution or torture may still seek, in proceedings before immigration judges, statutory withholding of removal under the INA or CAT protection.

*Executive Order 13132 (Federalism)*

This rule will not have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. Therefore, in accordance with section 6 of Executive Order 13132, it is determined that this rule does not have sufficient federalism implications to warrant the preparation of a federalism summary impact statement.

*F. Executive Order 12988 (Civil Justice Reform)*

This rule meets the applicable standards set forth in sections 3(a) and 3(b)(2) of Executive Order 12988.

*G. Paperwork Reduction Act*

This rule does not propose new or revisions to existing "collection[s] of information" as that term is defined under the Paperwork Reduction Act of 1995, Public Law 104–13, 44 U.S.C. chapter 35, and its implementing regulations, 5 CFR part 1320.

**List of Subjects**

*8 CFR Part 208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

*8 CFR Part 1003*

Administrative practice and procedure, Aliens, Immigration, Legal services, Organization and functions (Government agencies).

*8 CFR Part 1208*

Administrative practice and procedure, Aliens, Immigration, Reporting and recordkeeping requirements.

**Regulatory Amendments**

**DEPARTMENT OF HOMELAND SECURITY**

Accordingly, for the reasons set forth in the preamble, the Secretary of Homeland Security amends 8 CFR part 208 as follows:

**PART 208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 1. The authority citation for part 208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229, 8 CFR part 2.

■ 2. In § 208.13, add paragraph (c)(3) to read as follows:

**§ 208.13   Establishing asylum eligibility.**

\* \* \* \* \*

(c) \* \* \*

(3) *Additional limitation on eligibility for asylum.* For applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9, 2018 and the alien enters the United States after the effective date of the proclamation or order contrary to the terms of the proclamation or order. This limitation on eligibility does not apply if the proclamation or order

expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.

■ 3. In § 208.30, revise the section heading and add a sentence at the end of paragraph (e)(5) to read as follows:

**§ 208.30   Credit fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act or whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act.**

\* \* \* \* \*

(e) \* \* \*

(5) \* \* \* If the alien is found to be an alien described in 8 CFR 208.13(c)(3), then the asylum officer shall enter a negative credible fear determination with respect to the alien's application for asylum. The Department shall nonetheless place the alien in proceedings under section 240 of the Act for full consideration of the alien's claim for withholding of removal under section 241(b)(3) of the Act, or for withholding or deferral of removal under the Convention Against Torture if the alien establishes a reasonable fear of persecution or torture. However, if an alien fails to establish, during the interview with the asylum officer, a reasonable fear of either persecution or torture, the asylum officer will provide the alien with a written notice of decision, which will be subject to immigration judge review consistent with paragraph (g) of this section, except that the immigration judge will review the reasonable fear findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g) and in 8 CFR 1208.30(g).

\* \* \* \* \*

Approved:

Dated: November 5, 2018.

**Kirstjen M. Nielsen,**

*Secretary of Homeland Security.*

**DEPARTMENT OF JUSTICE**

Accordingly, for the reasons set forth in the preamble, the Attorney General amends 8 CFR parts 1003 and 1208 as follows:

**PART 1003—EXECUTIVE OFFICE FOR IMMIGRATION REVIEW**

■ 4. The authority citation for part 1003 continues to read as follows:

**Authority:** 5 U.S.C. 301; 6 U.S.C 521; 8 U.S.C. 1101, 1103, 1154, 1155, 1158, 1182, 1226, 1229, 1229a, 1229b, 1229c, 1231, 1254a, 1255, 1324d, 1330, 1361, 1362; 28

U.S.C. 509, 510, 1746; sec. 2 Reorg. Plan No. 2 of 1950; 3 CFR, 1949–1953 Comp., p. 1002; section 203 of Pub. L. 105–100, 111 Stat. 2196–200; sections 1506 and 1510 of Pub. L. 106–386, 114 Stat. 1527–29, 1531–32; section 1505 of Pub. L. 106–554, 114 Stat. 2763A–326 to –328.

■ 5. In § 1003.42, add a sentence at the end of paragraph (d) to read as follows:

**§ 1003.42   Review of credible fear determination.**

\* \* \* \* \*

(d) \* \* \* If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) prior to any further review of the asylum officer's negative determination.

\* \* \* \* \*

**PART 1208—PROCEDURES FOR ASYLUM AND WITHHOLDING OF REMOVAL**

■ 6. The authority citation for part 1208 continues to read as follows:

**Authority:** 8 U.S.C. 1101, 1103, 1158, 1226, 1252, 1282; Title VII of Public Law 110–229.

■ 7. In § 1208.13, add paragraph (c)(3) to read as follows:

**§ 1208.13   Establishing asylum eligibility.**

\* \* \* \* \*

(c) \* \* \*

(3) *Additional limitation on eligibility for asylum.* For applications filed after November 9, 2018, an alien shall be ineligible for asylum if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9, 2018 and the alien enters the United States after the effective date of the proclamation or order contrary to the terms of the proclamation or order. This limitation on eligibility does not apply if the proclamation or order expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.

■ 8. In § 1208.30, revise the section heading and add paragraph (g)(1) to read as follows:

**Federal Register** / Vol. 83, No. 218 / Friday, November 9, 2018 / Rules and Regulations **55953**

**§ 1208.30 Credible fear determinations involving stowaways and applicants for admission who are found inadmissible pursuant to section 212(a)(6)(C) or 212(a)(7) of the Act or whose entry is limited or suspended under section 212(f) or 215(a)(1) of the Act.**

\* \* \* \* \*

(g) \* \* \*

(1) *Review by immigration judge of a mandatory bar finding.* If the alien is determined to be an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3) and is determined to lack a reasonable fear under 8 CFR 208.30(e)(5), the immigration judge shall first review de novo the determination that the alien is described in 8 CFR 208.13(c)(3) or 1208.13(c)(3). If the immigration judge finds that the alien is not described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), then the immigration judge shall vacate the order of the asylum officer, and DHS may commence removal proceedings under section 240 of the Act. If the immigration judge concurs with the credible fear determination that the alien is an alien described in 8 CFR 208.13(c)(3) or 1208.13(c)(3), the immigration judge will then review the asylum officer's negative decision regarding reasonable fear made under 8 CFR 208.30(e)(5) consistent with paragraph (g)(2) of this section, except that the immigration judge will review the findings under the reasonable fear standard instead of the credible fear standard described in paragraph (g)(2).

\* \* \* \* \*

Dated: November 6, 2018.

**Jefferson B. Sessions III,**
*Attorney General.*
[FR Doc. 2018–24594 Filed 11–8–18; 4:15 pm]
**BILLING CODE 4410–30–P; 9111–97–P**

**DEPARTMENT OF TRANSPORTATION**

**Federal Aviation Administration**

**14 CFR Part 39**

**[Docket No. FAA–2018–0589; Product Identifier 2018–NM–021–AD; Amendment 39–19489; AD 2018–23–03]**

**RIN 2120–AA64**

**Airworthiness Directives; Airbus SAS Airplanes**

**AGENCY:** Federal Aviation Administration (FAA), Department of Transportation (DOT).

**ACTION:** Final rule.

**SUMMARY:** We are adopting a new airworthiness directive (AD) for certain Airbus SAS Model A318 and A319 series airplanes; Model A320–211, –212,

–214, –231, –232, and –233 airplanes; and Model A321–111, –112, –131, –211, –212, –213, –231, and –232 airplanes. This AD was prompted by reports of false resolution advisories (RAs) from certain traffic collision avoidance systems (TCASs). This AD requires modification or replacement of certain TCAS processors. We are issuing this AD to address the unsafe condition on these products.

**DATES:** This AD is effective December 14, 2018.

The Director of the Federal Register approved the incorporation by reference of certain publications listed in this AD as of December 14, 2018.

**ADDRESSES:** For service information identified in this final rule, contact Honeywell Aerospace, Technical Publications and Distribution, M/S 2101–201, P.O. Box 52170, Phoenix, AZ 85072–2170; phone: 602–365–5535; fax: 602–365–5577; internet: *http://www.honeywell.com.* You may view this service information at the FAA, Transport Standards Branch, 2200 South 216th St., Des Moines, WA. For information on the availability of this material at the FAA, call 206–231–3195. It is also available on the internet at *http://www.regulations.gov* by searching for and locating Docket No. FAA–2018–0589.

**Examining the AD Docket**

You may examine the AD docket on the internet at *http://www.regulations.gov* by searching for and locating Docket No. FAA–2018–0589; or in person at Docket Operations between 9 a.m. and 5 p.m., Monday through Friday, except Federal holidays. The AD docket contains this final rule, the regulatory evaluation, any comments received, and other information. The address for Docket Operations (phone: 800–647–5527) is U.S. Department of Transportation, Docket Operations, M–30, West Building Ground Floor, Room W12–140, 1200 New Jersey Avenue SE, Washington, DC 20590.

**FOR FURTHER INFORMATION CONTACT:** Steven Dzierzynski, Aerospace Engineer, Avionics and Administrative Services Section, FAA, New York ACO Branch, 1600 Stewart Avenue, Suite 410, Westbury, NY 11590; telephone 516–228–7367; fax 516–794–5531.

**SUPPLEMENTARY INFORMATION:**

**Discussion**

We issued a notice of proposed rulemaking (NPRM) to amend 14 CFR part 39 by adding an AD that would apply to certain Airbus SAS Model A318 and A319 series airplanes; Model

A320–211, –212, –214, –231, –232, and –233 airplanes; and Model A321–111, –112, –131, –211, –212, –213, –231, and –232 airplanes. The NPRM published in the **Federal Register** on July 10, 2018 (83 FR 31911). The NPRM was prompted by reports of false RAs from certain TCASs. The NPRM proposed to require modification or replacement of certain TCAS processors.

We are issuing this AD to address the occurrence of false RAs from the TCAS, which could lead to a loss of separation from other airplanes, possibly resulting in a mid-air collision.

The European Aviation Safety Agency (EASA), which is the Technical Agent for the Member States of the European Union, has issued EASA AD 2017–0196, dated October 5, 2017 (referred to after this as the Mandatory Continuing Airworthiness Information, or ''the MCAI''), to correct an unsafe condition for certain Airbus SAS Model A318 and A319 series airplanes; Model A320–211, –212, –214, –231, –232, and –233 airplanes; and Model A321–111, –112, –131, –211, –212, –213, –231, and –232 airplanes. The MCAI states:

Since 2012, a number of false TCAS resolution advisories (RA) have been reported by various European Air Navigation Service Providers. EASA has published certification guidance material for collision avoidance systems (AMC 20–15) which defines a false TCAS RA as an RA that is issued, but the RA condition does not exist. It is possible that more false (or spurious) RA events have occurred, but were not recorded or reported. The known events were mainly occurring on Airbus single-aisle (A320 family) aeroplanes, although several events have also occurred on Airbus A330 aeroplanes. Investigation determined that the false RAs are caused on aeroplanes with a Honeywell TPA–100B TCAS processor installed, P/N [part number] 940–0351–001. This was caused by a combination of three factors: (1) Hybrid surveillance enabled; (2) processor connected to a hybrid GPS [global positioning system] source, without a direct connection to a GPS source; and (3) an encounter with an intruder aeroplane with noisy (jumping) ADS–B Out position.

EASA previously published Safety Information Bulletin (SIB) 2014–33 to inform owners and operators of affected aeroplanes about this safety concern. At that time, the false RAs were not considered an unsafe condition. Since the SIB was issued, further events have been reported, involving a third aeroplane.

This condition, if not corrected, could lead to a loss of separation with other aeroplanes, possibly resulting in a mid-air collision.

Prompted by these latest findings, and after review of the available information, EASA reassessed the severity and rate of occurrence of false RAs and has decided that mandatory action must be taken to reduce the rate of occurrence, and the risk of loss of separation with other aeroplanes. Honeywell International Inc. published Service Bulletin

**EXHIBIT C**

**Order, East Bay Sanctuary Covenant v. Trump, No. 18-cv-6810**
**(N.D. Cal. Nov. 19, 2018)**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| EAST BAY SANCTUARY COVENANT, et al., | Case No. 18-cv-06810-JST |
| Plaintiffs, | **ORDER GRANTING TEMPORARY RESTRAINING ORDER; ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION** |
| v. | |
| DONALD J. TRUMP, et al., | Re: ECF No. 8 |
| Defendants. | |

The Immigration and Naturalization Act ("INA") "deals with one of the oldest and most important themes in our Nation's history: welcoming homeless refugees to our shores," and it "give[s] statutory meaning to our national commitment to human rights and humanitarian concerns." 125 Cong. Rec. 23231-32 (Sept. 6, 1979). As part of that commitment, Congress has clearly commanded in the INA that any alien who arrives in the United States, irrespective of that alien's status, may apply for asylum – "whether or not at a designated port of arrival." 8 U.S.C. § 1158(a)(1).

Notwithstanding this clear command, the President has issued a proclamation, and the Attorney General and the Department of Homeland Security have promulgated a rule, that allow asylum to be granted only to those who cross at a designated port of entry and deny asylum to those who enter at any other location along the southern border of the United States. Plaintiff legal and social service organizations, Plaintiffs East Bay Sanctuary Covenant, Al Otro Lado, Innovation Law Lab, and Central American Resource Center of Los Angeles (collectively, the "Immigration Organizations"), now ask the Court to stop the rule from going into effect. ECF No. 8. The Court will grant the motion.

The rule barring asylum for immigrants who enter the country outside a port of entry

irreconcilably conflicts with the INA and the expressed intent of Congress. Whatever the scope of the President's authority, he may not rewrite the immigration laws to impose a condition that Congress has expressly forbidden. Defendants' claims that the rule can somehow be harmonized with the INA are not persuasive.

Also, Plaintiffs and the immigrants they represent will suffer irreparable injury if the rule goes into effect pending resolution of this case. Asylum seekers will be put at increased risk of violence and other harms at the border, and many will be deprived of meritorious asylum claims. The government offers nothing in support of the new rule that outweighs the need to avoid these harms.

The Court addresses the parties' various arguments, and explores the Court's reasons for granting Plaintiffs' motion, more fully below.

# I. BACKGROUND

## A. Asylum Framework

Asylum is a protection granted to foreign nationals already in the United States or at the border who meet the international law definition of a "refugee." Congress has currently extended the ability to apply for asylum to the following non-citizens:

> Any alien who is physically present in the United States or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance with this section or, where applicable, section 1225(b) of this title.

8 U.S.C. § 1158(a)(1). Congress has also created exceptions for aliens who (1) may be removed to a safe third country, (2) did not apply within one year of arriving in the United States, or (3) have previously been denied asylum, absent a material change in circumstances or extraordinary circumstances preventing the alien from filing a timely application. *Id.* § 1158(a)(2).

To obtain asylum status, applicants must clear three hurdles. First, applicants must establish that they qualify as refugees who have left their country "because of persecution or a well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion," *id.* § 1101(a)(42)(A), and that their status in one of

United States District Court
Northern District of California

2

those groups "was or will be at least one central reason" for the persecution, *id.* § 1158(b)(1)(A); *see also id.* § 1158(b)(1)(B).

Second, Congress has established a series of statutory bars to eligibility for asylum, such as an applicant's role in persecuting members of protected groups or "reasonable grounds for regarding the alien as a danger to the security of the United States." *Id.* § 1158(b)(2)(A). In addition, Congress authorized the Attorney General to "by regulation establish additional limitations and conditions, consistent with [8 U.S.C. § 1158], under which an alien shall be ineligible for asylum under [*id.* § 1158(b)(1)]." *Id.* § 1158(b)(2)(C). If "the evidence indicates" that one of these statutory or regulatory bars applies, the applicant bears the burden of proving that it does not. 8 C.F.R. § 1240.8(d).

Finally, even if an applicant satisfies those two requirements, the decision to grant asylum relief is ultimately left to the Attorney General's discretion, *see I.N.S. v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999); *Delgado v. Holder*, 648 F.3d 1095, 1101 (9th Cir. 2011), subject to the court of appeals' review for whether the Attorney General's decision was "manifestly contrary to the law and an abuse of discretion," 8 U.S.C. § 1252(b)(4)(D).

If an alien is granted asylum status, the Attorney General must refrain from removing the alien and must grant the alien authorization to work in the United States. *Id.* § 1158(c)(1)(A)-(B). The alien's spouse and children may also "be granted the same status as the alien if accompanying, or following to join, such alien." *Id.* § 1158(b)(3)(A). Asylum status also provides a path to citizenship.[1] Still, asylum is not irrevocable. The Attorney General may terminate an alien's asylum status based on changed circumstances, a subsequent determination that a statutory bar applies, or under various other conditions. *Id.* § 1158(c)(2).

In addition to asylum, two other forms of relief from removal are generally available under U.S. immigration law. With some exceptions,[2] an alien is entitled to withholding of removal if

---

[1] After one year, asylum refugees may apply for adjustment of status to lawful permanent residents, provided they meet certain conditions. *See id.* § 1159(b)-(c). Lawful permanent residents may apply for citizenship after five years of continuous residence. *Id.* § 1427(a).

[2] An alien is not eligible for withholding of removal if

United States District Court
Northern District of California

United States District Court
Northern District of California

1  "the Attorney General decides that the alien's life or freedom would be threatened in that country

2  because of the alien's race, religion, nationality, membership in a particular social group, or

3  political opinion." *Id.* § 1231(b)(3)(A).  However, "[t]he bar for withholding of removal is higher;

4  an applicant must demonstrate that it is more likely than not that he would be subject to

5  persecution on one of the [protected] grounds." *Ling Huang v. Holder*, 744 F.3d 1149, 1152 (9th

6  Cir. 2014).

7      An alien may also seek protection under the Convention Against Torture ("CAT"), which

8  requires the alien to prove that "it is more likely than not that he or she would be tortured if

9  removed to the proposed country of removal," 8 C.F.R. § 1208.16(c)(2), and that the torture would

10  be "inflicted by or at the instigation of or with the consent or acquiescence of a public official or

11  other person acting in an official capacity," *id.* § 1208.18(a)(1).  Though these latter two forms of

12  relief require the applicant to meet a higher bar, they are mandatory rather than discretionary.  *See*

13  *Nuru v. Gonzales*, 404 F.3d 1207, 1216 (9th Cir. 2005).

14      **B.  Challenged Actions**

15      On November 9, 2018, the federal government took two actions that are the subject of this

16  dispute.

17      First, the Department of Justice ("DOJ") and Department of Homeland Security ("DHS")

18  published a joint interim final rule, entitled "Aliens Subject to a Bar on Entry Under Certain

19  Presidential Proclamations; Procedures for Protection Claims" (the "Rule").  83 Fed. Reg. 55,934

20  (Nov. 9, 2018) (to be codified at 8 C.F.R. pts. 208, 1003, 1208).   The Rule adds an "[a]dditional

21

22      (i) the alien ordered, incited, assisted, or otherwise participated in
        the persecution of an individual because of the individual's race,

23      religion, nationality, membership in a particular social group, or
        political opinion;

24      (ii) the alien, having been convicted by a final judgment of a
        particularly serious crime is a danger to the community of the

25      United States;
        (iii) there are serious reasons to believe that the alien committed a

26      serious nonpolitical crime outside the United States before the alien
        arrived in the United States; or

27      (iv) there are reasonable grounds to believe that the alien is a danger
        to the security of the United States.

28  8 U.S.C. § 1231(b)(3)(B).

limitation on eligibility for asylum" that applies to "applications filed after November 9, 2018."

*Id.* at 55,952.  Under the Rule, an alien is categorically ineligible for asylum "if the alien is subject to a presidential proclamation or other presidential order suspending or limiting the entry of aliens along the southern border with Mexico that is issued pursuant to subsection 212(f) or 215(a)(1) of the Act on or after November 9, 2018 and the alien enters the United States after the effective date of the proclamation or order contrary to the terms of the proclamation or order." *Id.* (to be codified at 8 C.F.R. §§ 208.13(c)(3), 1208.13(c)(3)).[3]

The Rule also amends the regulations governing credible fear determinations in expedited removal proceedings.  "Although DHS has generally not applied existing mandatory bars to asylum in credible-fear determinations,"[4] the Rule's bar applies in such proceedings.  83 Fed. Reg. at 55,947.  Accordingly, for an alien subject to the new bar, "the asylum officer shall enter a negative credible fear determination with respect to the alien's application for asylum." *Id.* (to be codified at 8 C.F.R. § 208.30(e)(5)).  The asylum officer will then proceed to evaluate the alien's claim for withholding of removal or protection under CAT by assessing whether the alien has demonstrated a "reasonable fear of persecution or torture." *Id.*  If the asylum officer finds that this standard is not met, the alien will be removed unless an immigration judge determines upon review that (1) the alien is not actually subject to the categorical bar, i.e. did not enter in violation of a presidential proclamation or order or (2) the alien satisfies the reasonable fear standard. *See id.* (to be codified at 8 C.F.R. § 1208.30(g)(1)).

In promulgating the Rule, the agencies claimed exemption from the Administrative Procedure Act's ("APA") notice-and-comment requirements. *See* 5 U.S.C. § 553(b)-(d).  In so doing, they invoked § 553(a)(1)'s "military or foreign affairs function" exemption and § 553(b)(B)'s "good cause" exemption.  83 Fed. Reg. at 55,949-51.  They also invoked

---

[3] This categorical bar does not apply only if the Presidential proclamation or order contains an explicit exception to the bar.  *See* 83 Fed. Reg. at 55,952 (to be codified at 8 C.F.R. §§ 208.13(c)(3), 1208.13(c)(3)) ("This limitation on eligibility does not apply if the proclamation or order expressly provides that it does not affect eligibility for asylum, or expressly provides for a waiver or exception that makes the suspension or limitation inapplicable to the alien.").

[4] Under the current regulations, DHS places aliens subject to mandatory bars in full removal proceedings.  8 C.F.R. § 208.30(e)(5).

§ 553(d)(3)'s "good cause" waiver of the thirty-day grace period that is usually required before a newly promulgated rule goes into effect. *Id.* at 55,949-50. The Court discusses the proffered reasons for both the Rule and the waiver of § 553 requirements as relevant below.

Second, the President of the United States issued a presidential proclamation, entitled "Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States" (the "Proclamation").[5] Asserting the President's authority under the Immigration and Nationality Act, 8 U.S.C. §§ 1182(f), 1185(a), the Proclamation suspended "[t]he entry of any alien into the United States across the international boundary between the United States and Mexico" for ninety days. Proclamation § 1.[6] The Proclamation applies only to aliens who enter after its issuance, *id.* § 2(a), and expressly exempts "any alien who enters the United States at a port of entry and properly presents for inspection," *id.* § 2(b).

The combined effect of the Rule and the Proclamation is that any alien who enters the United States across the southern border at least over the next ninety days, except at a designated port of entry, is categorically ineligible to be granted asylum.

**C. Procedural History**

That same day, the Immigration Organizations filed this lawsuit against Defendants,[7] ECF

---

[5] *See* Whitehouse.gov, *Presidential Proclamation Addressing Mass Migration Through the Southern Border of the United States*, (November 9, 2018), available at https://www.whitehouse.gov/presidential-actions/presidential-proclamation-addressing-mass-migration-southern-border-united-states/.

[6] The Proclamation expires earlier if the United States reaches "an agreement [that] permits the United States to remove aliens to Mexico in compliance with the terms of section 208(a)(2)(A) of the INA (8 U.S.C. [§] 1158(a)(2)(A))." Proclamation § 1. It may also extend for a longer period of time, however. The Proclamation requires the "Secretary of State, the Attorney General, and the Secretary of Homeland Security [to] jointly submit to the President . . . a recommendation on whether an extension or renewal of the suspension or limitation on entry in section 1 of this proclamation is in the interests of the United States." Proclamation § 2(d).

[7] Defendants are President Donald Trump, DOJ, Acting Attorney General Matthew Whitaker, the Executive Office for Immigration Review ("EOIR"), EOIR Director James McHenry, DHS, Secretary of Homeland Security Kirstjen Nielsen, U.S. Citizenship and Immigration Services ("USCIS"), USCIS Director Lee Cissna, Customs and Border Protection ("CBP"), CBP Commissioner Kevin McAleenan, Immigration and Customs Enforcement ("ICE"), and Acting ICE Director Ronald Vitiello. Compl. ¶¶ 13-27. Individual Defendants are sued in their official capacities.

United States District Court
Northern District of California

No. 1 ("Compl."), and immediately moved for a TRO, ECF No. 8. The Organizations allege two claims: (1) a claim under 5 U.S.C. § 706(2), that the Rule is an invalid regulation because it is inconsistent with 8 U.S.C. § 1158, Compl. ¶¶ 101-106; and (2) a claim that Defendants violated the APA's notice-and-comment provisions, *see* 5 U.S.C. § 553, Compl. ¶¶ 107-110.

The case was assigned to the undersigned on November 13, 2018, and the Court set a hearing on the TRO for November 19, 2018. ECF Nos. 9, 11. Defendants filed their opposition on November 15, 2018, ECF No. 27, and the Immigration Organizations filed a reply on November 16, 2018, ECF No. 35.[8] The Court also permitted the states of Washington, Massachusetts, New York, and California (the "States") to file an amicus brief in support of the TRO. ECF No. 20.[9] The Court likewise permitted the Immigration Reform Law Institute ("IRLI") to file an amicus brief in opposition. ECF No. 37.

## II. JURISDICTION

The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331.

## III. THRESHHOLD CHALLENGES

### A. Article III Standing

The Court addresses as a threshold matter the Immigration Organizations' standing to bring this lawsuit. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 101-02 (1998).

#### 1. Legal Standard

Article III standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be

---

[8] The Immigration Organizations included declarations and other evidence with, and made a third party standing argument in, their reply that they did not submit with their opening brief. Because Defendants neither objected to this material nor requested an opportunity to respond to it, the Court has considered the Immigration Organizations' reply brief in full. *See Cincinnati Ins. Co. v. Harry Johnson Plumbing & Excavating Co.*, No. 4:16-CV-5090-LRS, 2017 WL 5639944, at *1 (E.D. Wash. Oct. 23, 2017) (affirming consideration of new evidence on reply when an opposing party did not object); *see also Quillar v. CDCR*, No. 2:04-CV-01203-KJM, 2012 WL 4210492, at *3 n.2 (E.D. Cal. Sept. 19, 2012) ("Plaintiff has not responded to Anderson's second declaration or moved to strike it despite having ample time."), *aff'd sub nom. Quillar v. Hill*, 582 F. App'x 736 (9th Cir. 2014).

[9] After the Court granted the motion for leave to file an amicus brief, the States failed to re-file the brief as a separate docket entry pursuant to the Court's order. At the hearing, the Court deemed the brief filed without objection.

United States District Court
Northern District of California

redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" *Id.* at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992)). *Lujan*, 504 U.S. at 560).

Because "[t]he party invoking federal jurisdiction bears the burden of establishing these elements," they are "an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Accordingly, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561. A TRO requires a "clear showing of each element of standing." *Townley v. Miller*, 722 F.3d 1128, 1133 (9th Cir. 2013). "At this very preliminary stage of the litigation, [the Immigration Organizations] may rely on the allegations in their Complaint and whatever other evidence they submitted in support of their TRO motion to meet their burden." *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir.), *reconsideration en banc denied,* 853 F.3d 933 (9th Cir. 2017), and *reconsideration en banc denied,* 858 F.3d 1168 (9th Cir. 2017), and *cert. denied sub nom. Golden v. Washington*, 138 S. Ct. 448 (2017).[10]

Where, as here, an organization seeks to sue on its own behalf, rather than in a representative capacity, the Court "conduct[s] the same [standing] inquiry as in the case of an individual." *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982); *see also* ECF No. 35 at 8 (relying on direct harm to Immigration Organizations); Compl. ¶¶ 78-100 (same).

### 2. Discussion

Defendants argue that the Immigration Organizations lack a cognizable Article III injury. ECF No. 27 at 17-18. The Immigration Organizations respond that the Rule causes them injury because it impairs their funding, frustrates their missions, and forces them to divert resources to address the Rule's impacts. ECF No. 35 at 8-10.

---

[10] Where a party fails to establish standing to seek affirmative preliminary relief, such as a preliminary injunction, that failure "requires denial of the motion for preliminary injunction, not dismissal of the case." *Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015).

United States District Court
Northern District of California

These asserted injuries are the types of injuries alleged in *Havens*, 455 U.S. at 379. *Havens* involved the challenge by an equal-housing organization called HOME under the Fair Housing Act, 42 U.S.C. § 3604, to a realtor's "racial steering" practices, i.e., providing false information to prospective renters based on race. *Id.* at 366, 388. HOME alleged, on its own behalf, that the realtor's practices had "frustrated its efforts to assist equal access to housing through counseling and other referral services" and that the organization had been forced to respond by "devot[ing] significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices." *Id.* at 379 (alteration in original) (citation omitted). The Supreme Court agreed that if the alleged violations had "perceptibly impaired HOME's ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact." *Id.* Further, the *Havens* Court explained, "[s]uch concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests." *Id.*

Following *Havens*, the Ninth Circuit has held that an organization may establish injury on its own behalf where "a challenged statute or policy frustrates the organization's goals and requires the organization 'to expend resources in representing clients they otherwise would spend in other ways.'" *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc) (quoting *El Rescate Legal Servs., Inc. v. Exec. Office of Immigration Review*, 959 F.2d 742, 748 (9th Cir. 1991)). But it has warned that "an organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit." *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 903 (9th Cir. 2002) (citation omitted).

As a threshold matter, Defendants' arguments that *Havens* and its progeny apply with less force here are not persuasive. To the extent Defendants and IRLI suggest that these cases are limited to the FHA context, numerous Ninth Circuit cases demonstrate otherwise. *See, e.g.*, *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1035 (9th Cir. 2015) (lawsuit for violations of National Voter Registration Act); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1018 (9th Cir.

9

United States District Court
Northern District of California

1    2013) (preemption challenge to state law restricting transportation of illegal aliens); *City of*

2    *Redondo Beach*, 657 F.3d at 940 (First Amendment challenge to city ordinance).  Nor is *Havens*'s

3    rule confined to cases where Congress confers a special "legally cognizable interest," such as

4    truthful information, upon the organization.  ECF No. 27 at 18; *see also* ECF No. 37 at 7.  In *Valle*

5    *de Sol*, for instance, plaintiffs argued that the state law was preempted by federal immigration law.

6    732 F.3d at 1012.  There was no suggestion that the Supremacy Clause or the immigration statutes

7    gave plaintiffs a right to operate aid programs.  *Cf. id.* at 1018.

8         As IRLI notes, some individual appellate judges have criticized certain applications of the

9    *Havens* test as impermissibly diluting the standing inquiry.  *See* ECF No. 37 at 6 (citing *People for*

10   *the Ethical Treatment of Animals v. U.S. Dep't of Agric. ("PETA")*, 797 F.3d 1087, 1099 (D.C.

11   Cir. 2015) (Millett, J., dubitante); *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 632 F. App'x

12   905, 908 (9th Cir. 2015) (Chabria, J., concurring)); *see also Fair Hous. Council of San Fernando*

13   *Valley v. Roommate.com, LLC*, 666 F.3d 1216, 1224 (9th Cir. 2012) (Ikuta, J., dissenting).  As an

14   initial matter, the Court is "bound to follow binding Ninth Circuit precedent unless the U.S.

15   Supreme Court or the Ninth Circuit en banc reverses course," *Siegal v. Gamble*, No. 13-CV-

16   03570-RS, 2016 WL 1085787, at *9 n.2 (N.D. Cal. Mar. 21, 2016); *see also Miller v. Gammie*,

17   335 F.3d 889, 893 (9th Cir. 2003) (en banc), so it cannot rest its ruling on expressions of doubt or

18   disagreement by individual panel members.  Regardless, the Court concludes the concerns raised

19   by those judges are not present here.

20        Primarily, those judges have expressed concern that the application of *Havens* "has drifted

21   away from the requirement that an organization actually suffer an injury."  *Fair Hous. Council*,

22   666 F.3d at 1225 (Ikuta, J., dissenting); *see also PETA*, 797 F.3d at 1101 (Millet, J., dubitante)

23   (explaining that the defendant agency had not "torn down, undone, devalued or otherwise

24   countermanded the organization's own activities," but rather had failed "to facilitate or subsidize

25   through governmental enforcement the organization's vindication of its own interests").  Judge

26   Ikuta, for instance, criticized prior cases finding that "an organization with a social interest in

27   advancing enforcement of a law was injured when the organization spent money enforcing that

28   law," reasoning that this was in fact the mission of the organization.  *Fair Hous. Council*, 666 F.3d

United States District Court
Northern District of California

1   at 1226. Nonetheless, Judge Ikuta agreed that the Ninth Circuit has "correctly recognized that

2   organizations have standing to sue on their own behalf when a defendant's actions impair the

3   organization's ability to function as an organization," such as by impairing its "interest in

4   recruiting members, obtaining funding, or collecting dues." *Id.* at 1224-25. In her view, *Havens*

5   represented an equally cognizable form of impairment, where an organization's "purpose is to

6   provide a specified type of service and a defendant's actions hinder the organization from

7   providing that core service." *Id.* at 1225.

8       The Court distills two warnings from these critiques. First, there are doubts whether the

9   frustration of an organization's mission is a concrete harm unless "a defendant's actions impair the

10  organization's ability to function as an organization" by inhibiting the organization's acquisition

11  of resources – such as members or funding – or by "hinder[ing] the organization from providing

12  [its] core service." *Id.* at 1225; *see also Animal Legal Defense Fund*, 632 F. App'x at 909

13  (Chabria, J., concurring) (suggesting that Ninth Circuit precedent should be read "to require the

14  organization to show that it was 'forced' to divert resources to avoid or counteract an *injury to its*

15  *own ability to function*" (emphasis added) (quoting *City of Redondo Beach*, 657 F.3d at 943)).

16  Second, there are similar concerns that the organization's diversion of resources must be to efforts

17  that are outside of the organization's "core" services, rather than redirecting from one core

18  organizational priority to another. *Fair Hous. Council*, 666 F.3d at 1225.

19      Here, the Immigration Organizations have demonstrated the requisite organizational injury.

20  First, their mission has been frustrated in numerous cognizable ways. The record reveals that the

21  government has an established policy of limiting the number of people who may present asylum

22  claims at ports of entry – called "metering" – and that this policy currently results in lengthy

23  delays, some eclipsing six weeks. *See, e.g.*, ECF No. 8-4 ¶¶ 32-34; ECF No. 19-1 at 6-10; No. 35-

24  3 at 17-28; ECF No. 35-4 ¶¶ 5-9; ECF No. 35-5 ¶¶ 5-7. Under this practice, border officials at

25  official ports of entry turn away asylum seekers and other migrants and force them to return at a

26  later date. ECF No. 35-3 at 17 (quoting DHS Secretary Kirstjen Nielsen). The record further

27  establishes that unaccompanied children seeking asylum, who are among the Immigration

28  Organizations' clients, are entirely barred from presenting their claims at a port of entry. *See* ECF

No. 35-8 ¶¶ 4, 10, 13.  Because of the Rule, the Organizations' clients with potentially meritorious asylum claims are significantly delayed or wholly unable to pursue those claims, which are the Organizations' core service.  The inability of an organization's constituency to gain access to or participate in the organization's core services is a well-recognized impairment of an organization's ability to function.  The en banc Ninth Circuit recognized such an injury to day-laborer organizing entities in *City of Redondo Beach*, where a local ordinance prohibiting public solicitation of employment prevented day laborers from making their availability known and discouraged potential employers from hiring them.  657 F.3d at 943.

Moreover, the Immigration Organizations' funding is directly tied to their ability to pursue affirmative asylum claims on a per-case basis.  *See* ECF No. 8-3 ¶ 7; ECF No. 8-4 ¶ 11; ECF No. 8-7 ¶¶ 15-16.  The Rule's impairment of the Organizations' ability to pursue asylum cases therefore impairs their functioning by jeopardizing their funding, an independently sufficient injury.  *See Constr. Indus. Ass'n of Sonoma Cty. v. City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975) (holding that a construction association suffered cognizable injury from a "restriction on building" where its members "contribute[d] dues to the Association in a sum proportionate to the amount of business the builders d[id] in the area").

Second, the Immigration Organizations have been forced to respond by diverting resources to efforts that exceed the scope of their core services.  Plaintiff Al Otro Lado, for instance, has expended significant staff resources to accompany its minor clients full-time in order to safeguard them from various dangers in border towns.  ECF No. 35-8 ¶¶ 14-16; *see also* ECF No. 8-4 ¶¶ 38-40; ECF No. 35-3 ¶ 5.  This is sufficient to satisfy *Havens*.  *See City of Redondo Beach*, 657 F.3d at 943 (finding sufficient diversion of "time and resources spent in assisting day laborers during their arrests and meeting with workers about the status of the ordinance would have otherwise been expended toward [the organization's] core organizing activities").[11]  Moreover, to the extent

---

[11] Because the Court concludes that the expenditure of resources on non-legal services to protect clients is sufficiently outside of Al Otro Lado's core services, it need not reach the question whether the reallocation of resources from asylum claims to other forms of immigration relief or retraining its personnel falls outside of the Immigration Organizations' core services.  *But see Valle de Sol*, 732 F.3d at 1018 (relying on diversion of "staff and resources to educating [organization's] members about the [challenged] law").

United States District Court
Northern District of California

1   that the Immigration Organizations will simply have fewer resources because of a loss of funding,

2   an additional showing of diversion is unnecessary. *See City of Petaluma*, 522 F.2d at 903.

3   Defendants' remaining standing argument appears to be that Plaintiffs' harms are "self-

4   inflicted" or "speculative." ECF No. 27 at 17. As to the self-inflicted point, *Havens* and similar

5   cases recognize that the diversion of resources to avoid injury to the organization's interests is not

6   truly voluntary for the purposes of injury. Further, *Clapper v. Amnesty International USA*, 568

7   U.S. 398 (2013), does not support Defendants' position. There, the Supreme Court rejected as

8   inadequate for Article III plaintiffs' "highly speculative fear" that the government would (1) ever

9   seek to intercept communications from plaintiffs' foreign clients, (2) do so based on the type of

10   surveillance challenged; (3) have its request authorized by a court; (4) successfully obtain

11   communications; and (5) obtain specific communications that involved plaintiffs. *Id.* at 410.

12   Because this fear of intercepted communications was too speculative, plaintiffs' use of resources

13   to take precautions against that surveillance was likewise not cognizable. *Id.* at 416 ("In other

14   words, respondents cannot manufacture standing merely by inflicting harm on themselves based

15   on their fears of hypothetical future harm that is not certainly impending."). Here, the

16   Immigration Organizations' fears have already materialized because, as described above, their

17   function is currently impaired by the Rule. Moreover, given the demonstrated obstacles to

18   pursuing asylum cases under the current regime, the Court also finds that the Immigration

19   Organizations' loss of per-case funding is certainly impending.

20   Accordingly, the Court concludes that the Immigration Organizations have made a clear

21   showing of a cognizable injury. Though not challenged by Defendants, the Court further finds

22   that these injuries are fairly traceable to the Rule and likely to be redressed by the relief sought.

23   **B.    Third-Party Standing**

24   The Immigration Organizations further argue that they have third-party standing to assert

25   the legal rights of their clients "who are seeking to enter the country to apply for asylum but are

26   being blocked by the new asylum ban." ECF No. 35 at 13.

27   **1.    Legal Standard**

28   The default rule is that "a litigant must assert his or her own legal rights and interests, and

United States District Court
Northern District of California

1    cannot rest a claim to relief on the legal rights or interests of third parties." *Powers v. Ohio*, 499

2    U.S. 400, 410 (1991).  In order to depart from that rule and assert a third party's right: (1) "[t]he

3    litigant must have suffered an 'injury in fact'"; (2) "the litigant must have a close relationship to

4    the third party"; and (3) "there must exist some hindrance to the third party's ability to protect his

5    or her own interests." *Id.* at 410-11 (citation omitted).

### 2.    Discussion

7          The Court concludes that the Immigration Organizations have third-party standing to assert

8    their clients' interests.

9          First, as discussed above, the Organizations have adequately demonstrated an injury in

10   fact.

11         Second, the Organizations' attorney-client relationship is "one of special consequence,"

12   which the Supreme Court has recognized as sufficient to support third-party standing.  *Caplin &*

13   *Drysdale, Chartered v. United States*, 491 U.S. 617, 624 n.3 (1989); *see also U.S. Dep't of Labor*

14   *v. Triplett*, 494 U.S. 715, 720 (1990) ("A restriction upon the fees a lawyer may charge that

15   deprives the lawyer's prospective client of a due process right to obtain legal representation falls

16   squarely within this principle.").  Moreover, the Organizations rely on an "existing attorney-client

17   relationship," rather than a "hypothetical" one with "as yet unascertained" clients.  *Kowalski v.*

18   *Tesmer*, 543 U.S. 125, 131 (2004).

19         Finally, the Court has little difficulty finding a "genuine obstacle" to the Organizations'

20   clients asserting their own rights.  *See Singleton v. Wulff*, 428 U.S. 106, 116 (1976) ("If there is

21   some genuine obstacle to such assertion, however, the third party's absence from court loses its

22   tendency to suggest that his right is not truly at stake, or truly important to him, and the party who

23   is in court becomes by default the right's best available proponent.").  As discussed above, the

24   record is replete with reports of the government preventing asylum-seekers from presenting

25   themselves at ports of entry to begin the asylum process, including DHS Secretary Nielsen's own

26   statement confirming that this is the government's official practice.  *See, e.g.*, ECF No. 35-3 at 17-

27   28.  In addition to these delays, Plaintiff Al Otro Lado submitted a declaration stating that its

28   unaccompanied minor clients are categorically barred from applying at ports of entry.  ECF No.

¶¶ 4-5, 10.  Nor do the Organizations' clients have other avenues for review.  At the hearing, the Organizations asserted, and Defendants did not dispute, that asylum seekers whose applications were denied on the basis of the Rule would be unable to litigate the lawfulness of the Rule in their immigration proceedings or otherwise.[12]

*Powers* explains that a court must consider whether third parties will be able to vindicate their rights "[a]s a practical matter."  499 U.S. at 414.  *Powers* involved a facially available remedy, as a juror excluded for racial reasons *could* bring such a suit but would often lack the incentive to do so or overcome certain difficulties of proof.  *Id.*  Where, as here, the practical difficulties involve the ability, rather than incentive to assert rights, the obstacle is even greater.  Moreover, the Court must consider the time-sensitive nature of the claims.  *See Singleton*, 428 U.S. at 117.  Asylum seekers' claims naturally carry with them some urgency, which is only compounded by the dangerous conditions in border towns.  *See* ECF No. 35-8 ¶¶ 14-15.  If the Immigration Organizations are not permitted to raise their clients' rights, their clients may never have the chance to do so.  *See* ECF No. 8-4 ¶¶ 38-39 (noting record-high murder rate in border town and past instances where "[a]sylum seekers turned back from a port of entry have been kidnapped and held for ransom by cartel members waiting outside").

The Court therefore concludes that the Immigration Organizations have standing to assert their clients' rights.

### C.     Statutory Standing/Zone of Interests

Defendants also argue that Immigration Organizations do not come within the "zone of interests" of the statutes on which their claims are based.  ECF No. 27 at 18-20.

#### 1.     Legal Standard

The zone-of-interests test requires a court "to determine, using traditional tools of statutory interpretation, whether a legislatively conferred cause of action encompasses a particular plaintiff's claim."  *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 127 (2014).  A court "presume[s] that a statute ordinarily provides a cause of action 'only to plaintiffs

---

[12] The Court reaches no independent conclusion on this point but accepts the parties' assertion for purposes of this motion.

United States District Court
Northern District of California

whose interests fall within the zone of interests protected by the law invoked.'" *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1302 (2017) (quoting *Lexmark*, 572 U.S. at 129).

Here, the Immigration Organizations allege claims under the APA. *See* Compl. ¶¶ 101, 106, 108-109. The APA provides a cause of action to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C. § 702. The relevant zone of interests is not that of the APA itself, but the underlying statute. *See Havasupai Tribe v. Provencio*, 906 F.3d 1155, 1166 (9th Cir. 2018).

"[I]n the APA context, . . . the test is not 'especially demanding.'" *Lexmark*, 572 U.S. at 130 (quoting *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 225 (2012)). Rather, the Supreme Court has "conspicuously included the word 'arguably' in the test to indicate that the benefit of any doubt goes to the plaintiff," and has explained that it "forecloses suit only when a plaintiff's 'interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that' Congress authorized that plaintiff to sue." *Id.* (quoting *Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 225)). But "what comes within the zone of interests of a statute for purposes of obtaining judicial review of administrative action under the 'generous review provisions' of the APA may not do so for other purposes." *Bennett v. Spear*, 520 U.S. 154, 163 (1997) (citation omitted). The Court must answer this question "not by reference to the overall purpose of the Act in question," but by interpreting "the statutory provision whose violation forms the legal basis for [the] complaint." *Id.* at 175-76 (emphasis and citation omitted).

### 2. Discussion

Litigants with third-party standing may satisfy the zone-of-interests inquiry by reference to the third parties' rights. *See FAIC Secs., Inc. v. United States*, 768 F.2d 352, 357-58 (D.C. Cir. 1985) (Scalia, J.).

Because the Immigration Organizations are asserting the rights of their clients as potential asylum seekers, they easily satisfy the APA's lenient zone-of-interests inquiry. *See Match-E-Be-Nash-She-Wish Band*, 567 U.S. at 225; *Patel v. U.S. Citizenship & Immigration Servs.*, 732 F.3d 633, 636 (6th Cir. 2013) ("Given that § 1153(b)(3) expressly provides for issuance of employment

United States District Court
Northern District of California

1 visas directly to qualified aliens, it is arguable, to say the least, that a qualified alien who wants an

2 employment visa is within that provision's zone of interests."); *Doe v. Trump*, 288 F. Supp. 3d

3 1045, 1068 (W.D. Wash. 2017) (finding that because "[m]aking provisions for the resettlement

4 and absorption of refugees into the United States is the core mission of" plaintiff social service

5 organizations, those "organizations' interests in effectuating refugee resettlement and absorption

6 falls within the zone of interest protected by the INA and the Refugee Act of 1980").

7 **IV.    MOTION FOR TEMPORARY RESTRAINING ORDER**

8   **A.    Legal Standard**

9    The Court applies a familiar four-factor test on both a motion for a temporary restraining

10 order and a motion for a preliminary injunction. *See Stuhlbarg Int'l Sales Co. v. John D. Brush &*

11 *Co.*, 240 F.3d 832, 839 n. 7 (9th Cir. 2001). A plaintiff seeking either remedy "must establish that

12 he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of

13 preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the

14 public interest." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir.

15 2009) (quoting *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008)). Injunctive relief is "an

16 extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled

17 to such relief." *Winter*, 555 U.S. at 22.

18    To grant preliminary injunctive relief, a court must find that "a certain threshold showing

19 [has been] made on each factor." *Leiva-Perez v. Holder*, 640 F.3d 962, 966 (9th Cir. 2011) (per

20 curiam). Assuming that this threshold has been met, "'serious questions going to the merits' and a

21 balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

22 injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and

23 that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

24 1127, 1135 (9th Cir. 2011).

25   **B.    Likelihood of Success on the Merits**

26    As an initial matter, the parties agree that the Proclamation does not render any alien

27 ineligible for asylum. ECF No. 27 at 31; ECF No. 35 at 18. On that understanding, the

28 Immigration Organizations have clarified that they do not challenge the Proclamation as exceeding

1  the President's authority under 8 U.S.C. § 1182(f).  ECF No. 35 at 18-19.  This case therefore does

2  not present the question whether 8 U.S.C. § 1182(f) authorizes the President to directly limit

3  asylum eligibility by proclamation.

### 1. Validity of the Rule

4

5  The Immigration Organizations' claim that the Rule is inconsistent with the statute

6  presents a straightforward question of statutory interpretation.[13]  Does Congress's grant of

7  rulemaking authority in 8 U.S.C. § 1158(b)(2)(C) permit the Attorney General to adopt a

8  categorical bar to asylum *eligibility* based on a characteristic that Congress specified does not

9  impact an alien's ability to *apply* for asylum?

### a. Legal Standard

10

11  Where a plaintiff alleges that, as a result of an erroneous legal interpretation, the agency's

12  action was "not in accordance with the law," 5 U.S.C. § 706(2)(A), or "in excess of statutory

13  jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C), courts apply the

14  framework for review first established in *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467

15  U.S. 837 (1984).  *See Nw. Envtl. Advocates v. U.S. E.P.A.*, 537 F.3d 1006, 1014 (9th Cir. 2008).

16  Under *Chevron*, the Court considers "whether Congress has directly spoken to the precise

17  question at issue.  If the intent of Congress is clear, that is the end of the matter."  *Campos-*

18  *Hernandez v. Sessions*, 889 F.3d 564, 568 (9th Cir. 2018) (quoting *Chevron*, 467 U.S. at 842).  In

19  other words, the Court asks "whether, 'applying the normal tools of statutory construction,' the

20  statute is ambiguous."  *Sung Kil Jang v. Lynch*, 812 F.3d 1187, 1190 (9th Cir. 2015) (quoting *INS*

21  *v. St. Cyr*, 533 U.S. 289, 321 n.4 (2001)).  Second, "if the statute is silent or ambiguous with

22  respect to the specific issue, the question for the court is whether the agency's answer is based on

23  a permissible construction of the statute."  *Campos-Hernandez*, 889 F.3d at 568 (quoting *Chevron*,

24  467 U.S. at 843).[14]

25

26  [13] At the hearing, the parties agreed that resolution of this question is entirely separate from the validity or sufficiency of the justifications for the Rule.

27  [14] The *Chevron* framework applies here because (1) "it appears that Congress delegated authority to the agency generally to make rules carrying the force of law," and (2) "the agency interpretation claiming deference was promulgated in the exercise of that authority."  *Marmolejo-Campos v.*

28  *Holder*, 558 F.3d 903, 908 (9th Cir. 2009) (en banc) (quoting *United States v. Mead Corp.*, 533

United States District Court
Northern District of California

### b. Discussion

"The first and most important canon of statutory construction is the presumption 'that a legislature says in a statute what it means and means in a statute what it says there.'" *In re Pangang Grp. Co., LTD.*, 901 F.3d 1046, 1056 (9th Cir. 2018) (quoting *Conn. Nat. Bank v. Germain*, 503 U.S. 249, 253 (1992)). A court "must read the words in their context and with a view to their place in the overall statutory scheme." *King v. Burwell*, 135 S. Ct. 2480, 2489 (2015) (citation omitted).

In 1996, Congress passed the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), Pub. L. No. 104-208, 110 Stat. 3009-546, which "abolished the distinction between exclusion and deportation procedures and created a uniform proceeding known as 'removal.'" *Vartelas v. Holder*, 566 U.S. 257, 262 (2012). "Congress made 'admission' the key word, and defined admission to mean 'the lawful entry of the alien into the United States after inspection and authorization by an immigration officer.'" *Id.* (quoting 8 U.S.C. § 1101(a)(13)(A)). As part of IIRIRA, Congress provided that "[a]n alien present in the United States without being admitted or paroled, or who *arrives in the United States at any time or place other than as designated by the Attorney General*, is inadmissible." 8 U.S.C. § 1182(6)(A)(i) (emphasis added). Aliens who enter illegally are therefore inadmissible under IIRIRA. *See id.*

However, separately from the question of admissibility, Congress has clearly commanded that immigrants be eligible for asylum regardless of where they enter. Prior to IIRIRA, asylum was potentially available to "an alien physically present in the United States or at a land border or port of entry, irrespective of such alien's status." 8 U.S.C. § 1158(a) (1980). In IIRIRA, Congress amended § 1158(a) to provide that "[a]ny alien who is physically present in the United States or who arrives in the United States (*whether or not at a designated port of arrival* and including an alien who is brought to the United States after having been interdicted in international or United States waters), irrespective of such alien's status, may apply for asylum in accordance" with § 1158 and § 1225(b). 8 U.S.C. § 1158(a) (emphasis added).[15] In short, Congress's amendment to

U.S. 218, 226-27 (2001)). The Court notes, however, that Defendants do not claim that the Rule is entitled to *Chevron* deference.

[15] Congress also amended 8 U.S.C. § 1225(a)(1) in substantially the same manner, providing that

§ 1158(a) specifically captured within its scope all aliens who violated § 1182(6)(A)(i). Congress provided that this violation would render those aliens inadmissible but would have no effect on their ability to apply for asylum.

Congress's determination that place of entry not be disqualifying to an application for asylum is consistent with the treaty obligations underlying § 1158's asylum provisions. Congress enacted the Refugee Act of 1980, including 8 U.S.C. § 1158, "to bring United States refugee law into conformance with the 1967 United Nations Protocol Relating to the Status of Refugees, 19 U.S.T. 6223, T.I.A.S. No. 6577, to which the United States acceded in 1968." *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 436-37 (1987). "The Protocol incorporates the substantive provisions of Articles 2 through 34 of the United Nations Convention Relating to the Status of Refugees (the Convention), July 5, 1951, 189 U.N.T.S. 150." *Delgado v. Holder*, 648 F.3d 1095, 1100 (9th Cir. 2011) (en banc). Because the Protocol is not "self-executing," it "does not have the force of law in American courts." *Khan v. Holder*, 584 F.3d 773, 783 (9th Cir. 2009). Nonetheless, it provides "a useful guide in determining congressional intent in enacting the Refugee Act." *Id.* (citation omitted); *see also Cardoza-Fonseca*, 480 U.S. at 436-37.

Of particular relevance here, Article 31 of the Protocol provides:

> The Contracting States shall not impose penalties, *on account of their illegal entry or presence*, on refugees who, coming directly from a territory where their life or freedom was threatened in the sense of [A]rticle 1, enter or are present in their territory without authorization, provided they present themselves without delay to the authorities and show good cause for their illegal entry or presence.

19 U.S.T. at 6275 (emphasis added).

Considering the text and structure of the statute, as well as the interpretive guide of the U.N. Protocol, reveals Congress's unambiguous intent. The failure to comply with entry requirements such as arriving at a designated port of entry should bear little, if any, weight in the asylum process. The Rule reaches the opposite result by adopting a categorical bar based solely

---

"[a]n alien present in the United States who has not been admitted or who arrives in the United States (whether or not at a designated port of arrival and including an alien who is brought to the United States after having been interdicted in international or United States waters) shall be deemed for purposes of this chapter an applicant for admission." Inadmissible aliens are generally placed in full removal proceedings. *See* §§ 1225(b)(2)(A), 1229.

on the failure to comply with entry requirements.

Defendants maintain that the Rule is nonetheless "consistent with" the statute. § 1158(b)(2)(C). First, Defendants contend that even if Congress unambiguously stated that manner of entry has no effect on an alien's ability to *apply* for asylum, it can be the *sole* factor by which the alien is *rendered ineligible*. ECF No. 27 at 26-27. The argument strains credulity. To say that one may *apply* for something that one has no right to *receive* is to render the right to apply a dead letter. There simply is no reasonable way to harmonize the two.

Clearly, the Attorney General may deny eligibility to aliens authorized to apply under § 1158(a)(1), whether through categorical limitations adopted pursuant to § 1158(b)(2)(C) or by the exercise of discretion in individual cases.[16] But Congress's judgment that manner of entry should have no impact on ability to apply necessarily implies some judgment that manner of entry should not be the basis for a categorical bar that would render § 1158(a)(1)'s terms largely meaningless. Basic separation of powers principles dictate that an agency may not promulgate a rule or regulation that renders Congress's words a nullity. *Mohasco Corp. v. Silver*, 447 U.S. 807, 825 (1980) ("As we have held on prior occasions, [an agency's] 'interpretation' of the statute cannot supersede the language chosen by Congress.").

Next, Defendants argue that because the agency is permitted to give manner of entry *some* weight, *see Matter of Pula*, 19 I & N. Dec. at 474, then Defendants could give it *conclusive* weight. ECF No. 27 at 28-29. As with Defendants' prior argument, this one fails because it runs headlong into the contrary language of the statute. And Defendants' reliance on *Lopez v. Davis*, 531 U.S. 230 (2001), is misplaced. Though *Lopez* approved the Bureau of Prisons' categorical

[16] For this reason, many of Defendants' arguments are based on strawmen. The Immigration Organizations do not argue that the Attorney General cannot adopt *any* limits that render ineligible aliens who are authorized to apply for asylum. *Cf.* ECF No. 27 at 27-28. Nor do the Immigration Organizations argue that the statute prohibits the Attorney General from adopting categorical bars that do not conflict with § 1158(a)'s text and Congress's underlying judgment. *See* ECF No. 35 at 19. Therefore, it is immaterial that the Attorney General has previously adopted a categorical bar on fraud in the application. *See* ECF No. 27 at 30 (citing *Nijjar v. Holder*, 689 F.3d 1077, 1082 (9th Cir. 2012)). It is difficult, moreover, to see much conflict with the statute posed by a limitation that permits termination of asylum if "[t]here is a showing of fraud in the alien's application such that he or she was not eligible for asylum at the time it was granted," 8 C.F.R. § 208.24(a)(1), which simply reinforces the eligibility criteria that are already in place.

1    rule denying early release to certain prisoners, *id.* at 243-44, the rule in "*Lopez* applies only when

2    Congress has not spoken to the precise issue and the statute contains a gap." *Toor v. Lynch*, 789

3    F.3d 1055, 1064 (9th Cir. 2015) (citation omitted). Congress has done so here.

4          Not only does the Rule flout the explicit language of the statute, it also represents an

5    extreme departure from prior practice. The BIA had previously held that the "manner of entry or

6    attempted entry is a proper and relevant discretionary factor to consider," but that "it should not be

7    considered in such a way that the practical effect is to deny relief in virtually all cases." *Matter of*

8    *Pula*, 19 I. & N. Dec. 467, 473 (BIA 1987). Numerous Circuits have approved of *Matter of Pula*

9    and have further emphasized that illegal entry deserves little weight in the asylum inquiry. *See,*

10   *e.g.*, *Hussam F. v. Sessions*, 897 F.3d 707, 718 (6th Cir. 2018) ("Here, Petitioner certainly should

11   have been more forthcoming with immigration officials. But under *Pula*, the Board's analysis

12   may not begin and end with his failure to follow proper immigration procedures."); *Zuh v.*

13   *Mukasey*, 547 F.3d 504, 511 n.4 (4th Cir. 2008); *Huang v. I.N.S.*, 436 F.3d 89, 100 (2d Cir. 2006)

14   ("As with peripheral embellishments, if illegal manner of flight and entry were enough

15   independently to support a denial of asylum, we can readily take notice, from the facts in

16   numerous asylum cases that come before us, that virtually no persecuted refugee would obtain

17   asylum. It follows that Wu's manner of entry, on the facts in this record, could not bear the

18   weight given to it by the IJ."). In particular, the Ninth Circuit has repeatedly observed that in

19   exercising discretion to grant asylum, the agency should take into account that bona fide asylum

20   seekers may feel compelled to violate immigration laws "to gain entry to a safe haven," and "that

21   deception 'does not detract from but supports [a] claim of fear of persecution.'" *Mamouzian v.*

22   *Ashcroft*, 390 F.3d 1129, 1138 (9th Cir. 2004) (quoting *Akinmade v. I.N.S.*, 196 F.3d 951, 955 (9th

23   Cir. 1999)); *Gulla v. Gonzales*, 498 F.3d 911, 917 (9th Cir. 2007) (same). True, consideration of

24   this admittedly unweighty factor, in conjunction with other factors, might lead to denial of asylum

25   in an individual case. But that does not make Congress's command in § 1158(a) ambiguous.

26         Finally, Defendants suggest that, even if the manner of entry deserves little weight as a

27   general matter, violation of a Presidential proclamation is of particularly grave consequence and is

28   therefore distinct from an "ordinary" entry violation. The asserted distinction is not supported by

United States District Court
Northern District of California

1    evidence or authority.  And if what Defendants intend to say is that the President by proclamation

2    can override Congress's clearly expressed legislative intent, simply because a statute conflicts

3    with the President's policy goals, the Court rejects that argument also.  No court has ever held that

4    § 1182(f) "allow[s] the President to expressly override particular provisions of the INA." *Trump*

5    *v. Hawaii*, 138 S. Ct. 2392, 2411 (2018).

6          Furthermore, the Court observes that the Rule itself actually gives the President the ability

7    to issue even more restrictive proclamations that would then be given conclusive weight in the

8    asylum context.  At the moment, aliens may enter and apply for asylum only because the current

9    Proclamation expressly says so.  *See* Proclamation § 2(b).  By simply incorporating by reference

10   any future proclamations, the Rule gives the President plenary authority to halt asylum claims

11   entirely along the southern border, subject only to the requirements of § 1182(f).

12         There is little reason to think Congress intended this result.  Congress located the

13   President's authority to suspend entry in § 1182, which governs admissibility, not asylum.  To the

14   extent that Congress delegated authority to limit asylum eligibility, it conferred that authority on

15   the Attorney General, who, unlike the President, is subject to the procedural requirements of the

16   APA.  *See Franklin v. Massachusetts*, 505 U.S. 788, 800 (1992).  When Congress wanted to

17   delegate authority directly to the President in immigration matters, it did so.  *See, e.g.*, 8 U.S.C.

18   § 1182(f); *cf. Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 173 (1993) ("The reference to the

19   Attorney General in the statutory text [of 8 U.S.C. § 1253(h)(1) (1988)] is significant not only

20   because that term cannot be reasonably construed to describe either the President or the Coast

21   Guard, but also because it suggests that it applies only to the Attorney General's normal

22   responsibilities in the INA.").  Here, it did not.  "In such circumstances, the President may still

23   give directions to executive agencies, and he can usually fire a recalcitrant agency head.  But he

24   cannot take away the agency's statutory authority or exercise it himself."  *Main St. Legal Servs.,*

25   *Inc. v. Nat'l Sec. Council*, 811 F.3d 542, 558 (2d Cir. 2016).  This too, is unambiguously

26   foreclosed by the statute.

27         Accordingly, for the foregoing reasons, the Court concludes that the Immigration

28   Organizations are likely to succeed on the merits of their 5 U.S.C. § 706(2) claim.

United States District Court
Northern District of California

## 2. Notice-and-Comment Requirements

Because the Immigration Organizations are likely to succeed on the merits of their claim that the Rule is invalid, the Court need not reach their notice-and-comment claim in order to grant relief. Nonetheless, mindful of the preliminary stage of the proceedings, the Court analyzes this additional basis for standing.

### a. Legal Standard

The APA requires agencies to publish notice of proposed rules in the Federal Register and then allow "interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(c). "The essential purpose of according [§] 553 notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." *Batterton v. Marshall*, 648 F.2d 694, 703 (D.C. Cir. 1980). Accordingly, agencies may not treat § 553 as an empty formality. Rather, "[a]n agency must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1203 (2015). It is therefore "antithetical to the structure and purpose of the APA for an agency to implement a rule first, and then seek comment later." *United States v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010) (citation omitted).

These purposes apply with particular force in important cases. As Judge Posner has stated, "[t]he greater the public interest in a rule, the greater reason to allow the public to participate in its formation." *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 171 (7th Cir. 1996).[17]

Nonetheless, the APA contains some limited exceptions to the notice-and-comment requirements. As relevant here, § 553 does not apply "to the extent that there is involved – a . . .

---

[17] Indeed, the Congressional Research Service has explained that "[a]lthough the APA sets the minimum degree of public participation the agency must permit, [matters] of great importance, or those where the public submission of facts will be either useful to the agency or a protection to the public, should naturally be accorded more elaborate public procedures." Vanessa K. Burrows & Todd Garvey, Cong. Research Serv., R41546, A Brief Overview of Rulemaking and Judicial Review 1 (2011) (internal quotation marks and citation omitted).

United States District Court
Northern District of California

1   foreign affairs function of the United States."  5 U.S.C. § 553(a)(1).  In addition, an agency need

2   not comply with notice and comment when it "for good cause finds (and incorporates the finding

3   and a brief statement of reasons therefor in the rules issued) that notice and public procedure

4   thereon are impracticable, unnecessary, or contrary to the public interest."  *Id.* § 553(b)(B).

5       Section 553(d) also provides that a promulgated final rule shall not go into effect for at

6   least thirty days.  Independently of this good-cause exception to notice and comment, an agency

7   may also waive this grace period "for good cause found and published with the rule."  *Id.*

8   § 553(d)(3).

9       An agency's legal conclusions regarding whether § 553 notice-and-comment procedures

10  are required are not entitled to deference.  *Reno-Sparks Indian Colony v. E.P.A.*, 336 F.3d 899,

11  909 n.11 (9th Cir. 2003); *see also Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d 702, 706 (D.C.

12  Cir. 2014) ("[O]ur review of the agency's legal conclusion of good cause is de novo.").

### b.    Foreign Affairs

14      The Rule invokes the foreign affairs exception, stating that "Presidential proclamations . . .

15  at the southern border necessarily implicate our relations with Mexico, including sensitive and

16  ongoing negotiations with Mexico about how to manage our shared border."  83 Fed. Reg. at

17  55,950.  Accordingly, the Rule explains, the then-anticipated proclamation "would be inextricably

18  related to any negotiations over a safe-third-country agreement . . . , or other similar

19  arrangements," and the Rule would be "an integral part of ongoing negotiations with Mexico and

20  Northern Triangle countries over how to address the influx of tens of thousands of migrants."  *Id.*

21      The Court cannot accept the Rule's first assumption that a relationship to Presidential

22  proclamations regarding immigration "*necessarily* implicate[s]" the foreign affairs exception.  *Id.*

23  (emphasis added).  In *Yassini v. Crosland*, the Ninth Circuit cautioned that "[t]he foreign affairs

24  exception would become distended if applied to [an immigration enforcement agency's] actions

25  generally, even though immigration matters typically implicate foreign affairs."  618 F.2d 1356,

26  1360 n.4 (9th Cir. 1980) (per curiam).  Accordingly, the Ninth Circuit stated that in those cases,

27  "[f]or the exception to apply, the public rulemaking provisions should provoke definitely

28  undesirable international consequences."  *Id.*  Other Circuits have likewise warned that the foreign

affairs exception cannot be given too much breadth in the immigration context. *See City of New York v. Permanent Mission of India to United Nations*, 618 F.3d 172, 202 (2d Cir. 2010) ("While immigration matters typically implicate foreign affairs at least to some extent, it would be problematic if incidental foreign affairs effects eliminated public participation in this entire area of administrative law." (internal quotation marks and citation omitted)); *Jean v. Nelson*, 711 F.2d 1455, 1478 (11th Cir. 1983) ("Not every request for international cooperation seriously may be called 'foreign policy.'"), *dismissed in relevant part as moot*, 727 F.2d 957, 984 (11th Cir. 1984) (en banc). As the Second Circuit observed, "[t]his approach accords with Congress's admonition in the legislative history of the APA not to interpret the phrase ' "foreign affairs function" . . . loosely . . . to mean any function extending beyond the borders of the United States.'" *City of New York*, 618 F.3d at 202 (quoting S. Rep. No. 79-752, at 13 (1945)). Therefore, that the Rule addresses entry and asylum does not, standing alone, immunize it from notice and comment. *Cf. Doe v. Trump*, 288 F. Supp. 3d 1045, 1075 (W.D. Wash. 2017) (observing that "8 C.F.R. part 207, the regulations implementing the Refugee Act of 1980, and subsequent amendments . . . were subject to notice and comment before they were codified" (citing Aliens and Nationality; Refugee and Asylum Procedures, 46 Fed. Reg. 45,116 (Sept. 10, 1981)).

The Rule also states that it represents "an integral part of ongoing negotiations" with Mexico and the Northern Trainable countries regarding migrants. 83 Fed. Reg. at 55,950. Defendants assert that the foreign affairs exception therefore applies because the Rule is "linked intimately with the Government's overall political agenda concerning relations with another country." ECF No. 27 at 25 (quoting *Am. Ass'n of Exporters & Importers-Textile & Apparel Grp. v. United States*, 751 F.2d 1239, 1249 (Fed. Cir. 1985)); *see also Yassini*, 618 F.2d at 1360 (analyzing whether the agency official was "in effect announcing his own foreign policy, or merely implementing the expressed foreign policy of the President"). The Court accepts for the purposes of argument that the Rule was part of the President's larger coordinated effort in the realm of immigration.

But the Court must also consider the counterfactual, namely, whether "definitely undesirable international consequences" would result from following rulemaking procedures.

*Yassini*, 618 F.2d at 1360 n.4.[18]  Defendants rely on *Rajah v. Mukasey*, where the Second Circuit found obvious undesirable consequences that would result from rulemaking regarding the agency's designation of specific groups of aliens as required to register under a post-September 11th data collection program.  544 F.3d 427, 437 (2d Cir. 2008).  Publicly debating why certain nations' citizens posed a greater threat risked compromising sensitive intelligence, impairing relationships with those countries, and unduly slowing the response to potential terrorist attacks. *Id.*  However, Defendants do not explain how information that would be revealed through the rulemaking process would harm foreign policy interests.

Instead, Defendants' argument reduces to the need for speed and flexibility in the President's ongoing negotiations with Mexico and other countries.  *See* ECF No. 27 at 25 (explaining that harm would result "because large numbers of aliens are transiting through Mexico *right now* and Mexico's prompt help in addressing the situation is needed immediately").  Defendants do not say in their opposition, and were unable to explain at the hearing, how eliminating notice and comment would assist the United States in its negotiations.  And it cannot be the case that simply stating that something will have an effect makes that effect likely or even possible, particularly where there is no apparent logical connection between dispensing with notice and comment and achieving a foreign affairs goal.  Pending further information produced in the administrative record, the Court concludes that at this preliminary stage, there are at least

---

[18] The Court agrees with Defendants that, unlike with the good cause exception, 5 U.S.C. § 553(a)(1) does not require the agency to state the reasons for the foreign affairs exception in the published rule.  ECF No. 27 at 25; *cf.* § 553(b)(B) ("[W]hen the agency for good cause finds (and incorporates the finding and a brief statement of reasons therefor in the rules issued) . . . ."  The Second Circuit's statement that an agency has no obligation to state its reasons in the rule "when the consequences are seemingly as evident," as in *Rajah*, therefore adds nothing to the analysis. 544 F.3d at 437.

Nonetheless, when the use of the exception is challenged by litigation, courts have generally required the agency to defend the applicability of the exception by pointing to evidence of undesirable foreign policy consequences.  *See, e.g.*, *Yassini*, 618 F.2d at 1360 n.4; *Jean*, 711 F.2d at 1478 (emphasizing that "[t]he government at trial offered no evidence of undesirable international consequences that would result if rulemaking were employed"); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1076 (W.D. Wash. 2017) ("The court is simply unwilling to apply the exception without some evidence to support its application."); *but see Raoof v. Sullivan*, 315 F. Supp. 3d 34, 44 (D.D.C. 2018) (reasoning that regulation of exchange visitor program "certainly relates to the foreign affairs and diplomatic duties conferred upon the Secretary of State and the State Department" without requiring additional evidence).

United States District Court
Northern District of California

1  "serious questions going to the merits" of this claim.  *Alliance for the Wild Rockies*, 632 F.3d at

2  1135.

3                c.      **Good Cause**

4        An agency "must overcome a high bar if it seeks to invoke the good cause exception to

5  bypass the notice and comment requirement."  *Valverde*, 628 F.3d at 1164.  In other words, the

6  exception applies "only in those narrow circumstances in which 'delay would do real harm.'"  *Id.*

7  at 1165 (quoting *Buschmann v. Schweiker*, 676 F.2d 352, 357 (9th Cir. 1982)).  Courts must

8  conduct this analysis on a "case-by-case [basis], sensitive to the totality of the factors at play."  *Id.*

9  at 1164 (quoting *Alcaraz v. Block*, 746 F.2d 593, 612 (9th Cir. 1984)).  "[T]he good cause

10  exception should be interpreted narrowly, so that the exception will not swallow the rule."

11  *Buschmann*, 676 F.2d at 357 (citation omitted).

12        Here, the Rule invokes the good cause exception "to avoid creating an incentive for aliens

13  to seek to cross the border" during the notice-and-comment period.  83 Fed. Reg. at 55,950.  It

14  cited the same rationale for waiving the 30-day grace period.  *Id.*  The Rule reasons that when

15  aliens illegally cross into the United States, it causes harm because they may evade detection

16  entirely or, if apprehended, could "take advantage of a second opportunity to remain in the United

17  States by making credible-fear claims in expedited-removal proceedings."  *Id.*  Further, even if

18  their fears were not found credible, "they are likely to be released into the interior pending

19  [additional] proceedings that may not occur for months or years."  *Id.*  The Rule emphasizes that

20  these harms are particularly acute given the "large numbers of migrants – including thousands of

21  aliens traveling in groups, primarily from Central America – expected to attempt entry at the

22  southern border in the coming weeks."  *Id.*  The incentive to cross illegally "would make more

23  dangerous their already perilous journeys, and would further strain CBP's apprehension

24  operations."  *Id.*

25        The Rule assumes that knowledge that the government was proposing to restrict asylum

26  would encourage more asylum seekers to cross illegally in the interim.  As a matter of social

27  psychology, this makes some intuitive sense.  In applying the foreign affairs exception, *American*

28  *Association of Exporters and Importers* recognized that "prior announcement of [the agency's]

United States District Court
Northern District of California

1    intention to impose stricter quotas pending consultations creates an incentive for foreign interests

2    and American importers to increase artificially the amount of trade in textiles prior to a final

3    administrative determination." 751 F.2d at 1249. But the Court cannot give this fact the same

4    weight it had in *Exporters*, particularly because migrants seeking asylum in the United States have

5    neither the same access to information nor the same ability to adjust their behavior as the

6    international corporations in that case. Aliens who enter illegally are already subject to criminal

7    and civil penalties, *see* 8 U.S.C. § 1325, which the government has been prosecuting under a

8    "zero-tolerance" policy, *see* ECF No. 35-3 at 12. Some record evidence indicates that some of

9    those aliens nonetheless cross illegally for reasons that may be unaffected by the Rule's additional

10   penalties, such as a lack of awareness of entry requirements or by imminent necessity caused by,

11   among other things, threats of immediate violence from criminal groups near the border. ECF No.

12   8-4 ¶¶ 26-28; ECF No. 35-4 ¶ 12.

13          At this preliminary stage, the Court concludes that assessing the reasonableness of the

14   Rule's linchpin assumption in this context would be premature given the fluid state of the record

15   in this fast-moving litigation. The parties represent that the record will soon be much more robust.

16   The Immigration Organizations explained at the hearing that they are continually discovering new

17   evidence as to the facts on the ground at the border, which they intend to submit. For their part,

18   Defendants have not yet had an opportunity to produce the administrative record, but they

19   represented that they were prepared to do so within a matter of days. The Court therefore

20   concludes that, at this time, there are at least serious questions going to the merits as to whether

21   Defendants have met the "high bar" required for the good cause exception. *Valverde*, 628 F.3d at

22   1164.[19]

23   **C.      Irreparable Harm**

24          The Immigration Organizations "must establish that irreparable harm is *likely*, not just

25   possible, in order to obtain a [TRO]." *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1172 (9th

26

27   ───────────────────
     [19] The Rule offered the same rationale for dispensing with the notice-and-comment requirements
28   and the thirty-day grace period, and the parties do not distinguish between the two good cause
     exceptions in this motion.

United States District Court
Northern District of California

Cir. 2011) (citation omitted). This factor focuses on "whether the harm to Plaintiffs [i]s irreparable," rather than "the severity of the harm." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). "There must be a 'sufficient causal connection' between the alleged irreparable harm and the activity to be enjoined, and showing that 'the requested injunction would forestall' the irreparable harm qualifies as such a connection." *Nat'l Wildlife Fed'n v. Nat'l Marine Fisheries Serv.*, 886 F.3d 803, 819 (9th Cir. 2018) (quoting *Perfect 10, Inc. v. Google, Inc.*, 653 F.3d 976, 981-82 (9th Cir. 2011)). But the plaintiff "need not further show that the action sought to be enjoined is the exclusive cause of the injury." *Id.* (quoting *M.R. v. Dreyfus*, 697 F.3d 706, 728 (9th Cir. 2012)).

Because the Immigration Organizations have standing to assert their clients' rights, the Court considers the irreparable injury to the asylum-seekers. In the context of stays pending removal, the Ninth Circuit has observed that "[i]n asylum, withholding of removal and CAT cases, the claim on the merits is that the individual is in physical danger if returned to his or her home country." *Leiva-Perez*, 640 F.3d at 969. Accordingly, "[c]onsideration of the likelihood of such treatment," regardless of whether other factors would render the alien ineligible for relief, "should be part of the irreparable harm inquiry." *Id.*

As discussed above, the record establishes that, while the Rule is in effect, these asylum seekers experience lengthy or even indefinite delays waiting at designated ports of entry along the southern border. *See, e.g.*, ECF No. 35-5 ¶¶ 4-5; ECF No. 35-8 ¶ 13. The record thus belies Defendants' contention that "[t]he rule and proclamation do not prevent any individual alien from seeking asylum." ECF No. 27 at 32. The Court may consider harms that flow from the Rule, even if the Rule is not the "exclusive cause." *Nat'l Wildlife Fed'n*, 886 F.3d at 819 (citation omitted). Further, the record reveals that asylum seekers experience high rates of violence and harassment while waiting to enter, as well as the threat of deportation to the countries from which they have escaped. *See, e.g.*, ECF No. 35-3 at 1-2, 29-30; ECF No. 35-4 ¶ 6; ECF No. 35-8 ¶¶ 7, 11. These harms are both irreparable and likely to occur.

Defendants argue that any harm can be avoided by simply violating the policy, because the only loss then is "a discretionary benefit to which [asylum seekers] are never entitled" and "they

remain eligible for mandatory protections from removal." ECF No. 27 at 32. This argument ignores several basic facts. First, Congress has determined that the right to bring an asylum claim *is* valuable, regardless of whether it is discretionary. Second, and more importantly, the application of the Rule will result in the denial of meritorious claims for asylum that would otherwise have been granted. That means that persons who are being persecuted on the basis of their religion, race, or other qualifying characteristic, to whom the United States would otherwise have offered refuge, will be forced to return to the site of their persecution. Moreover, aliens who violate the Rule are placed in expedited removal proceedings under 8 U.S.C. § 1225(b)(1)(B), *see* 83 Fed. Reg. at 55,943, where they receive far fewer procedural protections to review the application of that standard. *See Vasquez v. Holder*, 635 F.3d 563, 566 (1st Cir. 2011) ("The lack of procedural protections accompanying expedited removal stands in contrast to the significant process, specified in 8 U.S.C. § 1229a, that is required to effectuate a formal removal."). Finally, although discretionary, a grant of asylum confers additional important benefits not provided by withholding of removal or CAT protection, such as the ability to proceed through the process with immediate family members, *see* 8 U.S.C. § 1158(b)(3), and a path to citizenship, *see id.* §§ 1159(b)-(c), 1427(a). The Defendants ignore these very real harms.

In addition, the Immigration Organizations allege that they were deprived of the opportunity to offer comments on the Rule. Courts have recognized that the loss of such opportunity may constitute irreparable injury while a rule promulgated in violation of § 553 is in effect, provided that plaintiffs suffer some additional concrete harm as well. *See, e.g.*, *California v. Health & Human Servs.*, 281 F. Supp. 3d 806, 830 (N.D. Cal. 2017) ("Every day the IFRs stand is another day Defendants may enforce regulations likely promulgated in violation of the APA's notice and comment provision, without Plaintiffs' advance input."). Otherwise, "section 553 would be a dead letter." *N. Mariana Islands v. United States*, 686 F. Supp. 2d 7, 17 (D.D.C. 2009) (quoting *Sugar Cane Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002)). As discussed above, the Rule frustrates the Immigration Organizations' missions and forces them to divert resources outside of their core services. Moreover, if the Court were to ultimately find the Rule invalid or procedurally defective, any interim harm "would not be susceptible to remedy."

1   *Health & Human Servs.*, 281 F. Supp. 3d at 830; *cf.* 5 U.S.C. § 702 (waiving sovereign immunity

2   for "relief other than money damages").

3          Accordingly, the Court finds that the Immigration Organizations have made a clear

4   showing that it is likely that they and their clients will suffer irreparable harm absent a TRO.

5          **D.      Balance of the Equities and the Public Interest**

6          The Court turns to the final two *Winter* factors. "When the government is a party, these

7   last two factors merge." *Drakes Bay Oyster Co. v. Jewell*, 747 F.3d 1073, 1092 (9th Cir. 2014).

8          Here, the balance of the equities and the public interest favor granting a TRO. As

9   discussed extensively throughout this Order, potential asylum seekers are exposed to numerous

10  harms while waiting to present their claims, including not only physical privations like physical

11  assault but also the loss of valuable, potentially meritorious claims for asylum. The Rule, when

12  combined with the enforced limits on processing claims at ports of entry, leaves those individuals

13  to choose between violence at the border, violence at home, or giving up a pathway to refugee

14  status.

15         The Court acknowledges Defendants' argument that "[t]he government's interest in

16  efficient administration of the immigration laws at the border also is weighty." *Landon v.*

17  *Plascencia*, 459 U.S. 21, 34 (1982). But as *Landon* explained, "control over matters of

18  immigration is a sovereign prerogative, largely within the control of the executive *and the*

19  *legislature*." *Id.* (emphasis added). The Court must also consider that the Immigration

20  Organizations are likely to succeed on the merits of their claim that the Rule contravenes

21  Congress's judgment to give full consideration to asylum seekers' claims regardless of their

22  failure to comply with entry requirements. *See Fish v. Kobach*, 840 F.3d 710, 756 (10th Cir.

23  2016) (recognizing that Congress's clear statutory commands balancing competing interests

24  "demonstrate Congress's determination that the public interest" will be best served in that

25  manner). The executive's interest in deterring asylum seekers – whether or not their claims are

26  meritorious – on a basis that Congress did not authorize carries drastically less weight, if any.

27         Defendants also contend that maintaining the Rule serves the public interest because,

28  absent the Rule, aliens will continue to cross the border in a dangerous manner. ECF No. 27 at 32.

United States District Court
Northern District of California

United States District Court
Northern District of California

1    The Rule's sole reference to the danger presented by crossings appears in a quote from a 2004

2    rule, with no explanation as to how the situation may have evolved in the intervening fourteen

3    years. *See id.* at 55,950 ("There continues to be an 'urgent need to deter foreign nationals from

4    undertaking dangerous border crossings, and thereby prevent the needless deaths and crimes

5    associated with human trafficking and alien smuggling operations.'" (quoting Designating Aliens

6    for Expedited Removal, 69 Fed. Reg. 44,877, 48878 (Aug. 11, 2004)). The Rule contains no

7    discussion, let alone specific projections, regarding the degree to which it will alleviate these

8    harms. On the other side of the scale, the Court must weigh the extensive record evidence of the

9    danger experienced by asylum seekers waiting to cross in compliance with the Rule. *See, e.g.*,

10   ECF No. 35-3 at 1-2, 29-32; ECF No. 35-4 ¶¶ 10-11; ECF No. 35-5 ¶ 5; ECF No. 35-8 ¶ 15.

11            Finally, the Court considers the administrative burden to Defendants of maintaining the

12   status quo. The Court initially notes that "[a]ny administrative burden [injunctive relief] places on

13   the government is greatly minimized by the fact that the government already has a process in place

14   for adjudicating" asylum applications for aliens who enter in violation of a Presidential

15   proclamation. *Saravia v. Sessions*, 280 F. Supp. 3d 1168, 1201 (N.D. Cal. 2017), *aff'd*, 905 F.3d

16   1137 (9th Cir. 2018). And by the Rule's own estimate, the Rule would reduce Defendants'

17   burdens to administer the immigration system, but would also add some offsetting burdens, such

18   as increased resources towards detaining aliens pending expedited removal. 83 Fed. Reg. at

19   55,947.[20] The Court finds that the burden of the existing system does not outweigh the harms that

20   flow from the Rule.

21            Accordingly, the Court will grant the motion for a TRO.

22   **E.      Scope of Relief**

23            Finally, the Court considers the scope of relief due.

24                              **1.      Geographic Scope**

25            Defendants contend that the Court should limit any injunctive relief to "remedying

26   _____

27   [20] At this preliminary stage, the Court need not determine the extent to which the Rule's
     assessment of administrative burdens of the existing system is contradicted by the record. *But see*
28   ECF No. 35-9.

1   Plaintiffs' particular alleged resource-allocation harms."  ECF No. 27 at 34.  As explained above,

2   however, the Immigration Organizations also assert the rights of their asylum seeker clients in this

3   proceeding.[21]

4        The scope of the remedy is dictated by the scope of the violation.  Where a law is

5   unconstitutional on its face, and not simply in its application to certain plaintiffs, a nationwide

6   injunction is appropriate.  *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[T]he scope of

7   injunctive relief is dictated by the extent of the violation established, not by the geographical

8   extent of the plaintiff.").  Moreover, as another court has observed, the Supreme Court's recent

9   decision in *Trump v. International Refugee Assistance Project*, 137 S. Ct. 2080, 2082 (2017),

10  "validates the nationwide application of the preliminary injunction for certain contexts."  *City of

11  Chicago v. Sessions*, No. 17 C 5720, 2017 WL 4572208, at *2 (N.D. Ill. Oct. 13, 2017).  Like

12  *International Refugee Assistance Project*, this case involves government policy on entering the

13  country.  Given the need for uniformity in immigration law, the Court concludes that a nationwide

14  injunction is equally desirable here.

15       A "nationwide injunction . . . is [also] compelled by the text of the Administrative

16  Procedure Act, which provides in relevant part:

        To the extent necessary to decision and when presented, the reviewing court shall
17      decide all relevant questions of law, interpret constitutional and statutory
        provisions, and determine the meaning or applicability of the terms of an agency
18      action. *The reviewing court shall ... (2) hold unlawful and set aside agency action,
        findings, and conclusions found to be—(A) arbitrary, capricious, an abuse of
19      discretion, or otherwise not in accordance with law . . . .*"

20

21  490 F.3d 687, 699 (9th Cir. 2007) (citing 5 U.S.C. § 706) (emphasis added in original), *aff'd in

22  part, rev'd in part on other grounds sub nom. Summers v. Earth Island Inst.*, 555 U.S. 488 (2009);

23  *see also Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409-10 (D.C. Cir. 1998)

24  ("We have made clear that '[w]hen a reviewing court determines that agency regulations are

25  unlawful, the ordinary result is that the rules are vacated – not that their application to the

26

27  ――――――――――――――――
    [21] Defendants also do not explain how such a limitation would work in practice, for example,
28  whether the clients of the Plaintiff firms would have special rights that other immigrants would not
    have and what effect that would have on the uniformity of the immigration laws.

United States District Court
Northern District of California

individual petitioners is proscribed.'" (quoting *Harmon v. Thornburgh,* 878 F.2d 484, 495 n. 21 (D.C.Cir.1989)).  Because the Court here concludes as a preliminary matter that the Rule is unlawful because it conflicts with the INA, it is unlawful as applied to anyone.  The Court will issue a nationwide injunction.

### 2.    Expedited Removal Procedures

Defendants suggest in passing in their opposition, ECF No. 27 at 33, and reiterated at the hearing, that 8 U.S.C. § 1252(e)(3) limits the scope of the relief the Court may issue.[22]  As an initial matter, the Court could simply enjoin the Rule as it amends asylum eligibility in 8 C.F.R. §§ 208.13, 1208.13, without disturbing any expedited removal procedures.  Defendants have provided no authority to support the proposition that any rule of asylum eligibility that may *be applied* in expedited removal proceedings is swallowed up by § 1252(e)(3)'s limitations.  That interpretation would expand that provision well beyond "section 1225(b) . . . and its implementation."  8 U.S.C. § 1252(e)(3).

Moreover, even if the Court's TRO enjoined the Rule's amendments to the expedited removal regulations, it is not clear that this provision applies to the Immigration Organizations' APA claims.  *See M.M.M. ex rel. J.M.A. v. Sessions*, 319 F. Supp. 3d 290, 293, 296 (D.D.C. 2018) (transferring 5 U.S.C. § 706(2) claim but concluding that it must retain exclusive jurisdiction over 8 U.S.C. § 1252(e)(3) claim).

---

[22] In relevant part, 8 U.S.C. § 1252(e)(3) provides:

> (3) Challenges on validity of the system
>
> (A) In general
>
> Judicial review of determinations under section 1225(b) of this title and its implementation is available in an action instituted in the United States District Court for the District of Columbia, but shall be limited to determinations of –
> . . . .
>
> (ii) whether such a regulation, or a written policy directive, written policy guideline, or written procedure issued by or under the authority of the Attorney General to implement such section, is not consistent with applicable provisions of this subchapter or is otherwise in violation of law.

United States District Court
Northern District of California

1    Given the lack of support for Defendants' position, the Court declines to limit its relief on

2  that basis.

3                                   **CONCLUSION**

4    For the foregoing reasons, the Court GRANTS the Immigration Organizations' motion for

5  a temporary restraining order.  The Court hereby ENJOINS Defendants and their officers, agents,

6  servants, employees, and attorneys, and any other person or entity subject to their control or acting

7  directly or indirectly in concert or participation with Defendants from taking any action continuing

8  to implement the Rule and ORDERS Defendants to return to the pre-Rule practices for processing

9  asylum applications.

10    This Temporary Restraining Order shall take effect immediately and shall remain in effect

11  until December 19, 2018 or further order of this Court.

12              ORDER TO SHOW CAUSE RE PRELIMINARY INJUNCTION

13    Defendants, and each of them, is hereby ORDERED TO SHOW CAUSE on December 19,

14  2018, at 9:30 a.m., or as soon thereafter as counsel may be heard[23] in the courtroom of the

15  Honorable Jon S. Tigar, located at 450 Golden Gate Avenue, San Francisco, California, why they,

16  and each of them, and their officers, agents, servants, employees, and attorneys, and any other

17  person or entity subject to their control or acting directly or indirectly in concert or participation

18  with Defendants, should not be enjoined from taking any action continuing to implement the Rule

19  and ordered to return to the pre-Rule practices for processing asylum applications, pending the

20  final disposition of this action.

21    Rule 65(c) of the Federal Rules of Civil Procedure provides that a district court may grant

22  a preliminary injunction "only if the movant gives security in an amount that the court considers

23

24  [23]    When a temporary restraining order is issued with notice and after a hearing . . . the
25  14-day limit for such orders issued without notice does not apply.  *See Horn Abbot*
    *Ltd. v. Sarsaparilla Ltd.*, 601 F.Supp. 360, 368 n. 12 (N.D.Ill.1984).  Nevertheless,
26  absent consent of the parties, "[a] court may not extend a 'TRO' indefinitely, even
    upon notice and a hearing." *Id.*
27

28  *Pac. Kidney & Hypertension, LLC v. Kassakian*, 156 F. Supp. 3d 1219, 1223 (D. Or. 2016).

1    proper to pay the costs and damages sustained by any party found to have been wrongfully

2    enjoined or restrained." Fed. R. Civ. P. 65(c). The district court retains discretion "as to the

3    amount of security required, *if any.*" *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009)

4    (internal quotation marks and citations omitted) (emphasis in original). Here, Defendants have not

5    requested a bond, much less supported the issuance of a bond in any fixed amount. Also, the

6    Court find that balance of equities weighs strongly in favor of the Plaintiffs. Further, there is a

7    significant public interest underlying this action. Accordingly, the Court finds it appropriate to

8    waive a bond. *See Reed v. Purcell*, No. CV 10-2324-PHX-JAT, 2010 WL 4394289, at *5 (D.

9    Ariz. Nov. 1, 2010) ("In the present case, Defendants have not requested a bond, nor have they

10   submitted any evidence regarding their likely damages."); *Taylor-Failor v. County. of Hawaii*, 90

11   F. Supp. 3d 1095, 1103 (D. Haw. 2015) ("Plaintiffs are individuals of limited financial means and

12   there is a significant public interest underlying this action."); *Elliott v. Kiesewetter*, 98 F.3d 47, 60

13   (3d Cir. 1996) ("Where the balance of . . . equities weighs overwhelmingly in favor of the party

14   seeking the injunction, a district court has the discretion to waive the Rule 65(c) bond

15   requirement.").

16        By November 26, 2018, the parties must submit either a stipulation, or competing

17   proposals, for a briefing schedule in advance of the December 19 hearing. The schedule must

18   contain not only the briefs the parties will file and the due dates for those briefs, but also a

19   deadline for the production of the administrative record and for any discovery either party may

20   wish to conduct. The parties may also request the Court continue the December 19 hearing to a

21   later date and continue the TRO in effect. Unless they make such a request, however, no briefing

22   deadline in the parties' proposal(s) may occur later than December 14, 2018 at 5:00 p.m.

23        **IT IS SO ORDERED.**

24   Dated: November 19, 2018

25

26   
     _____
                  JON S. TIGAR
27               United States District Judge

28

United States District Court
Northern District of California

**EXHIBIT D**

**Transcript of Hearing, East Bay Sanctuary Covenant v. Trump, No. 18-cv-6810 (N.D. Cal. Nov. 19, 2018)**

Pages 1 – 63

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

BEFORE THE HONORABLE JON S. TIGAR, JUDGE

EAST BAY SANCTUARY COVENANT, et al., )
                                      )
            Plaintiffs,               )
  VS.                                 ) NO. C 18-06810 JST
                                      )
DONALD J. TRUMP, et al.,              )
                                      ) San Francisco,
            Defendants.               ) California
_____ )

                          Monday, November 19, 2018

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:
                    AMERICAN CIVIL LIBERTIES UNION
                    125 Broad Street
                    18th Floor
                    New York, New York  10004
               BY:  **LEE GELERNT, ESQ.**

                    AMERICAN CIVIL LIBERTIES UNION
                    39 Drumm Street
                    San Francisco, California  94111
               BY:  **CHRISTINE P. SUN, ESQ.**
                    **VASUDHA TALLA, ESQ.**
                    **SPENCER AMDUR, ESQ.**
                    **JULIE MICHELLE VEROFF, ESQ.**

                    SOUTHERN POVERTY LAW CENTER
                    1666 Connecticut Avenue, NW
                    Suite 100
                    Washington, D.C. 20009
               BY:  **MELISSA CROW, ESQ.**

Reported By:  **BELLE BALL, CSR 8785, CRR, RDR**
              Official Reporter, U.S. District Court

(Appearances continued, next page)

**APPEARANCES, CONTINUED:**

For Plaintiffs:
                        CENTER FOR CONSTITUTIONAL RIGHTS
                        666 Broadway
                        Seventh Floor
                        New York, New York  10012
                  BY:  **BAHER AZMY, ESQ.**

For Amicus State of Washington:
                        WASHINGTON ATTORNEY GENERAL'S OFFICE
                        Post Office Box 40100
                        Olympia, Washington  98504
                  BY:  **MEGAN DY LIN, ESQ.**

For Amicus Immigration Reform Law Institute:
                        LAW OFFICE OF LAWRENCE J. JOSEPH
                        1250 Connecticut Avenue, NW
                        Suite 700
                        Washington, D.C.  20036
                  BY:  **LAWRENCE J. JOSEPH, ESQ.**


For Defendants:
                        U.S. DEPARTMENT OF JUSTICE
                        950 Pennsylvania Avenue, NW
                        Washington, D.C.  20530
                  BY:  **SCOTT G. STEWART, ESQ.**
                        **DEPUTY ATTORNEY GENERAL**
                        **OFFICE OF IMMIGRATION LITIGATION**

                        U.S. DEPARTMENT OF JUSTICE
                        Ben Franklin Station
                        Post Office Box 868
                        Washington, D.C.  20044
                  BY:  **FRANCESCA M. GENOVA, ESQ.**
                        **TRIAL ATTORNEY**
                        **OFFICE OF IMMIGRATION LITIGATION**


Also Present:          **MARY BAUER, ESQ.**

| | |
|---|---|
| 1 | <u>**Monday - November 19, 2018**</u>                        <u>**9:28 a.m.**</u> |
| 2 | <u>**P R O C E E D I N G S**</u> |
| 3 | **THE CLERK:** Calling Civil Case 18-6810, East Bay |
| 4 | Sanctuary Covenant, et al. versus President of U.S. Donald J. |
| 5 | Trump, et al. |
| 6 | Counsel, will you please approach and make your |
| 7 | appearances. |
| 8 | **MR. GELERNT:** Good morning, Your Honor. Lee Gelernt |
| 9 | from American Civil Liberties Union for plaintiffs. |
| 10 | **MR. STEWART:** Good morning, Your Honor. Scott |
| 11 | Stewart on behalf of the Department of Justice for the |
| 12 | President and the other defendants. I'm joined by my |
| 13 | colleague, Francesca Genova. Thank you. |
| 14 | **THE COURT:** Welcome, good morning. And good morning |
| 15 | also to other counsel, whose appearances have been noted for |
| 16 | the record. |
| 17 | It also looks like we have a few more people in the |
| 18 | gallery than we normally do. Welcome to you also. This is a |
| 19 | public proceeding. |
| 20 | Let me deal with a few administrative matters before we |
| 21 | get going. I'm going to set time limits on argument of 45 |
| 22 | minutes per side. That time includes time spent answering |
| 23 | questions from the Court. There may be substantial questions |
| 24 | from the Court. |
| 25 | First the plaintiffs will argue, and then the defendants. |

1    And then the Court will take a 15-minute recess.  Then the

2    plaintiffs will make a rebuttal argument if they want to do

3    that and they have time left, and the defendants will make a

4    rebuttal argument if they want to do that and they have time

5    left.  At that time, unless I order otherwise, I will then take

6    the motion under submission.

7         There is no need to reserve time or to ask Mr. Noble to

8    reserve time.  The amount of time you don't take during your

9    initial argument is the time that you will have for your

10   rebuttal.  He will be keeping track of your time.

11        For the administrative convenience of the Court, the

12   amicus brief of the State amici at Docket No. 34 is now deemed

13   filed.  I asked them to file it separately, and for whatever

14   reason, they didn't, so we're just going to dispense with that.

15        Do counsel have anything for the Court's attention before

16   we proceed this morning?

17             **MR. GELERNT:**  No, Your Honor.

18             **MR. STEWART:**  No, Your Honor.

19             **THE COURT:**  All right.  Very good.

20        Mr. Gelernt, you may proceed.

21             **MR. GELERNT:**  Thank you, Your Honor.

22        Congress has made explicit in the Immigration and

23   Nationality Act that an individual may apply for asylum,

24   quote-unquote, whether or not they crossed at a point of entry

25   That was 1980, when they adopted the Refugee Act.

1      1997, they again made explicit that it did not matter

2   where you entered, you could apply for asylum.

3      So what we have here, I believe, Your Honor, is not only a

4   case dealing with an enormous potential humanitarian crisis,

5   but a classic separation-of-powers case.  The administration is

6   trying to override what Congress has done.

7      Congress has made a very explicit decision to say it

8   doesn't matter where you enter.  And the reason, I think, is

9   straightforward.  It's not to condone people entering between

10  ports of entry.  Congress has put in criminal penalties for

11  that.  They have also put in civil penalties.

12     But what Congress recognized and what international law

13  recognizes and what all experts in this area recognize,

14  including our declarants, is that there will be times when

15  people enter between ports of entry.  But entering between a

16  port of entry has no bearing on how much danger you may be in.

17     And so what our declarations show is that there are times

18  when people enter between ports of entry, where they just

19  simply couldn't help it.  Right now, they're being pushed back

20  from ports of entry by the Mexican government.  They're not

21  even allowed to be put on lists.  There are young children in

22  Mexico who are begging to be put on a list at a port of entry,

23  who are not allowed to.  There are long lines.  CBP is pushing

24  people back.  Sometimes they tell families:  Well, you can go

25  to a different port, that's 50 miles away.

1    And contrary to the narrative that's been out there

2    publicly, these are not all criminals, cartel members who are

3    coming here.  These are families.  Yesterday one of our counsel

4    were out there, and little boys are trying to get their teddy

5    bears, they're here without their parents, trying to get in.

6    This is a real humanitarian crisis.

7    And Congress could not have been clearer.  It cannot be

8    that you could not apply for asylum simply because you entered

9    between a port of entry.  And so what the President is trying

10   to do is simply override that.

11   And I think -- in response to the government's suggestion

12   that there's a crisis here, I think there's a legal and factual

13   response to that.  The legal response is what I've just said.

14   Congress has made the decision.  And contrary to the

15   administration's claim that there is now an immediate crisis

16   going on, this is a long-term issue that Congress has been

17   dealing with.  By the government's own admission, there was

18   less than 400,000 apprehensions at the border.  If you look at

19   2000 to 2008, there were well over a million apprehensions in

20   those years, those eight years.

21   Congress has been well aware of this issue, and has taken

22   a variety of steps.  But the one thing it's never done is say:

23   You can't apply for asylum.  And that's just because of the

24   fundamental special nature of asylum.

25   Congress can do a lot.  No one is here condoning people

 1    crossing between borders.  But ultimately, people will cross

 2    borders because they don't know where the ports are, because

 3    they're pushed back, because criminal elements push them

 4    between ports.

 5        And Congress has said:  You have to be able to apply for

 6    asylum.

 7        The factual point I would make --

 8            **THE COURT:**  Mr. Gelernt, there's a great deal of

 9    information in the record, that it's sort of diffuse about the

10    number of people who have entered the United States along the

11    southern border at various ports -- points in time, the number

12    of people who have applied for asylum, and so forth.

13        Is there anything from this record from which I can

14    determine the number of people in a recent period, a recent

15    fixed period such as the most recent fiscal year or some other

16    definable period who were granted asylum under the existing

17    law, but who would have been denied asylum or denied asylum and

18    deported, under the new interim rule?

19            **MR. GELERNT:**  Your Honor, I don't think there's

20    anything that specific in the record.  We certainly can try

21    and supply it.  But I think this is -- this is moving so

22    quickly.  My co-counsel may have some specific number.

23        But I think --

24            **THE COURT:**  Well, perhaps -- I don't mean to -- I'm

25    mindful of our time limitations.  And obviously, there will be

1    an opportunity for rebuttal.  And so a member of your team

2    could be looking for this.  And we can move along to something

3    else.

4            **MR. GELERNT:**  I think, Your Honor, the answer may be

5    to 20,000 --

6        (Off-the-Record discussion between counsel)

7            **MR. GELERNT:**  20,000 who applied, and 6,000 who

8    passed.  So we may be talking about --

9            **THE COURT:**  Well, let's do this.  Let's postpone that

10   question.

11           **MR. GELERNT:**  Yes, Your Honor.

12           **THE COURT:**  Because the next time you answer it, I'll

13   be looking for a record cite.

14           **MR. GELERNT:**  Right, Your Honor.  I apologize.

15           **THE COURT:**  Let's, let's -- I have some additional

16   questions.

17        Are you challenging the validity of the proclamation,

18   standing alone?  Or just the rule?

19           **MR. GELERNT:**  Your Honor, that's a very important

20   question.  And I think -- what we believe is the only thing we

21   need to challenge it is regulation.  We are not here

22   challenging the proclamation, suspension of entry.  I mean, we

23   have real doubts that does, anything because EWI's, by

24   definition, entering without inspection are already barred.

25        We are simply here challenging the regulation.  We think

```
1    it's enough to have an injunction on the regulation, because

2    that's what bars asylum.

3              THE COURT:  Got it.  Okay.  As long as I've

4    thoroughly interrupted you anyway, let me --

5              MR. GELERNT:  No, Your Honor.  I apologize for not

6    having that record cite.

7              THE COURT:  No, no, no, please.  At some point this

8    morning I'm going to need to find out what is the term of the

9    relief the plaintiffs are seeking.

10         Is this really a temporary retraining order, or, given the

11   circumstances, is it really in the nature of a request for a

12   preliminary injunction?  And if it's a TRO, what further

13   proceedings do the plaintiffs anticipate, and on what timeline?

14         As you know, the rules anticipate --

15             MR. GELERNT:  Right.

16             THE COURT:  -- a schedule of follow-on proceedings.

17   And I have -- my instinct tells me that the parties are going

18   to seek immediate appellate review.  And that a

19   preliminary-injunction proceeding is not in anybody's

20   near-term future.  But, you may tell me otherwise.  We just

21   have to straighten that out.

22             MR. GELERNT:  Well, Your Honor, I think one thing the

23   Ninth Circuit has said is that if it's a pure TRO, it might

24   not be appealable.  So I think we're looking for a TRO right

25   now, but we would be prepared to move on whatever schedule you
```

 1    think is appropriate for preliminary injunction.

 2         So a TRO, as Your Honor knows, would last 14 days.  It

 3    could be extended another 14.  So we are prepared to be back

 4    here in 14 days, or if you extend it, any time between 14 and

 5    28.

 6         But on the TRO, I think the reason we believe we need a

 7    TRO, a short-term TRO, is because the danger right now.  Every

 8    day, people are in real danger of being --

 9              **THE COURT:**  The question before the Court is not

10    whether I would not issue a TRO because of -- nothing about my

11    question either expresses a view on the merits of TRO

12    application, or forecloses the possibility of the issuance of

13    a TRO.  But I do wonder what further proceedings does anybody

14    contemplate.

15         We don't even -- no one has even hinted that there might

16    be the production of an administrative record.  I mean, reading

17    the briefs, I think the parties have given me everything they

18    want to give me.  And if that's true -- and I'll ask the

19    government this question --

20              **MR. GELERNT:**  Right.

21              **THE COURT:**  -- in a few minutes, obviously.  What

22    further proceedings do they anticipate.  But I'm -- I guess

23    what I'm saying is -- well, I think I've said what I need to

24    say.

25              **MR. GELERNT:**  No, that's fair, Your Honor.  If there

1    are going to be further proceedings, we believe we have

2    obviously put in enough for either a TRO or a preliminary

3    injunction, which I think what is Your Honor's getting at.

4    And whether, now, you would want a guidance from the Ninth

5    Circuit on going forward.

6         If we were going to go forward, we certainly would want to

7    see some type of record from the government on why the

8    regulation was passed, because we don't think what's in the

9    preamble to the rule was sufficient.

10        We would certainly continue to give Your Honor more

11   information because, as you know, there was no 30-day grace

12   period for the rule to go into effect, and no notice of

13   comment.  And so we've literally been scrambling 24-7 all over

14   the country.  And every day, we're learning about individuals

15   who are in serious danger.

16        So I think if we did go forward, if Your Honor decided to

17   bifurcate, have a TRO and then have a PI, and neither side

18   tried to take up the TRO, I think we would present that type of

19   record evidence for you, because I think people's lives are

20   very much in danger.  They're in danger on the Mexican side

21   because they are stranded there, families, kids, for six weeks,

22   seven weeks.  And it's very dangerous over there.

23        There are also individuals now we're finding who have gone

24   through to this country, been apprehended, would normally apply

25   for asylum, have very strong asylum claims, but are not allowed

1  to be -- not being allowed to apply for asylum and are in

2  imminent damage of being removed.

3       In terms of the record, I think, as Your Honor has pointed

4  out, there is not an administrative record.  There is a fairly

5  conclusory preamble to the regulation.  And I would just want

6  to make two points about that preamble.  One is a sort of

7  conceptual point.

8       If Your Honor looks at that preamble, I think Your Honor

9  will see that almost everything there goes to that the

10  government doesn't -- this administration doesn't believe that

11  people are passing at high enough rates or showing -- passing

12  at too high rates or showing up for their hearings.  All those

13  types of things.

14       And what I think Your Honor will take from that is that

15  really, the beef the administration has is with how the asylum

16  process works.  Not with ports of entry versus entry without

17  inspection, which is really supposed to be the issue.  How

18  often people show up for their hearings.  And we dispute that

19  factually.  And we have an affidavit from the Tahirih

20  declaration -- Tahirih (Phonetic).

21       But that doesn't go to whether you apply at a port of

22  entry or enter without inspection.  That simply goes to the

23  government's feeling that the asylum process is too easy for

24  people.  It's an asylum process, though, that Congress set up.

25       Likewise, the time it takes to do the hearings.  You have

1    Mr. Rodriguez's declaration, who is the head of the United

2    States Citizenship and Immigration Service, who is saying the

3    same amount of time -- it takes the same amount of time to do a

4    hearing at a port as between -- when someone enters at a port

5    versus when they are enter between ports.

6        So most of what you see in there about the high asylum

7    rate for people from the Northern Triangle really doesn't go to

8    where they enter.  It goes to the administration again feeling

9    like the asylum process is not what they would want.  But, it's

10    a asylum process Congress set up.

11        **THE COURT:**  What is the fit between that point, which

12    I think finds support in the record, and the legal fit between

13    that point and your complaint that the proclamation and the

14    rule violate the INA, or that there was an improper failure to

15    utilize a notice and comment period?  Do I incorporate the one

16    into the other?

17        **MR. GELERNT:**  Your Honor, I think that's exactly the

18    right point, because what we are saying is all those facts

19    might suggest that Congress look at the asylum process again.

20    I mean, Congress has looked at it a ton, and said:  We're

21    happy with the asylum process.

22        But all of that goes to whether or not there should be

23    asylum at a port of entry or entering without inspection.  It's

24    the government's burden to come forward and say:  The reason

25    we're shutting down asylum for people between ports but not at

1    ports is there's some government interest in that.

2         And we cannot really find that in the preamble.

3    Everything about the rates, the grant rates of asylum goes to

4    whether you -- doesn't go to where you apply, it goes to

5    whether you can apply, anywhere.

6         The only things the government is saying about why they

7    want people to go to ports is:  Well, they would rather people

8    go to the ports, and it be an orderly process.

9         We don't dispute that.  That's fine.  But the reason we

10   dispute factually is -- well, as I said, Your Honor, it's a

11   legal and factual answer, because legally, Congress has made

12   the decision, is well aware of this issue.  So that's really

13   dispositive.

14        But factually, the government has not put in anything to

15   suggest that this rule will eliminate people going between

16   ports of entry.

17        And I think that's what our declarations say, and there's

18   really nothing in the record to contradict it.  That they're

19   very unsophisticated people, often, who simply don't know where

20   the ports are.  There are criminal gangs who pull people

21   between ports of entry and they say "You have to go here" and

22   they are sometimes at gunpoint.  Sometimes the kids are not

23   allowed to be put on a.

24        List.  What we've learned recently is that the Mexican

25   government is not letting children at ports of entry apply

1    unless they have a guardian or a parent to tell them -- to --

2    to sign something.  Well, if they're fleeing from their

3    parents, they're obviously not going to have a parent there.

4         So what the administration has said is:  We think putting

5    out this rule and we think doing it right now will channel

6    everyone to a port.  It's simply not supported by the record.

7         And to Your Honor's question I think on the notice and

8    comment is very important, because what our plaintiffs would

9    have said in a notice and comment is:  This is not going to

10   work to channel everyone to a port of entry.  And what they

11   would explain based on decades and decades of expert

12   observations is just simply saying:  "Go to a port, you can't

13   apply" is not going to work.  They are indigenous people coming

14   from Central America who have no idea where the ports are.

15   There are cartels telling people at gunpoint:  You must enter

16   here or we're going to kidnap you, rape you.  There are long

17   lines, six weeks, sometimes, little sleeping in Mexico in

18   dangerous areas.  So that would have all been said in a notice

19   of comment.  So I think that's really what's missing from the

20   preamble and the regulation, is any reason to believe that this

21   kind of rule would channel everyone to a port.

22        But again, this is something, Your Honor, that Congress

23   has known for a long time.  Again, 2000 to 2008, well over a

24   million people were entering between ports.  So the

25   administration claiming that all of a sudden there's an

1    emergency now?  This is a long-term issue that Congress has

2    been dealing with.  And Congress has tried a variety of ways.

3    And certainly, everyone says you can channel people to ports if

4    you want, but the one thing you cannot do is buy asylum.

5        (Off-the-Record discussion between counsel)

6            **THE COURT:**  Where in the record could I easily

7    find -- and you can address this in rebuttal too -- the

8    reference to a million people entering between ports between

9    2000 and 2018 (sic)?  I'm just asking for a record cite --

10           **MR. GELERNT:**  I'm sorry, Your Honor --

11           **THE COURT:**  -- to the point you just made, either

12   now, or at some later time in your argument.

13           **MR. GELERNT:**  Yes, Your Honor.  I apologize again.  I

14   hope I don't have to apologize too many more times.

15           **THE COURT:**  You don't have to apologize -- it's a big

16   record.  I don't know where it is, either.  That's why I asked

17   you.  So it's fine.

18           **MR. GELERNT:**  Um -- but -- Your Honor, it is an

19   official United States Border Patrol, and I --

20       (Off-the-Record discussion between counsel)

21           **MR. GELERNT:**  Your Honor, it's cited in the Isacson

22   declaration.  He has two declarations.  One an original, and

23   one a supplemental.  And it's the United States Border Patrol

24   specific southwest border sector numbers.

25       And what it shows is in 2000, there were 1.6 million

1    between the ports.  2001, 1.2 million.  The next two years,

2    over 900,000.  The next two years -- next three years, again

3    over a million.  This year, the government has said there's

4    under 400,000.

5         And so I think the relevance for that for the notice and

6    comment is:  This is not one of those emergency situations.

7         And the notice and comment is very important in a

8    situation like this, because it needs to take into account the

9    views of people on the ground, like our plaintiffs.  And what

10   would have happened if there were notice and comment is we

11   would have explained that the numbers were higher historically,

12   we would have explained why this rule is not going to channel

13   certain people to the ports.

14        And so I think -- what the Ninth Circuit has said is:  You

15   really need a strong showing for good cause.  They have said

16   it's very demanding; the Courts should really scrutinize it.  I

17   don't think the preamble's conclusory assertion that this rule

18   will channel everyone to the ports and that it was truly an

19   emergency is actually -- could come close to satisfying the

20   Ninth Circuit's standard.

21        What the Ninth Circuit has said is that you -- you have to

22   make sure that it's truly an emergency.  What we're talking

23   about here, I know that there's been a lot of talk in the press

24   about the caravan.  But the truth is that when you look at the

25   preamble, there is very little about the caravan, and there is

1  a lot about annual statistics.  And I think that that is

2  because, ultimately, the government recognized that the caravan

3  is not a serious issue.

4       And as the Isacson declaration and the Pinheiro

5  declaration pointed out, caravans -- most of the people usually

6  end up dropping off.  Our own military has put out that it is

7  likely to be only 20 percent of the people come.  And most of

8  those people will come to the ports.

9       And, caravans have been coming for years, as our

10  declarations have said.  I think this narrative about the

11  caravan has gotten out there, but the truth is it's something

12  that happens all the time.  Immigration is cyclical.  And the

13  numbers, as I said, have been way higher.  So I think the need

14  for putting in this rule immediately was not there.

15       And the government has suggested:  Well, there were

16  foreign affairs.  But again, the courts have been clear that

17  just because it's immigration doesn't mean it's foreign

18  affairs.

19       And if you look at the *Jean v. Nelson* case out of the

20  Eleventh Circuit, that was about the Haitians, but they said

21  the foreign affairs exception wasn't guaranteed -- sorry --

22  wasn't satisfied.

23       If you look at the cases the government is relying on,

24  they were aware there was serious emergency foreign affairs

25  issues: That Iran hostage crisis.  After 9-11.  Those are the

1    types of foreign affairs situations where the Congress has

2    said:  We will excuse notice and comment.  But not in a

3    situation where ultimately what the government is saying is:

4    We don't like the patterns of migration, that Congress has been

5    aware of.  So we don't believe there's actually been an

6    emergency.

7          I would just say a few words before I sit down about

8    standing, Your Honor.  The first thing I would say is, as

9    Your Honor knows, courts regularly find organizational

10   standing.  And we believe that we have -- declarations clearly

11   show that there is going to be a diversion of resources and

12   frustration of mission.

13         The other thing I would say is at this point, since as

14   Your Honor knows, we are moving very quickly, the Ninth Circuit

15   has said, like, for example, in the case *Valle de Sol*:  At this

16   stage, the preliminary stage, you don't need to have fullest

17   possible record.  You just need to have a basic showing.

18         I think that we have more than a basic showing about how

19   all our organizations are going to have to divert resources.

20   And that's both for our merits INA claim, and our notice and

21   comment claim.

22         And I know the government has also pushed a

23   zone-of-interest type of argument.  The things I would say

24   about that are it's a prudential doctrine.  Obviously, at this

25   stage, the Court can just satisfy itself that there's enough

1    here.

2         And courts routinely find in situations like this that

3    organizations are within the zone of interest.  That's the

4    A.O.L. case by Judge Bashant in the Southern District of

5    California, that's the *Doe* case by Judge Robart.  It's also

6    *Hawai'i v. Trump* where the states are -- where the state was

7    suing under the INA, and found to be within the zone of

8    interest.

9         I think, ultimately, the government's argument proves too

10   much.  If it had to be a non-citizen, then no organization

11   would ever be able to sue.  But courts have routinely found

12   that organizations can sue.  And especially in a situation like

13   this, where things are moving so quickly, and where it's an

14   enormous --

15            THE COURT:  Give me again, please, the name of the

16   Ninth Circuit case on lower --

17            MR. GELERNT:  *Valle de Sol*, Your Honor.  It was the

18   challenge -- it was a 2013 *Valle de Sol* case --

19            THE COURT:  I have it now.  Thanks.

20            MR. GELERNT:  Yeah.

21            THE COURT:  Thank you.

22            MR. GELERNT:  And, and then, then just before I sit

23   down, on the APA notice and comment, I think the government is

24   sort of half-heartedly suggesting the organizations don't have

25   a right to sue on that claim, the APA 553 notice and comment.

1    Truthfully, in the immigration area, those are the only

2  people who actually comment.  A non-citizen, especially a

3  non-citizen abroad, is not commenting on a regulation.  So I

4  think it would have to be the organization who's ultimately

5  going to comment on that.  So we think, clearly, there's

6  standing, especially at this preliminary stage, Your Honor.

7    So unless the Court has questions, I would reserve the

8  rest of my time.

9            **THE COURT:**  Very good.

10           **MR. GELERNT:**  Thank you, Your Honor.

11           **THE COURT:**  Thank you, Mr. Gelernt.

12   Mr. Stewart.

13           **MR. STEWART:**  Thank Your Honor.  May it please the

14  Court.

15    The rule and proclamation at issue in this case respond in

16  a targeted and lawful way to a serious crisis facing our

17  immigration system.  That crisis is the crushing strain caused

18  by large numbers of unlawful entries at our southern border

19  that are followed by ultimately meritless assertions in the

20  credible fear process.

21    This misuse of our asylum system --

22           **THE COURT:**  What's the practical effect of the rule?

23  What does the administration hope to accomplish in terms of

24  the rule's practical effect?

25           **MR. STEWART:**  A few things, Your Honor.  One

1    practical effect is to channel, as the rule explains, those

2    who seek to enter the country to ports of entry where they can

3    be processed in an orderly, controlled and sensible way, where

4    they don't have to be the subjects of at-large preliminary

5    examinations that put themselves and American law enforcement

6    lives at risk.  That's one.

7        The other, Your Honor, is to facilitate negotiations with

8    our international partner, Mexico, in the effort to have Mexico

9    as well as the Northern Triangle countries contribute and help

10   address the serious issues caused by migrants transiting

11   through Mexico, making a journey that has potential danger.

12       So it's aimed also to facilitate an orderly and safe

13   process to get that existing set of problems resolved.

14           **THE COURT:**  So I want to pick up on the point that

15   you just made which actually echoes something Mr. Gelernt just

16   said, and that is that the regulation -- the language of the

17   regulation takes the view that, writ large, there are not

18   enough meritorious asylum claims contained within the body of

19   applicants.  And that's essentially what you just said.  And

20   that is that we have too many people applying for asylum who

21   are not qualified.

22       You and I can agree that some of the applicants are

23   entitled to receive asylum, and they do receive asylum.

24   Correct?

25           **MR. STEWART:**  Correct, Your Honor.

1      **THE COURT:**  That happens.  Is there anything about

2  this rule that increases the percentage of meritorious

3  applications?

4      If that's the problem, what, if anything, does this rule

5  do to solve that problem?

6      **MR. STEWART:**  Your Honor, it discourages people from

7  crossing unlawfully, and essentially buying potentially years

8  of release into the country because of the very low initial

9  threshold by establishing a positive credible fear.

10      **THE COURT:**  Is there any correlation between what you

11  said and the existence of credible fear or the other criteria

12  that would qualify somebody for asylum?

13      How are those things logically related to each other?

14      It's true the rule will discourage people from entering

15  the country to make asylum claims.  That seems clear.  Everyone

16  agrees on that.  And it does that in some ways by making it

17  more difficult to present such a claim.  And there's a debate

18  about whether it's appropriate to make it more difficult than

19  the way the rule does that.  That's why we're here this

20  morning.

21      But my question is:  Having done that, how does that make

22  it more likely that the claims that are ultimately presented

23  are meritorious?

24      **MR. STEWART:**  Because the people who are most likely

25  to present -- to have legitimate asylum claims will then go to

1    ports of entry, are more likely to go to ports of entry.  Or

2    they will be beneficiaries of a potential solution with

3    Mexico, with the Northern Triangles that addresses this issue

4    on a broader scale, Your Honor.

5        Your Honor, I would emphasize here that this is not a rule

6    that targets just asylum-seekers, across the board.  It's

7    focused on a particular problem of folks who are largely from

8    Northern Triangle countries who cross illegally between ports

9    of entry and are able to stay in the country because they pass

10   a federal fear screening, even though they ultimately, by large

11   numbers, don't show up for asylum hearings, don't apply for

12   asylum at all, and when they do apply and do show up, their

13   claims are ruled to have no merit.

14       And that --

15       **THE COURT:**  Why is it that people with meritorious

16   asylum claims are more likely to go to ports of entry than

17   people whose claims are not meritorious?  How does the one

18   follow from the other?

19       **MR. STEWART:**  Because if they're rendered ineligible

20   to get asylum, they will -- they will channel to ports of

21   entry because they don't want to miss that shot at asylum.  If

22   they do have an ultimate shot at getting asylum, at meeting

23   their criteria and showing what they need to show, and

24   actually prevailing on their case, then they're likely to say:

25   Oh, gosh, I don't want to blow my shot at this.  I want to

1   present lawfully, so I can still be eligible for this

2   discretionary benefit.

3       That's it, Your Honor.

4       **THE COURT:** Doesn't that argument assume that people

5   whose claims ultimately are going to be denied know that they

6   are going to be denied in advance?

7       People say: Well, my claim is going to be granted, so I

8   better go here.

9       Someone says: Well, my claim's actually going to be

10   denied. I'll go this different place.

11       Is that the government's position?

12       **MR. STEWART:** Your Honor, I do think the people who

13   actually -- some people logically know that their asylum

14   claims are going to have more merit than others. A very small

15   number of these claims turn out to show -- you know, have

16   merit. It's the people, it seems, who actually show up to

17   their asylum hearings and make out the case. It's not the

18   case for everyone. I mean, there's a very small group of

19   people who end up in this group who end up actually getting

20   grants of asylum.

21       And it encourages people to -- who actually know they have

22   a strong case for asylum to go and follow the orderly processes

23   to do that. So --

24       **THE COURT:** I think the language -- beg your pardon.

25   I think the language from the Federal Register -- and it says

1  this more than once -- is that:  The government is seeking to

2  facilitate the orderly processing at ports of entry that takes

3  into account resource restraints at ports of entry and in U.S.

4  detention facilities.

5      Now, my question for the government is:  How would you

6  describe the state of the record as to whether the ports of the

7  entry are either, on the one hand, capable of processing what

8  by definition will be an increased flow of asylum applicants,

9  or on the other, whether they are backed up?

10     Or isn't there in the record a statement from the Director

11 of Homeland Security -- although it was not put in by the

12 administration, it comes from her -- that the government is

13 metering people at ports of entry?

14     And isn't that inconsistent with the government's stated

15 goal as it's expressed in this interim rule?

16     **MR. STEWART:**  Your Honor, processing at ports of

17 entry, it does take time.  You know, there can be delays at

18 various times.  And there could be the need to shift

19 additional resources.  And the rule acknowledges the need to

20 potentially do that.

21     There will be, you know, a need to see how some of

22 things -- some things work out, and where -- where additional

23 resources may need to be deployed.

24     But again, I mean, when you have people present at ports

25 of entry, you don't have a situation where you have CBP

1    officers needing to chase people down, and ugly conditions, and

2    that sort of thing.  So it does make it orderly.

3         And presumably, the processing could, ideally, be faster.

4    There could be needs to put more resources towards that.  But

5    again, it's early in the process of this rule, and that can be,

6    you know, worked out soundly and in a controlled way.

7              **THE COURT:**  Let's go to a higher level of abstraction

8     and talk about the law for a second.  And this is a point that

9     actually I meant to discuss with Mr. Gelernt, and maybe I'll

10    do it in his rebuttal argument.

11        What is the burden on the government, if any, for its

12   stated justification to be supported by the record were

13   actually true?

14        You and I are debating right now -- or I think

15   "discussing" is a better word -- we are discussing how likely

16   it is that the government could meet its stated goal of

17   facilitating orderly processing of asylum applicants at ports

18   of entry.  And we could have the same discussion with regard to

19   the asserted ground that the government wants to negotiate a

20   safe third-country agreement with Mexico.  I could ask you how

21   likely, on the record, the government is to actually achieve

22   that goal.

23        But these discussions beg the question of whether the

24   government has a legal obligation to -- for its asserted

25   justification to be true, or for it to be supported by the

1  record.  And I don't know -- and it would be useful to me to

2  know what you think that burden, if any, is.  And for the

3  plaintiffs to tell me the same thing.

4         **MR. STEWART:**  Your Honor, maybe on rebuttal I can

5  more crisply articulate how I would put that in terms.  But I

6  think it would be very light, in whatever it is here in this

7  context, where you have matters at the border in which the

8  executive branch exercises great authority and discretion.

9  Particularly matters that are so well-documented in the

10  proposed rule, they're areas of broad authority and

11  discretion.

12         **THE COURT:**  Ah, ah, "so well-documented"?  That's my

13  question.

14         **MR. STEWART:**  The rule well-documents the problem,

15  Your Honor.  It is a problem that's causing great strain on

16  our already backlogged --

17         **THE COURT:**  It makes certain assertions.  And my

18  question is:  To what extent do those assertions need to be

19  supported?

20    To say something is true is not to make it true.

21         **MR. STEWART:**  Your Honor, I don't think that the

22  plaintiffs in this case have actually gone after the actual

23  factual grounds in any meaningful way on which the rule

24  actually relies.

25    The attacks that they make are:  Oh, you know, numbers of

1    apprehensions or appearances at the southern boards are down,

2    overall.

3        This addresses with more specificity --

4        **THE COURT:**  I might conclude otherwise.  And I'm

5    giving the government an opportunity to tell me what standard

6    I should apply.

7        **MR. STEWART:**  I'll try to have a more crisp

8    articulation of that, Your Honor, if I may think about that

9    for a little bit?

10       **THE COURT:**  Yeah.

11       **MR. STEWART:**  I appreciate that, Your Honor.  Thank

12   you.

13       **THE COURT:**  Yeah.

14       **MR. STEWART:**  The numbers in this case show,

15   Your Honor, and as the rule explains, many of this group that

16   transit Mexico and cross unlawfully between ports of entry do

17   not even apply for asylum.  Many fail to show up at their

18   hearings.  And those who do, end up getting asylum in very

19   small numbers, because these claims regularly lack merit.

20       This claim -- this strain on our system has compounded a

21   backlog, drawn resources and attention away from other

22   meritorious claims of the many hundreds of thousands of cases

23   pending, and uniquely strains the immigration system.  These

24   are kind of the central reasons for this rule.  This is what

25   it's targeting, and this is what it's -- what it's doing.

1    **THE COURT:**  The rule -- the rule is predictive of the

2    things you just said.  It says:  These bad things are going to

3    happen, and so we need to implement this rule.  You're using

4    the present tense.

5        Is there anywhere in the record from which I could find

6    support for the notion that the system is now currently being

7    overwhelmed by the caravan, or asylum-seekers from what the

8    government calls the "Northern Triangle"?

9        **MR. STEWART:**  I mean, the numbers -- it explains, you

10   know, in fair terms, Your Honor, that --

11       **THE COURT:**  This is what I did to Mr. Gelernt.  I'm

12   just looking for support in the record.

13       Is there record information that I could cite that says --

14   that is supportive of the contention that, as you said a moment

15   ago, that the strain on our system has compounded a backlog and

16   drawn resources and attention away from other meritorious

17   claims, et cetera?

18       **MR. STEWART:**  The -- the main areas, Your Honor, are

19   on Pages 55945 to -947.  Among other things, those pages

20   catalog the large numbers of folks at issue here who are able

21   to enter, get possible federal -- credible fear screenings.

22       They sap detention resources which are limited and often

23   difficult, especially in the case of family units, which have

24   been rising above -- or have risen, at times, above previous

25   years.  That many of -- many in this group are able to be

1  released once they have positive credible fear determinations

2  and stay in the country for months, even years, even though

3  they don't have an entitlements to be -- they are not

4  ultimately found to have a meritorious asylum claim.

5      This adds to what is already, I believe we say, the rule

6  says that -- -946, the 800,000-plus cases pending in the

7  current backlog of Section 240 proceedings, over 100,000 of

8  which involve nationals of Northern Triangle countries.

9      So those are a few points, Your Honor.  It also details

10  the relative lack of merit of a lot of these claims that are

11  the target of this particular rule.

12      And I could also add additional details.  But I would

13  point to those pages in particular, and the page or so before

14  and after those, Your Honor.

15          **THE COURT:**  Thank you.

16      **MR. STEWART:**  Your Honor, moving to some more

17  fundamental legal points here about why this is a very, very

18  light burden for the executive branch to meet, it's because

19  asylum is not a mandatory obligation.  It's a discretionary

20  benefit that comes with -- you know, comes only with a

21  favorable exercise of discretion, after numerous criteria are

22  met.

23      And it's something that --

24          **THE COURT:**  And, and where are you locating this

25  burden?  Is this the government's good-cause burden to

1    dispense with notice and comment?  Is it a burden that

2    relieves the executive branch of avoiding a conflict, a

3    statutory conflict?

4        When you say it's a light burden, which of the claims or

5    defenses are you now addressing?

6            **MR. STEWART:**  I'm addressing the merits of the

7    Immigration and Nationality Act claim.

8            **THE COURT:**  Okay.

9            **MR. STEWART:**  I can go to good cause and foreign

10   affairs if you would like.

11           **THE COURT:**  No, I just want to make sure I'm

12   following the argument.

13       Is the point that if the government meets what you've

14   described as a very light burden, then if I find that there's a

15   conflict between the rule and the proclamation as they operate

16   together and the language of the INA, that I cannot be worried

17   about the conflict?

18           **MR. STEWART:**  Your Honor, I'm not going to concede

19   that there's a conflict, and I would disagree that there's a

20   conflict.  I'd like to be able to explain why there's no

21   conflict.

22           **THE COURT:**  You can do that later.  I'm just trying

23   to figure out what -- what is it that the -- that the

24   government doesn't have to -- where is the low burden?  A low

25   burden to do what?

1    **MR. STEWART:**  The low burden to erect discretionary

2    conditions or limitations on eligibility for granting asylum.

3    That's in the statutory language.  That's

4    Section 1158(b)(2)(C).

5        1158(b)(2)(A), I believe it is, Your Honor, makes clear

6    that asylum is discretionary, it may be granted by the Homeland

7    -- by the Secretary of Homeland Security or the Attorney

8    General.  And bars to eligibility can, in turn, be erected, so

9    long as they are consistent with Section 1158, the statute.

10       Section 1158 erects very few barriers.  What it does erect

11   barriers on is in many -- the granting of asylum.  The Attorney

12   General or the Secretary can't grant asylum to certain

13   categories of offenders, and other types of people who fit --

14   fit different categories.

15       In addition, there is a lot of discretion to erect

16   additional bars, so long as they're consistent.  There's

17   nothing inconsistent by erecting a bar for someone who does not

18   just enter, but enters in a particularly problematic manner, as

19   determined by a presidential proclamation.

20       And that's a point that I think I would like to emphasize,

21   Your Honor.

22       **THE COURT:**  The government makes a distinction

23   between Congress saying that:  You can apply for asylum,

24   regardless of -- whether you came in at a port of entry.

25   You'd think, after the amount of preparation for this hearing,

1   I could actually say the statutory language.  But it's

2   escaping me.  Sorry.  I know you know what I mean.

3              **MR. STEWART:**  Yes, Your Honor.

4              **THE COURT:**  And, and then the President and the

5   Attorney General saying:  Well, they can say that, but we can

6   deny asylum on the same ground.

7        Doesn't the second thing render the first thing a nullity?

8        I'll give you an example.  Let's say we said -- we had a

9   Congressional statute that said: You can come to the hearing at

10  the federal courthouse in any vehicle.  You're allowed to ask

11  to come into the courthouse if you come in any vehicle.

12       But then we have a rule that someone passes that says:

13  I'll tell you what, you can ask, but if you came here on a

14  bicycle, you're not coming in.  You're not.

15       What's the point of saying the vehicle that you use to get

16  here doesn't matter?  How does it not render -- I'm not doing

17  as elegant of a job with this as I'd like, but how does it not

18  render the expression of Congressional intent a nullity?

19             **MR. STEWART:**  It would be as if you were to say:  You

20  can come and enter the courthouse so long as you do so,

21  consistent with the remainder of what I'm about to -- you

22  know, the conditions I lay out.

23       So, too, here, Your Honor, with Section 1158(a)(1) it says

24  that as a general rule -- it's captioned "In general" -- an

25  alien who's physically present in the United States may -- dot,

1    dot, dot -- may apply for asylum in accordance with this

2    section.

3         So that means in accordance with other provisions of 1158.

4    Those include, for example, the immediately-following

5    exceptions for even being eligible to apply for asylum.  So

6    yes, there's a broad general rule under 1158(a)(1), Your Honor,

7    to be able to apply for asylum.  But that's immediately

8    qualified by several exceptions just for applying.

9         **THE COURT:**  "In general" is a title.  It's not part

10    of the paragraph.  So to the extent that you're suggesting

11    that Congress meant to draw a distinction, I don't know that

12    the argument is supported by the statute.

13         What the statute says -- and I now have it in front of me,

14    and I wished I had a moment ago --

15              "Any alien who is physically present in the United

16              States or who arrives in the United States, whether

17              or not at a designated port of arrival..."

18         Et cetera.

19              "...may apply for asylum."

20         What's left of that?  I guess that's a better way of

21    asking the question.  If this rule is valid, what's left of

22    that expression of Congressional intent?

23         **MR. STEWART:**  Your Honor, you didn't mention the last

24    several words that follow that which says:

25              "...may apply for asylum in accordance with this

```
 1              section."

 2      1158 proceeds to make that general rule subject to a fair

 3  number of qualifications, exceptions, establishment,

 4  eligibility --

 5              THE COURT:  It absolutely does.

 6              MR. STEWART:  Yes.

 7              THE COURT:  None of them have to do with port of

 8   entry.

 9              MR. STEWART:  Your Honor, it's not inconsistent with

10   that -- well, first of all, Your Honor, what I would say there

11   is that it would render meaningless that -- under that --

12   under that view, it would be anybody can apply for asylum who

13   falls within the six statutory bars, but they would still

14   never be able to get asylum.

15      And, you know, still -- that -- you know, there's no

16  argument there that that somehow guts 1158(a)(1).  It's still a

17  general rule that you may apply, but then at the eligibility

18  stage, other qualifiers and other factors come in.

19      And one of those qualifiers, Your Honor, is 1158(b)(2)(C),

20  which says (As read):

21              "The Attorney General by regulation -- may by

22              regulation establish additional limits and conditions

23              consistent with this section under which an alien

24              shall be eligible for asylum under Paragraph 1."

25      And that's what he's done here, Your Honor.
```

```
1        And if I can --

2            THE COURT:  Well, it has to be consistent with the

3    section.

4            MR. STEWART:  Right.

5            THE COURT:  I mean, it would be -- we don't have a

6    situation where Congress said in Subsection (1):  Hey, even if

7    you've been convicted of a felony -- you know, regardless of

8    whether you've ever been convicted of a felony, you can come

9    in.

10       They put that down below.  They say:  If you've been

11   convicted of a felony, you're not eligible.

12       There's nowhere -- I guess my point is the difficulty I

13   have with the government's argument is that there's nowhere

14   else later in this -- yes, yes, there are exceptions.  But none

15   of them have anything to do with this explicit carve-out in any

16   way.

17       But I'll move on because now I feel as though I'm perhaps

18   debating this with you more than asking you.

19       Let me turn to something else.

20           MR. STEWART:  Can I add one little point on that,

21    Your Honor?

22           THE COURT:  Sure.

23           MR. STEWART:  I don't want to --

24           THE COURT:  No, no, please.

25           MR. STEWART:  The point I would add, Your Honor, is
```

1    that I think it's undisputed and under a matter of the BIA's

2    decision, it's clear that manner of entry can be relevant, and

3    therefore, is certainly dispositive of asylum eligibility in

4    some cases.

5        There's no -- there's no distinction that can be drawn

6    with that, no principal distinction that can be drawn with

7    that, and making manner of entry in a particular subset of

8    cases a categorical bar.

9        And here, Your Honor, the point I want to emphasize --

10            **THE COURT:**  Well, let's talk about that for a second.

11        Doesn't -- doesn't overwhelming authority say that while

12    manner of entry can be considered, it is to be given very

13    little weight?

14        And so my question would be, first:  Is there any

15    authority for the proposition that it could be given

16    dispositive weight?

17        And -- I guess that's the question.  I don't have a second

18    question.  If I did, it would be:  Wouldn't that, nonetheless,

19    bring whatever court said that, if one ever did, into conflict

20    with the explicit language of the statute?

21        But I don't think there is a court that's ever said that.

22            **MR. STEWART:**  No, Your Honor, it's -- the idea that

23    you can bar subsets of people based on manner of entry,

24    there's not any sort of overwhelming authority of that.

25        The *Pula* decision recognized it can be a factor.  It did

1  that as a general matter in individualized cases.  There's

2  nothing in the statute that prevents the Attorney General and

3  the Secretary, in their broad discretion, to categorically bar

4  that.

5      And if I can emphasize -- this is the point I want to

6  emphasize, Your Honor, is that this rule, accompanied by the

7  proclamation, do not make aliens ineligible for asylum, based

8  merely on illegal entry.  It's not an illegal entry, per se.

9      Rather, it makes them ineligible for asylum on a separate

10  and additional basis.  That -- not just that they illegally

11  entered, but that they contravened a particular presidential

12  proclamation suspending or limiting entry, based on the

13  President's particularized foreign-policy-laden determination

14  that that entry would be detrimental to the national interest.

15      So it's a heightened different-in-kind entry.  It's not

16  manner of entry, per se.  It's different, and it warrants the

17  ineligibility bar imposed here.

18          **THE COURT:**  What does the presidential proclamation

19  add to illegal manner of entry?

20          **MR. STEWART:**  For one thing, it points out that this

21  is the -- this violation of law implicates the national

22  interest in a particular way.

23      Two, it notes and tries to encourage potential

24  interdiction efforts to prevent this problem, and kind of

25  facilitate relations with Mexico.

1    And again, it puts the President's backing in his --

2  pursuant to his own broad authority under 1182(f) and 1185(a),

3  to find that this is a serious issue, and it needs to be

4  addressed.

5         **THE COURT:**  I think because the plaintiffs have

6   stated that they are not challenging the proclamation

7   independently, probably I don't reach the issue, because

8   there's no longer a controversy before the Court.

9    But, but because that wasn't clear when I took the bench,

10  let me ask you the same question I asked your opponent.  And

11  that is: in the absence of the rule, does the proclamation have

12  independent legal effect?

13        **MR. STEWART:**  It does, Your Honor, especially with --

14   with respect to the potential interdiction discussions and

15   efforts.  It does embody, you know, a particularized

16   determination.

17    What I would say, Your Honor, is that I don't -- the

18  proclamation is what triggers the ineligibility bar under the

19  rule.

20    So, I mean, there's really no basis to -- invalidating the

21  rule doesn't make a lot of sense.  It should be, if anything,

22  saying that there's an issue with the proclamation such that

23  another proclamation could be issued, potentially.

24    But I would say the proclamation does add, but there is a

25  lot of the two working in tandem here, Your Honor.

1           **THE COURT:**  The ports of entry -- the ability to seek

2    asylum through ports of entry is contained in the

3    proclamation, but not the rule.  Right?

4           **MR. STEWART:**  Um, I believe -- that's right,

5    Your Honor.  I mean, it is what's expressly addressed, but

6    they kind of, you know, interlock.

7           **THE COURT:**  So is it also correct that there is no

8    check in the rule, itself, on the President's ability to deny

9    asylum to anybody who enters at the southern border,

10    irregardless of where they enter?

11           **MR. STEWART:**  Your Honor, I don't know what that

12    argument means by the plaintiffs.  There's nothing in the

13    proclamation that purports to deny asylum to anyone.  It --

14    you know, it suspends and limits entry.

15    And there is an effect of you know, whether or not -- it

16    doesn't get into the issue of:  Oh, could the President,

17    himself --

18           **THE COURT:**  I think the argument goes to the question

19    of how much authority the interim rule purports to confer on

20    the President.

21    Anyway, I don't have a more specific question for you.

22           **MR. STEWART:**  It's really the departments exercising

23    their authority, Your Honor, to, under Title 8, and doing so

24    based in part on a presidential determination that the

25    President is, himself, expressly statutorily authorized to

1    make.

2        Your Honor, if I could turn maybe to some of the APA

3    procedural issues?

4            **THE COURT:**  Sure.

5        **MR. STEWART:**  And I want to hopefully save some -- a

6    decent amount of time for rebuttal.  But really quickly,

7    Your Honor --

8        (Reporter interruption)

9        **MR. STEWART:**  Thank you.

10       First, Your Honor, on the issue of good cause, the

11   declarations and the plaintiffs' briefing do not get to the key

12   good-cause argument that the preamble of this rule advances.

13       That good-cause argument is not, you know:  Oh, just

14   everyday continuation of normal migration patterns.  Rather,

15   the concern is that announcing an ineligibility rule but not

16   giving it immediate effect would lead to a surge in dangerous

17   and unlawful border crossings in order to evade this asylum

18   ineligibility bar.

19       That is logical; it makes sense.  When we have a situation

20   where I believe about a thousand folks are entering unlawfully

21   between ports of entry at the southern border, that means on

22   average, every day, you have another thousand who are within

23   range.

24       By plaintiffs' own declarations, it's pretty clear that

25   the communication streams to -- whether it be to caravans or

1   others who are transiting toward the southern border, hear

2   about that things.  And it's really the risk of a surge and all

3   the resource difficulties and the dangers to both life and

4   safety on both sides of the border that that occasions.

5       On foreign affairs, Your Honor, the plaintiffs and their

6   declarants also ignore, give short shrift to the key foreign

7   affairs here.  We are not just saying, Your Honor, that:  Oh,

8   because this involves immigration, it therefore automatically

9   meets the foreign affairs exception.

10      What's really trying to go -- you know, be facilitated

11  here, Your Honor, are negotiations with Mexico and with the

12  Northern Triangle countries to deal with this difficult problem

13  of, you know, each country taking responsibility for its own

14  nationals, for providing asylum, and that sort of things.

15          **THE COURT:**  In *Doe versus Trump*, my colleague

16   Judge Robart, in Washington, rejected the assertion of the

17   foreign-affairs exception on the ground that the government

18   had not provided any evidence to support the assertion.  So

19   this is similar to the question that I asked you before about

20   a different aspect of the government's argument.

21      And the question is:  What obligation, if any, is there on

22  the government to support an assertion of the foreign affairs

23  doctrine?  And if you say none, then that's your argument, and

24  then you can -- you don't have to say anything more.

25      And if you say it is anything other than none, the

1   question is:  How likely do you think it is that the United

2   States will be able to negotiate a safe third-party-country

3   agreement with Mexico?  And, what basis is there for thinking

4   that it's likely?

5           **MR. STEWART:**  We don't need to establish any definite

6   likelihood that it will be established, Your Honor.

7           **THE COURT:**  Is saying it sufficient?

8           **MR. STEWART:**  Your Honor, I'm not sure that saying it

9   would be sufficient, but it's not what the issue is here.  It

10   says -- we are --

11           **THE COURT:**  It is -- if I'm asking you about it, it's

12   the issue here.

13           **MR. STEWART:**  Your Honor, the rule explains that we

14   are in diplomatic discussions with Mexico and the other

15   countries, to try to deal with this problem.  And we can't

16   guarantee that that will bear a fruitful agreement, that that

17   will resolve all issues, but we're trying, we're hopeful --

18           **THE COURT:**  Can you please explain the relationship

19   between denying asylum to those who do not enter at a

20   designated port of entry and the likelihood that negotiations

21   with Mexico to achieve a safe-third-party-country agreement

22   will go up?

23           **MR. STEWART:**  Sure, Your Honor.  I think it goes

24   beyond the safe-third-country agreement.  But if I can give

25   you my kind of foreign-affairs pitch here, it's simply that

1   Mexico has a responsibility for the people transiting its

2   country and for its border with the United States.  One aspect

3   of that responsibility is not to turn a blind eye to people

4   who transit through that country, and then break United States

5   law by entering.

6       By closing the border between ports of entry and requiring

7   channeling to those ports of entry, the executive branch has

8   here recognized the importance of these principals, these

9   obligations, as well.  And it has signaled to Mexico that:

10  These are important to us, you can't just have this happening,

11  you need work with us to find a more comprehensive solution

12  that hopefully will be a safe-third-country agreement.

13       It will, in all events, hopefully produce something, you

14  know, fruitful that helps address this shared problem that by

15  plaintiffs' own declarations, you know, is one that is

16  significant and is worth addressing.

17       It is an international negotiation.  We can't guarantee a

18  result.  But it is intimately tied with the President's

19  foreign-affairs agenda, and his effort to do this.

20       If I may, Your Honor, if there's nothing immediate, can I

21  save the rest of my time for rebuttal?

22       **THE COURT:**  Sure, you may.  Thank you for being so

23  responsive to the Court's questions.

24       Ladies and gentlemen, the Court will be in recess for 15

25  minutes.  Thank you.

```
1        THE CLERK:  All rise.

2        (Recess taken from 10:24 a.m. to 10:43 a.m.)

3        THE COURT:  All right, let's go back on the record.

4    Mr. Gelernt.

5        MR. GELERNT:  Thank Your Honor.  If I could start by

6    answering some of your questions about the record.

7        In the proclamation -- in the rule, itself, the preamble,

8    at 55935, it shows that 6,000 people who EWI'ed -- sorry -- who

9    entered without inspection, received asylum.  And 74,000 passed

10   their CFI, the credible fear initial screening.  So those are

11   the numbers that I think we are looking at with this rule in

12   one year.

13       I know Your Honor had asked about burdens.  And I want to

14   just mention a couple of cases that I think are relevant to the

15   government's burden.  One is on the good cause.

16       I think the D.C. Circuit in the *Sorenson* case which we

17   cite lays out pretty clearly what the good-cause inquiry is

18   about and what the government's burden is.  And talks about how

19   it needs to be meticulous and demanding, it's narrowly

20   construed.  It's an extremely demanding burden.  So I think the

21   *Sorenson* case is what we would cite for that.

22       On the foreign-affairs exception, I think the Ninth

23   Circuit has a particularly demanding standard.  And I would

24   cite the Court to the *Yassini* case from the Ninth Circuit,

25   about the Iran hostage crisis.
```

```
 1          THE COURT:  I love Yassini, because both sides love
 2     that case.  Every now and then, you get that.  It's like --
 3     anyway.
 4          MR. GELERNT:  Yeah.  Well, for our part, we would
 5     cite Footnote --
 6          THE COURT:  You like Footnote 4.
 7          MR. GELERNT:  Exactly.  So I don't need to tell
 8     Your Honor about it, then.
 9          THE COURT:  I read the case.
10          MR. GELERNT:  On the burden on the INA claim, I
11     wasn't sure exactly what the government was saying its burden
12     was, but what we would answer it this way, is, that where
13     Congress has addressed the precise issue, no amount of
14     evidence the executive branch can put in would allow it to
15     override Congress.  Congress has made the judgment; they've
16     put it in the statute.
17         I don't hear the government to say that the Attorney
18     General can override Congress if it has -- if the Attorney
19     General had enough evidence.  It's a fight about what the
20     statute means.
21         And I think Your Honor has pinpointed what we believe are
22     the holes in the government's argument about the express
23     language being inconsistent with their role.
24          THE COURT:  Let me ask you a standing question.  And
25     I think Mr. Stewart probably wanted to hammer away a little
```

1    bit at the government's standing argument.  But I had a lot of

2    questions for him.  So perhaps we will hear more of that on

3    rebuttal.

4        But my question for you is:  Is there any way for

5    asylum-seekers who enter between designated ports of entry who

6    I'll just call "third-party plaintiffs" for purposes of our

7    discussion, is there any way for them to challenge the interim

8    final rule in their immigration proceedings?

9            **MR. GELERNT:**  Your Honor, as I understand it, I think

10    the government may say that there's limited judicial review

11    when you're putting in an expedited removal case, which is

12    what's going to happen -- expedited removal proceeding, which

13    are those summary proceedings at the border.

14        My understanding from past cases, and I think from this

15    case as well --

16            **THE COURT:**  I think after the IJ level, there's no

17    judicial review.  And I think it says that.

18            **MR. GELERNT:**  That's the government's position.

19            **THE COURT:**  Yeah, I think that sentence is in there,

20    either in the interim rule or the proclamation.  I'd have to

21    go back.

22            **MR. GELERNT:**  Just to be fair, to put the Court on

23    notice, we are challenging that, saying there has to be

24    judicial review, unrelated to this rule.  That's a case --

25    that's an issue that goes way back.  But at the moment,

1    Your Honor, that is the law of the land, that there's no

2    review of expedited removal.

3         **THE COURT:**  Okay.  So let's -- let's just assume that

4    what happens is if the rule goes into effect, that an alien or

5    an immigrant is apprehended having crossed at other than a

6    designated port of entry, and pursuant to the rule, is deemed

7    not to have a credible fear, and placed into -- you know, and,

8    given a reasonable-fear interview, and if found not to meet

9    that standard, placed into expedited removal.

10        Anywhere in there, would that person have the opportunity

11   to challenge this final rule?

12        **MR. GELERNT:**  The government's position is:  No, they

13   would not.  So they would be removed.  So I think that is what

14   we're looking at is individuals now being removed, without

15   even a chance to challenge the rule.

16        And I think, you know, the government may take issue with

17   jurisdictional positions -- I don't know what they're going to

18   say about jurisdiction -- generally is that there's no

19   jurisdiction over that.  But you certainly could issue a TRO, a

20   preliminary injunction, and reserve that question.

21        But right now, Your Honor's exactly right, that is the

22   government's position.  They're going to get that expedited

23   removal, and the government is going to say:  You can't apply

24   for asylum and -- based on the rule, and then you're going to

25   be removed.

1      And that is what we're seeing now in the last few days.

2          **THE COURT:**  If this case were not present, in other

3  words, if this case had not been filed and we were not having

4  our discussion, could that individual asylum-seeker file a

5  habeas case in Federal District Court if they couldn't get

6  relief directly in Immigration --

7          **MR. GELERNT:**  The government's position is:  No.  And

8  so that's why I think we're here, seeking a TRO.

9      And I just want to raise one point that you brought up

10 about third-party standing.  What we have learned in the last

11 48 hours is that there's an acute problem on the borders in

12 Mexico, where the Mexican government is not letting

13 unaccompanied children get on the waiting list.  Even though

14 the list is so long and they're in danger, but they're not even

15 allowed to be on the list.

16     So one of our plaintiffs, A.O.L., is going to represent

17 them.  But I think in order for them to challenge, they

18 couldn't even get into the country because they're not allowed

19 on a port of -- they're not allowed to apply at a port of

20 entry.

21     So we believe, in addition to all the other standing

22 arguments and zone of interest, which we believe we satisfied,

23 that there is third-party standing.  And it's classic

24 third-party standing where these children who are in Mexico

25 would not even be in those expedited-removal proceedings.  Even

1  if there were habeas, they wouldn't be able to access even the

2  IJ proceedings, the AO and -- asylum officer and IJ

3  proceedings.

4      So I think that's why we believe there's a critical need.

5  There's just too many people now in danger.  Those kids are in

6  desperate danger on the Mexican side.

7      And again, that goes back to some of Your Honor's points

8  about putting this in place so quickly, before there's even a

9  system to handle people at ports.  That's even assuming that,

10 ultimately, this rule would channel people.

11     The other point I would make is that I think Your Honor

12 pulled out the exact phrase in the promulgation -- the preamble

13 that's critical to understanding the disconnect between the

14 rule and what they're trying to do.  And that's where they say:

15 We're talking about writ large, the asylum process.

16     I mean, that really seems to be what's going on, is they

17 don't like the asylum process.  That's fine; the administration

18 can have that battle with Congress.  But ultimately, I think,

19 as the government concedes, the proclamation is not what's

20 denying asylum.  The Attorney General can have that fight with

21 Congress.  But there's really no connection between the rule

22 and the problems they see in the asylum process.

23     Now, we believe the asylum process is working.  Congress

24 made it clear that they wanted a low threshold at the border in

25 these summary hearings, because someone is traumatized, they

1  don't have counsel, they're not going to understand how to

2  present their claim.  And so Congress wanted a low threshold in

3  that first hearing.

4      But ultimately, this is more a fight between, I think, the

5  executive branch and Congress.  Congress has made a decision;

6  Congress can alter it.  But right now, Congress has been very

7  clear that people who enter between ports are allowed to apply.

8      And I think saying that they can apply but not eligible,

9  I'm not sure I can add anything to what Your Honor has said

10  about that would render it a nullity.

11      Unless there are further questions, Your Honor, I think I

12  would sit down, then.

13          **THE COURT:**  Thank.  I don't have any --

14          **MR. GELERNT:**  Thank you, Your Honor.

15          **THE COURT:**  -- more questions.  Thank you.

16  Mr. Stewart.

17          **MR. STEWART:**  Thank you, Your Honor.

18      A few points, Your Honor, that I just want to hit home

19  before I sit down.

20      One is that one of the strange things about this suit was

21  that it was brought -- it was filed the very day that this

22  regulation came out, before the rule and proclamation had

23  actually been applied to anyone.  So we have this odd situation

24  where we have organizations that are alleging speculative harms

25  that may not come to pass.  You know, they haven't waited to

1  see how the actual rule will play out.  You know, they're not

2  -- they're asserting they're going to be injured in certain

3  ways.

4       And we don't really have the situation of somebody filing

5  suit in the concrete context of having the rule applied to

6  them.  Those suits would be -- to the extent there would be a

7  systemic challenge to those folks, the exclusive venue for

8  those would be in the District of Columbia Federal Court, where

9  challenges to the validity of the expedited removal system

10  could be processed.

11       **THE COURT:**  Do you disagree, by the way, with

12  Mr. Gelernt that an individual asylum applicant who were

13  apprehended after -- excuse me -- who was apprehended after

14  crossing between designated ports of entry would not have an

15  opportunity to challenge the interim final rule?  In -- at any

16  point in the immigration proceedings?  Or, Mr. Gelernt would

17  say otherwise?

18       Well, actually, he said it was your position.  He didn't

19  tell me what his position was.  But that's what he said your

20  position would be.  Is he right?

21       **MR. STEWART:**  No, Your Honor, I think the right

22  challenge for that would -- again, it would be in the District

23  of -- it would be in DDC.  That's where a systemic challenge

24  -- you know, judicial review by somebody who is subject to an

25  expedited-removal determination, that's where those venues

```
 1   lie, just given the need for national uniformity.  But you

 2   actually need a person who's been subjected to the system.  So

 3   that would be the way to challenge that.

 4        There's also --

 5             THE COURT:  Would that halt the person's expedited

 6   removal?

 7             MR. STEWART:  It would -- I mean, it would depend on

 8   what the Court would say there, Your Honor.  I mean I don't --

 9   I won't concede that the Court could properly do that, but I

10   would add that the Court --

11             THE COURT:  So a court could do it improperly?  I

12   mean, I'm not trying to argue with you, but I'm just trying to

13   figure out who -- just what standing is about.  Who has the

14   right to stand up in court for these people.  Who lets them do

15   that.

16        So does the government -- let's put aside what Mr. Gelernt

17   would say if he were arguing the case in the District of the

18   District of Columbia.  Okay?  What would you say?

19        You're at the podium, and District Court says to you:  Is

20   this person -- hey, they just filed this lawsuit, the person's

21   in expedited removal.  Are you going to stop the expedited

22   removal?

23        What would the government's position be?

24             MR. STEWART:  I'm not going to commit to a position

25   on this at that time, Your Honor, in part, because I would
```

1  need to see what the situation is of the person challenging

2   the expedited removal.

3       Again, as we've emphasized, this is a premature suit, but

4  it is -- a challenge to the expedited removal system is venued

5  in DDC.  This court doesn't have authority to touch that

6  system.

7       And the District of Columbia is authorized and directed by

8  statute to proceed very quickly in dealing with those kinds of

9  suits.  It is the -- it is the place where these suits have

10  happened before.  One attempted such suit was filed not that

11  long ago, a couple months ago, I want to say.

12       The D.C. Circuit and the DDC have spoken authoritatively

13  to this question, and pointed out the problems of organizations

14  trying to seek relief on behalf of people, because what that

15  really is is somebody -- you need people who are subject to

16  this determination.  And the DDC can properly address those

17  things.

18       On the issue of relief, Your Honor, you asked --

19  Your Honor asked Mr. Gelernt earlier what the nature of any

20  relief would be.  I would emphasize that the plaintiffs were

21  asking for extraordinarily -- extraordinary emergency relief,

22  halting in its tracks an important executive branch policy,

23  based on abstract, remote, self-inflicted theories of injury.

24       And any relief that this Court could provide would have to

25  be sharply limited to their particular circumstances.  At most,

1    it would have to apply to the plaintiffs, themselves, and

2    people who are demonstrably their clients and, you know, would

3    be supposedly connected to the harm that they allege.

4           **THE COURT:**  I'd make these organizations the most

5     popular lawfirms at the border if I did that, wouldn't I?

6     This rule doesn't apply to you or your clients, but it applies

7     to every other law firm that might be trying to help

8     asylum-seekers?  How's that going to work?

9           **MR. STEWART:**  I'm not -- I'm recommending denying the

10    TRO, Your Honor, that's our position, but --

11          **THE COURT:**  No, I get that.  But this is a

12    manageability question.

13       But you're saying if you don't deny it I should just apply

14    the relief to them.  And I'm just wondering how that would

15    actually work, in practical effect.

16          **MR. STEWART:**  I think anybody who would -- again,

17     it's very hard here, Your Honor, because we have a situation

18     where we have speculative theories of harm where we don't know

19     how these -- this asylum application -- we don't have

20     confirmation that this asylum application situation is going

21     to play out the way hypothesized by the plaintiff

22     organizations.

23          **THE COURT:**  Let me ask you the same case-management

24    point that I asked Mr. Gelernt.  And that is:  Let's say I do

25    issue a temporary retraining order.  Then what?

1    Do you anticipate that there would be further proceedings?

2  Would there be another hearing with regard to a preliminary

3  injunction?  Would the parties take discovery from each other?

4    What do you think should happen, if I do issue a TRO?

5    **MR. STEWART:**  This would be an administrative-record

6  case, Your Honor.  The Court should -- if the Court were to

7  grant a TRO in any sort of -- in any sort of respect, it

8  should have administrative-record and preliminary-injunction

9  briefing as expeditiously as possible to get this matter

10  resolved.

11    It's a very important initiative.  It's --

12    **THE COURT:**  How quickly is the government prepared to

13  produce the administrative record?

14    **MR. STEWART:**  I could check on that, Your Honor, but

15  it could be -- you know, I'm -- you know --

16    **THE COURT:**  Everyone's acting like they're surprised

17  this might lead to a preliminary-injunction hearing.  But

18  anyway, okay.  So we'll take that under advisement.

19    **MR. STEWART:**  Right, Your Honor.  We'd be prepared

20  to, you know, move in a matter of days, you know,

21  expeditiously.  It's difficult for me to stand here and say,

22  you know, a couple of days --

23    **THE COURT:**  Fair enough.

24    **MR. STEWART:**  -- after a truncated week, what the day

25  would be.  But we'd want to move very expeditiously if that

1    were the direction things were headed in.

2          THE COURT:   All right.

3          MR. STEWART:   I would emphasize, Your Honor, you

4    asked earlier about the burden on these factual assertions.   I

5    think Mr. Gelernt actually somewhat hit on this when he

6    emphasized that the nature of his challenge is a legal one.

7          What I would say is that to the extent there is some

8    challenge on the accuracy of the government's assessments or

9    predictions, that would be an arbitrary and capricious type

10   challenge, I believe.

11         That kind of challenge has not been brought.   And it would

12   need to await the production of the administrative record, in

13   any event.   But it's just not at issue in this hearing.   And I

14   think Mr. Gelernt, in effect, said that when he said that the

15   nature of his challenge is really legal.

16         Zone of interest, Your Honor, just briefly, you know, we

17   hit this in our briefing, somewhat gets to some of the standing

18   issues, too.   But -- which I've also hit.   But the zone of

19   interest here, the people who would really be affected by this

20   rule are, you know, the aliens, themselves.   The immigration

21   laws are really aimed at the interests of aliens.

22         You know, there will presumably be aliens who fall within

23   the zone of the interest in these statutes.   But organizations

24   who fall into this category just do not fit within the aims of

25   the immigration laws in the same way.

1        I would also add that challenges to expedited or to -- you

2   see other indicators in the statute of expedited removal

3   challenges are channeled to D.C.  As I've said, challenges to

4   removal often take an individualized form.  And there's just

5   not this kind of organization -- you know, broad organizational

6   theory for this subset of cases.

7        And also, just on standing more generally, Your Honor, I

8   haven't seen any limiting principle that the plaintiffs had

9   offered to the *Havens Realty* point about just -- if they were

10  allowed standing here, then any organization that kind of has

11  its mission in the area of law that changed could claim

12  standing because it would, you know, affect what -- you know,

13  affect their mission, and they could choose to divert resources

14  in response to it.

15       Another point, Your Honor, I don't think that you had

16  mentioned this much, but this was a big theme, at least in the

17  briefing, and I don't know if this has been mentioned except by

18  Mr. Gelernt earlier today, is, I want to emphasize that a theme

19  in the ACLU's briefing has been -- ACLU and colleagues'

20  briefing, has been that that this rule effectively returns

21  people to their persecutors and torturers.

22       I want to emphasize, it does no such thing.  Asylum is a

23  discretionary benefit.  The key protections for avoiding return

24  to a country where someone is going to be persecuted or

25  tortured are statutory withholding in removal and protection

1  under the regulation implementing -- the regulations

2  implementing the convention against torture.

3       THE COURT:  Persons who are suffering from torture

4  don't also make asylum claims, sometimes?

5       MR. STEWART:  Some do, Your Honor, some do.  But

6  again, asylum is a discretionary benefit.  And the capability

7  of torture claims still is there in full force.

8       THE COURT:  It's discretionary, but it has a lower

9  bar.

10      MR. STEWART:  It has a lower bar for the showing of

11 demonstrating refugee status, Your Honor.  But there are

12 also -- not to change uses of the word "bars" -- other

13 prohibitions on it, and it also requires an ultimate favorable

14 exercise of discretion.

15      Again, it comes with a lot of benefits, Your Honor.  But

16 the --

17      THE COURT:  But the discretion is reviewable.  It's

18 easier to get.  But it's discretionary.  And so the effect of

19 this would be that there might be some persons -- I mean, my

20 question is:  Isn't it true that the effect of this would be

21 that there might be some persons who are subject to torture,

22 who might qualify for these are other forms of relief?  But

23 because, in the view of the authorities, they are not able to

24 meet what would now be the higher bar of mandatory forms of

25 relief, they don't get relief.

1    And it's not because they are not entitled to it, under

2  any circumstances.  It's that they are not entitled to it under

3  the form of relief that has a lower bar.

4    Isn't that what would happen?

5         MR. STEWART:  Your Honor, I think it's a shift --

6  it's a different way of exercising discretion over an

7  already-discretionary benefit.  And when you have a large

8  system, you know, you work with a system as perfectly as you

9  can, you know, to hammer things out in individual cases.

10    But it meets the United States's obligation, and it

11  properly allows people who are claiming some kind of

12  persecution or fear that's cognizable under the law to make

13  those claims.

14    The plaintiffs repeatedly insist that, you know, a great

15  many of the people whose interests they are claiming to look

16  after have very strong claims about torture and persecution.

17  They can still bring those claims.  The problem that we're

18  going after with this rule --

19         THE COURT:  Does the government contend none of them

20  that would have been granted in the past will now be denied?

21  That is a yes-or-no question.

22         MR. STEWART:  I don't think we, you know -- granted

23  what, Your Honor?

24         THE COURT:  Does the government contend -- your

25  argument -- I take your argument to be:  Look, the plaintiffs

1    can still bring these claims.  What's the problem?

2        And my question for you is:  Does the government contend

3    that some claims for relief -- that no claims for relief that

4    would have been granted in the past will now be denied?

5            **MR. STEWART:**  I can't -- I can't predict what will

6    happen, Your Honor.  I mean, it just -- nothing changes as far

7    as the availability of withholding of removal or a convention

8    under the protection against torture.  Those remain

9    unaffected.

10       It's just the discretionary benefit of asylum, which is --

11   brings with it a lot of other additional direct and collateral

12   benefits, is what's affected here.  And it's affected in

13   response to a major, major crisis.

14       And I'd add that many people subject to asylum bars could

15   similarly have claims -- claims of, you know, persecution, for

16   example, that they're now, despite those claims, ineligible to

17   get because, say, they fall under one of the six statutory

18   bars.  So there are circumstances in which people otherwise

19   eligible for asylum have been barred from asylum, as a

20   categorical matter.

21       This (Indicating), given the broad statutory authority and

22   the broad discretion in the executive branch, falls comfortably

23   within the legal authorization to do that.

24           **THE CLERK:**  You have one minute remaining.

25           **MR. STEWART:**  Thank you.

1      See if I have -- I just emphasize, as I've said,

2  Your Honor, in rebuttal, that to the extent any relief were

3  granted, you know, it should be very limited, very carefully

4  tailored, and very sensitive to the extraordinary executive

5  branch interests of this case in addressing a serious crisis in

6  our asylum system.

7      But in addition to that, I would, as I've explained, ask

8  the Court to deny the TRO, and allow the rule and proclamation

9  to continue to their effect.

10      Thank you, Your Honor.

11         **THE COURT:**  Mr. Stewart, thank you.  Gentlemen, thank

12  you both for your arguments.  Ladies and gentlemen, thank you

13  both for your briefing.

14      This matter is now under submission, and court is now in

15  recess.

16    (Proceedings concluded)

17

18

19

20

21

22

23

24

25

1
2
3
4          **CERTIFICATE OF REPORTER**

5          I, BELLE BALL, Official Reporter for the United States

6     Court, Northern District of California, hereby certify that the

7     foregoing is a correct transcript from the record of

8     proceedings in the above-entitled matter.

9

10                    *Belle Ball*

11          _____/s/ Belle Ball_____

12          Belle Ball, CSR 8785, CRR, RDR

13          Tuesday, November 20, 2018

14
15
16
17
18
19
20
21
22
23
24
25

**EXHIBIT E**

**Order, East Bay Sanctuary Covenant v. Trump, No. 18-cv-6810
(N.D. Cal. Nov. 30, 2018)**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| EAST BAY SANCTUARY COVENANT, et al., | Case No. 18-cv-06810-JST |
| Plaintiffs, | **ORDER DENYING MOTION FOR STAY PENDING APPEAL** |
| v. | Re: ECF No. 52 |
| DONALD J. TRUMP, et al., | |
| Defendants. | |

On November 19, 2018, the Court issued a temporary restraining order enjoining the implementation of a joint interim final rule promulgated by the Attorney General and the Department of Homeland Security. ECF No. 43. That rule allows asylum to be granted only to those who cross the southern border under conditions set by the President. Aliens Subject to a Bar on Entry Under Certain Presidential Proclamations; Procedures for Protection Claims, 83 Fed. Reg. 55,934 (Nov. 9, 2018) (to be codified at 8 C.F.R. pts. 208, 1003, 1208) (the "Rule"). Combined with the terms of a concurrently-enacted Presidential Proclamation, the Rule denies asylum to anyone who crosses the southern border anywhere besides a designated port of entry, even if he or she has a meritorious asylum claim. The Court concluded that the Rule is probably invalid because it directly conflicts with a statute passed by Congress; that there were serious questions whether the Rule was passed without the required procedural protections; and that allowing the Rule to go into effect would harm both asylum seekers with legitimate claims and the organizations who represent them.

Defendants now ask the Court to stay its ruling and allow the Rule to go into effect while they appeal the Court's temporary restraining order to the Ninth Circuit. The law provides that the Court should only grant a stay if the Defendants can show they are likely to win their appeal or if

the balance of harms tips in their favor. Defendants have not met this burden. They still have not shown that the Rule is a lawful exercise of Executive Branch authority or that any significant harm will accrue from continuing to implement the existing immigration laws passed by Congress, which is what the temporary restraining order requires. Nor have Defendants rebutted the significant harms that will be suffered by asylum seekers with legitimate claims and the organizations that assist them.

Accordingly, for the reasons set forth below, Defendants' motion for stay will be denied.

## I.  LEGAL STANDARD

A district court has the power to stay proceedings "incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for [the] litigants." *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936). The issuance of a stay is a matter of judicial discretion, not a matter of right, and the "party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Nken v. Holder*, 556 U.S. 418, 433-34 (2009). In exercising its discretion, the Court must consider four factors: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 434 (citation omitted). Under Ninth Circuit precedent, the movant "must show that irreparable harm is probable and either: (a) a strong likelihood of success on the merits and that the public interest does not weigh heavily against a stay; or (b) a substantial case on the merits and that the balance of hardships tips sharply in the [movant's] favor." *Leiva-Perez v. Holder*, 640 F.3d 962, 970 (9th Cir. 2011) (per curiam).

## II.  DISCUSSION

### A.  Likelihood of Success on the Merits

In their motion for stay, Defendants argue that they are likely to prevail on appeal for two main reasons: (1) the case is not justiciable because the Plaintiff Immigration Organizations do not have standing to bring their claims; and (2) the Court incorrectly found that the Rule was probably invalid. The Court is not persuaded by these arguments.

As to the first point, Defendants have not carried their burden to show a substantial case that this action is not justiciable. First, Defendants argue that any injury is not traceable to the Rule because the Rule does not cause the "metering" practices that interfere with the Immigration Organizations' functions. ECF No. 52 at 6-7. The Court rejects this argument because a litigant "need not eliminate any other contributing causes to establish its standing." *Barnum Timber Co. v. E.P.A.*, 633 F.3d 894, 901 (9th Cir. 2011). Moreover, the express purpose of the Rule is to "channel [asylum seekers] to ports of entry," by removing alternative avenues to apply for asylum, thereby exposing asylum seekers to the Government's practices. 83 Fed. Reg. 55,934, 55,934 (Nov. 9, 2018). Defendants also suggest – with no citation to any authority – that it is irrelevant whether this interferes with the Immigration Organizations' ability to provide their services, so long as they can still do so to some degree. ECF No. 52 at 6-7. This overlooks well-established binding precedent. *See Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc); *Constr. Indus. Ass'n of Sonoma Cty. v. City of Petaluma*, 522 F.2d 897, 903 (9th Cir. 1975).

Second, Defendants' argument that the zone-of-interests test cannot be satisfied by a third party's interests lacks merit. *See Am. Immigration Lawyers Ass'n v. Reno ("AILA")*, 199 F.3d 1352, 1357 (D.C. Cir. 2000); *FAIC Secs., Inc. v. United States*, 768 F.2d 352, 357-58 (D.C. Cir. 1985) (Scalia, J.). *Mountain States Legal Found. v. Glickman*, 92 F.3d 1228, 1232 (D.C. Cir. 1996), which did not involve third-party standing, is not to the contrary.

Third, Defendants contest whether the Organizations have third-party standing to raise their clients' claims. As an initial matter, Defendants assert that this argument was improperly raised for the first time on reply. ECF No. 52 at 5-6. As noted in the Court's temporary restraining order, Defendants neither requested an opportunity to respond nor raised an objection at the hearing on the TRO, even though Plaintiffs not only made these points in their reply brief but argued them at the hearing. ECF No. 43 at 7 n.8; ECF No. 45 at 50:9-51:6. The Court therefore exercised its discretion to consider the Immigration Organization's third-party standing argument. ECF No. 43 at 7 n.8. The Court likewise now exercises its discretion to consider Defendants' prudential standing objections raised for the first time in their stay motion.

3

United States District Court
Northern District of California

1    Defendants contest only whether there is "some hindrance to the third party's ability to

2  protect his or her own interests." *Powers v. Ohio*, 499 U.S. 400, 411 (1991). Their claim is

3  unpersuasive.[1] As the Organizations point out, courts have generally held that a third-party child's

4  minor status, standing alone, is a sufficient hindrance. *Marin-Garcia v. Holder*, 647 F.3d 666, 670

5  (7th Cir. 2011); *Payne-Barahona v. Gonzales*, 474 F.3d 1, 2 (1st Cir. 2007); *see also Smith v. Org.*

6  *of Foster Families For Equal. & Reform*, 431 U.S. 816, 841 n.44 (1977) ("[C]hildren usually lack

7  the capacity to make that sort of decision [as to how best to protect their interests], and thus their

8  interest is ordinarily represented in litigation by parents or guardians."). While these cases have

9  involved parents or foster parents asserting a child's rights, here, the Organizations' clients are

10  unaccompanied alien minors for whom their attorneys are naturally the "best proponents."

11  *Singleton v. Wulff*, 428 U.S. 106, 114 (1976); *see also Caplin & Drysdale, Chartered v. United*

12  *States*, 491 U.S. 617, 624 n.3 (1989).

13    Moreover, Defendants ignore the practical realities facing the Organization's other clients

14  under the Rule. Any asylum seeker who enters the United States in violation of the Rule in order

15  to contest its validity undertakes a substantial risk of forfeiting an otherwise meritorious asylum

16  claim. As Justice Scalia noted in *MedImmune, Inc. v. Genentech, Inc.*, "where threatened action

17  by government is concerned, we do not require a plaintiff to expose himself to liability before

18  bringing suit to challenge the basis for the threat[.]" 549 U.S. 118, 128-29 (2007); *see also id.* at

19  129 (collecting cases). On the other hand, an asylum seeker who endures the wait to apply for

20

21  _____

    [1] Defendants cite *AILA* for the proposition that asylum seekers may not challenge asylum
22  eligibility policies that have not yet been applied to them. ECF No. 52 at 8. *AILA* will not bear
    the weight Defendants place on it. In *AILA*, the D.C. Circuit addressed a challenge under 8 U.S.C.
23  § 1252(e)(3), which provides for "[j]udicial review of determinations under section 1225(b) of
    [Title 8] and its implementation" only under extremely limited conditions. 199 F.3d at 1358.
24  However, Congress did not impose such restrictions on review of claims pertaining to § 1158,
    such as the ones at issue here, or on asylum determinations in other proceedings, *see* 8 U.S.C.
25  § 1229; 8 C.F.R. § 208.9. As the Supreme Court has observed, where "Congress wanted [a]
    jurisdictional bar to encompass [particular] decisions [under the Illegal Immigration Reform and
26  Immigrant Responsibility Act of 1996] . . . it expressed precisely that meaning." *Kucana v.*
    *Holder*, 558 U.S. 233, 249 (2010). It is therefore unlikely that a challenge to the Attorney
27  General's exercise of § 1158 rulemaking authority falls within § 1252(e)(3). *See id.* ("[W]here
    Congress includes particular language in one section of a statute but omits it in another section of
28  the same Act, it is generally presumed that Congress acts intentionally and purposely in the
    disparate inclusion or exclusion.").

                                             4

United States District Court
Northern District of California

1  asylum at a designated port of entry complies with the Rule – and may therefore lack standing to

2  challenge its validity.  Therefore, as a matter of logic, the only way for an asylum seeker to assert

3  the invalidity of the Rule is to risk summary removal or to forego applying for asylum for the

4  lifespan of the litigation.  And the Supreme Court has permitted attorneys to assert their clients'

5  rights without naming them as parties.  *See Caplin & Drysdale*, 491 U.S. at 623 n.3.

6  Finally, notwithstanding their citations to various jurisdictional provisions of the

7  Immigration and Nationality Act ("INA"), *see* 8 U.S.C. § 1252, Defendants do not argue that they

8  preclude review of Plaintiffs' claims under the Administrative Procedure Act ("APA").  ECF No.

9  52 at 8.  The APA's zone-of-interests test is "not meant to be especially demanding," and

10  "forecloses suit only when a plaintiff's interests are so marginally related to or inconsistent with

11  the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to

12  permit the suit."  *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S.

13  209, 225 (2012) (citations omitted).  Defendants ignore this test in favor of a misplaced focus on

14  whether the INA itself provides an express cause of action.  *See id.* ("We do not require any

15  'indication of congressional purpose to benefit the would-be plaintiff.'" (quoting *Clarke v. Sec.*

16  *Indus. Ass'n*, 479 U.S. 388, 399 (1987)); *Doe v. Trump*, 288 F. Supp. 3d 1045, 1068 (W.D. Wash.

17  2017).

18  Nor have Defendants demonstrated a strong likelihood of success or even a substantial

19  case that the Rule is valid.  Defendants continue to rely on the Attorney General's general

20  authority to promulgate categorical bars, a point no one disputes.  ECF No. 52 at 8-9; *see* ECF No.

21  43 at 21.  But Defendants fail to engage with the specific conflict at issue here: that where

22  "Congress unambiguously stated that manner of entry has no effect on an alien's ability to *apply*

23  for asylum," Defendants cannot plausibly contend that "it can be the *sole* factor by which the alien

24  is *rendered ineligible*."  ECF No. 43 at 21.[2]  And to the extent that Defendants now argue that the

25  

26  [2] Rather than address the statute's own terms, Defendants appear to argue instead that Article 31 of the 1967 U.N. Protocol does not provide an independently enforceable bar against the Rule.

27  ECF No. 52 at 9-10.  But as the Supreme Court has explained, where "the plain language of th[e] statute appears to settle the question," courts look to the U.N. Protocol "to determine only whether there is 'clearly expressed legislative intention' contrary to that language."  *I.N.S. v. Cardoza-*

28  *Fonseca*, 480 U.S. 421, 432 n.12 (1987).  Because Defendants fail to address the statutory

United States District Court
Northern District of California

1    statute is ambiguous and the Rule is entitled to *Chevron* deference, ECF No. 52 at 9, they fail to

2    explain why their interpretation of § 1158 is reasonable, given that the Rule imposes a categorical

3    bar based on a factor that has been universally recognized as bearing little weight, *see* ECF No. 43

4    at 22 (collecting cases).

5          Because the Court's temporary restraining order concluded that the Immigration

6    Organizations had established serious questions going to the merits of their notice-and-comment

7    claims, ECF No. 43 at 27-29, it follows that Defendants also have shown serious questions going

8    to the merits. *Cf. Leiva-Perez*, 640 F.3d at 970 (explaining that the "serious questions" test

9    requires less than "showing that success is more likely than not"). Nonetheless, the existence of

10   such questions does not support a stay. First, Defendants have not shown a probability of

11   demonstrating that the Rule is valid, so the presence or absence of defects in the process by which

12   it was promulgated are largely immaterial to whether it should remain in place. Second, as

13   explained below, Defendants have not shown that "the balance of hardships tips sharply in [their]

14   favor." *Id.* at 970.

15         **B.      Irreparable Injury**

16         At the outset, the Court is compelled to reject Defendants' argument that an injunction

17   against the Executive Branch "a fortiori" imposes irreparable injury. *See Washington v. Trump*,

18   847 F.3d 1151, 1168 (9th Cir. 2017)*, cert. denied sub nom. Golden v. Washington*, 138 S. Ct. 448

19   (2017) ("[T]o the extent that the Government claims that it has suffered an institutional injury by

20   erosion of the separation of powers, that injury is not 'irreparable.' It may yet pursue and vindicate

21   its interests in the full course of this litigation."); *Texas v. United States*, 787 F.3d 733, 767-68

22   (5th Cir. 2015) (finding no irreparable injury because, while the United States "claims that the

23   injunction offends separation of powers and federalism, . . . it is the resolution of the case on the

24   merits, not whether the injunction is stayed pending appeal, that will affect those principles.").

25   Cases identifying the irreparable harm from the injunction of State *statutes* do not hold otherwise.

26   *See Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *O Centro*

27

28   _____

     language of § 1158, their arguments about the U.N. Protocol are of little moment.

1  *Espirita Beneficiente Uniao De Vegetal v. Ashcroft*, 314 F.3d 463, 467 (10th Cir. 2002); *cf. N.M.*

2  *Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1255-56 (10th Cir. 2017)

3  (distinguishing *King* where "Federal Appellants have been enjoined from effectuating their

4  interpretation of the Act and their internal regulations").[3]

5      Defendants' remaining claims of irreparable injury are inseparable from their arguments

6  that the Rule best serves the public interest by avoiding harm to potential asylum seekers.  ECF

7  No. 52 at 4-5.  As explained below, the Court finds those arguments unpersuasive.

8      **C.**    **Substantial Injury to Other Parties**

9      Defendants' argument on the third factor fails on both fronts.  First, Defendants' argument

10  that the Immigration Organizations *themselves* must have suffered "irreparable harm," ECF No. 52

11  at 6, fails because Defendants have not shown serious questions on third-party standing.  Further,

12  Defendants conflate the preliminary injunction standard with "whether issuance of the stay will

13  substantially injure the other parties interested in the proceeding."  *Nken*, 556 U.S. at 433

14  (citations omitted).  This test permits the Court to consider the harm to non-parties.  *See Latta v.*

15  *Otter*, 771 F.3d 496, 500 (9th Cir. 2014); *Lair v. Bullock*, 697 F.3d 1200, 1215 (9th Cir. 2012).

16  Defendants raise no credible argument that asylum seekers are not parties "interested" in the

17  validity of the Rule, and the TRO Order details the injuries they face.  *See* ECF No. 43 at 30-31.

18      Second, Defendants' argument that the Immigration Organizations suffer no harm because

19  they may now comment on the Rule is not supported by authority and does not address cases

20

21  [3] Nor does a requirement to implement the existing statutory scheme per the status quo – under which the government retains the discretion to deny asylum in every case – come close to the

22  affirmative intrusions required by the injunctions stayed in other cases.  *See I.N.S. v. Legalization Assistance Project of Los Angeles Cty. Fed'n of Labor*, 510 U.S. 1301, 1302-03 (1993)

23  (O'Connor, J., in chambers) (injunction "requiring the INS to, among other things, identify and adjudicate legalization applications filed by certain categories of applicants, not arrest or deport

24  certain classes of immigrants, and temporarily grant certain classes of immigrants stays of deportation and employment authorizations"); *Heckler v. Lopez*, 463 U.S. 1328, 1331 (1983)

25  (finding injunction would likely be reversed on scope alone, regardless of the merits, because "its mandatory nature, its treatment of the statutory requirement of exhaustion of administrative

26  remedies, and its direction to the Secretary to pay benefits on an interim basis to parties who have neither been found by the Secretary nor by a court of competent jurisdiction to be disabled,

27  significantly interferes with the distribution between administrative and judicial responsibility for enforcement of the Social Security Act which Congress has established"); *Adams v. Vance*, 570

28  F.2d 950, 954 (D.C. Cir. 1978) ("request for an order directing action by the Secretary of State in foreign affairs").

United States District Court
Northern District of California

1    holding otherwise.  *See* ECF No. 43 at 31; *California v. Health & Human Servs.*, 281 F. Supp. 3d

2    806, 830 (N.D. Cal. 2017).

3        **D.**    **Public Interest**

4        The last factor in the analysis is the public interest.  As to this point, the Government

5    largely repeats the arguments from its prior brief.  Similarly, the Court arrives at the same

6    conclusion regarding where the public interest lies at this stage of the case.  ECF No. 43 at 32-33.

7    Noting Congress's clearly-expressed intent regarding the availability of asylum, the Court gives

8    substantial weight to the political branches' control over immigration, *see Landon v. Plascencia*,

9    459 U.S. 21, 34 (1982), and in particular that the Supreme Court has "repeatedly emphasized that

10   over no conceivable subject is the legislative power of Congress more complete than it is over the

11   admission of aliens."  *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (citation omitted).  The Court also

12   considers that "where the agency's discretion has been clearly constrained by Congress," courts

13   have concluded that "there is an overriding public interest . . . in the general importance of an

14   agency's faithful adherence to its statutory mandate."  *Ramirez v. U.S. Immigration & Customs*

15   *Enf't*, 310 F. Supp. 3d 7, 33 (D.D.C. 2018) (alteration in original) (second quoting *Jacksonville*

16   *Port Auth. v. Adams*, 556 F.2d 52, 59 (D.C. Cir. 1977)).  The Rule deviates substantially from this

17   mandate.

18       In addition to these more abstract considerations, Defendants argue that the public interest

19   suffers a more practical harm because, while the Rule is enjoined, more asylum seekers will cross

20   illegally between ports of entry.  ECF No. 52 at 4-5.  Defendants have the right, as they have

21   asserted, to "use every legal tool available to halt this dangerous and illegal practice."  ECF No. 52

22   at 4.  But Defendants have not shown even serious questions that the Rule is, in fact, legal.

23   Moreover, the record to date reveals that, far from using every available tool, Defendants have

24   been actively deterring asylum seekers from ports of entry.  *See, e.g.*, ECF No. 35-3 at 17-28.

25       Finally, the Court rejects Defendants' implicit suggestion that the only way to fix a statute

26   they disagree with is to issue a rule that directly contravenes the statute.  As Justice Gorsuch

27   noted, "[i]f a statute needs repair, there's a constitutionally prescribed way to do it.  It's called

28   legislation.  To be sure, the demands of bicameralism and presentment are real and the process can

1    be protracted.  But the difficulty of making new laws isn't some bug in the constitutional design:

2    it's the point of the design, the better to preserve liberty."  *Perry v. Merit Sys. Prot. Bd.*, 137 S. Ct.

3    1975, 1990 (2017) (Gorsuch, J., with Thomas, J., dissenting); see also U.S. Const., art. I, § 1 ("All

4    legislative Powers herein granted shall be vested in a Congress of the United States[.]").

5        The motion is denied.

6        **IT IS SO ORDERED.**

7    Dated:  November 30, 2018



8

9                        JON S. TIGAR
                      United States District Judge

10

11

12

United States District Court
Northern District of California

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28